ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :    SEALED INDICTMENT

     -v.-
                                    :    S8 09 Cr. 524
CHIGBO PETER UMEH,
     a/k/a "Emeka Okonkwo,"
     a/k/a "Chigbogu Umehwunne,"
     a/k/a "Mike,"                  :
     a/k/a "Chibue,"
     a/k/a "El Negro,"              :
JORGE IVAN SALAZAR CASTANO,
     a/k/a "El Chavel,"             :
KONSTANTIN YAROSHENKO,
NATHANIEL FRENCH,                   :
     a/k/a "The Frenchman,"
     a/k/a "The Expert," and        :
KUDUFIA MAWUKO,
     a/k/a "Marco,"                 :

                  Defendants.       :

- - - - - - - - - - - - - - - - - -x

JUDGE RAKOFF

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/25/10

COUNT ONE

NARCOTICS IMPORTATION CONSPIRACY

     The Grand Jury charges:

BACKGROUND

     1.   During the last decade, drug trafficking organizations based in South America have increasingly used countries along or near the West African coast as trans-shipment hubs for importing massive quantities of cocaine to be later distributed in Europe or elsewhere within Africa. Through a combination of privately owned aircraft and maritime vessels, these organizations, predominately based in Colombia and Venezuela, have transported hundreds of tons of cocaine, worth

billions of dollars, to places such as Guinea Bissau, Guinea Conakry, Sierra Leone, Togo, Mali, Ghana, Nigeria and Liberia. In so doing, representatives of these drug trafficking organizations have often sought to bribe high-level public officials with large cash payments and narcotics in order to ensure the safe passage, storage, and distribution of their cocaine shipments.

   2. Since in or about June 2007, certain drug trafficking organizations based in Colombia and Venezuela have sought to establish a new base of operations in Liberia, which they have intended to use as a trans-shipment point for the distribution of thousands of kilograms of cocaine in Europe and elsewhere in Africa.  Together with other co-conspirators, CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," KONSTANTIN YAROSHENKO, NATHANIEL FRENCH, a/k/a "The Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, attempted to bribe high-level officials in the Liberian Government in order to protect shipments of vast quantities of cocaine.  In seeking to ensure the safe passage of their cocaine shipments, the defendants agreed, among other things, to make payments in cash and also in the form of cocaine, a portion of which cocaine they

understood would be imported from West Africa into the United States.

3. According to CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," the defendant, one of the planes that he was arranging to land in Liberia would contain four tons of cocaine, which originally had been supplied to the conspiracy and protected in Colombia by the *Fuerzas Armadas Revolucionarias de Colombia* (hereinafter, the "FARC"). The FARC is an international terrorist group dedicated to the violent overthrow of the democratically elected Government of Colombia. The FARC has also evolved into the world's largest supplier of cocaine. The United States Secretary of State has designated the FARC as a foreign terrorist organization since in or about October 1997.

### THE DEFENDANTS

4. At all times relevant to this Indictment, CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," the defendant, was a broker who assisted various international narcotics suppliers in shipping numerous tons of cocaine from South America to West Africa, from where the cocaine was transported to Europe or elsewhere within Africa.

5. Together with his co-conspirators, CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a

"Mike," a/k/a "Chibue," a/k/a "El Negro," the defendant, attempted to bribe individuals whom he believed to be high-level officials within the Government of Liberia. The purpose of these bribes was to ensure the safe transport of at least three large trans-Atlantic shipments of cocaine. These three cocaine shipments were to be transported from South America to Liberia, a location which UMEH and his co-conspirators intended to use as a trans-shipment point for other locations within West Africa and Europe. UMEH understood that from Liberia, portions of this cocaine would subsequently be imported into the United States. Specifically, UMEH attempted to facilitate:

    (a) a shipment of approximately 4,000 kilograms of cocaine, which was to be flown from Venezuela to Monrovia, Liberia;

    (b) a shipment of approximately 1,500 kilograms of cocaine, which was to be flown from Venezuela to Monrovia, Liberia, on an aircraft originating in Panama; and

    (c) a shipment of approximately 500 kilograms of cocaine, which was to be transported by a ship from Venezuela to a location off the coast of Liberia.

    6. At all times relevant to this Indictment, JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," the defendant, was a cocaine supplier based in Colombia and Spain, who, together with his co-conspirators, was capable of transporting thousand-

4

kilogram quantities of cocaine, by airplane and by boat, from South America to various locations in West Africa, for distribution within Africa and for trans-shipment to Europe and other markets. SALAZAR CASTANO, together with his co-conspirators, sent large commercial aircraft containing cocaine from South America to West Africa, as well as smaller, private airplanes that departed from clandestine airstrips in Venezuela. SALAZAR CASTANO was also responsible for negotiating payments in the form of cash and cocaine to individuals whom he believed to be corrupt Liberian officials; these payments were intended to guarantee the safe passage of the South American cocaine into West Africa. SALAZAR CASTANO understood that from Liberia, portions of this cocaine would subsequently be imported into the United States.

      7.  At all times relevant to this Indictment, KONSTANTIN YAROSHENKO, the defendant, was an aircraft pilot and aviation transportation expert who transported thousand-kilogram quantities of cocaine throughout South America, Africa, and Europe. YAROSHENKO indicated that he utilized and managed at least five different airplanes through which he arranged for the transportation of this cocaine. In his capacity as a pilot and businessman, YAROSHENKO agreed to supply the aircraft, pilots, and crew that were to be used for shipments of cocaine from South America to Liberia, as well as from Liberia to other locations

5

within West Africa.  YAROSHENKO understood that from Liberia, portions of this cocaine would subsequently be imported into the United States.

       8.  At all times relevant to this Indictment, NATHANIEL FRENCH, a/k/a "The Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, worked with CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," the defendant, on behalf of drug suppliers to transport ton-level quantities of cocaine by boat across the Atlantic Ocean from South America to West Africa.  FRENCH primarily assisted the drug suppliers by providing logistical support and coordination for maritime shipments.  MAWUKO primarily assisted the drug suppliers through his extensive knowledge of maritime navigation, including the development of sea routes that would evade law enforcement radar, and his investigations of sites that were especially well-suited for loading and unloading the cocaine.  FRENCH and MAWUKO understood that from Liberia, portions of the cocaine subsequently would be imported into the United States.

## STATUTORY ALLEGATIONS

       9.  From at least in or about June 2007, up to and including in or about May 2010, CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," KONSTANTIN YAROSHENKO, NATHANIEL FRENCH, a/k/a "The

6

Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, each of whom will first enter the United States in the Southern District of New York, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

    10. It was a part and an object of the conspiracy that CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," KONSTANTIN YAROSHENKO, NATHANIEL FRENCH, a/k/a "The Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, and others known and unknown, would and did distribute a controlled substance, to wit, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending that such substances would be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States, in violation of Sections 812, 959(a), 960(a)(3) and 960(b)(1)(B) of Title 21, United States Code.

## OVERT ACTS

    11. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed:

    a.  In or about June 2007, two co-conspirators not named herein ("CC-1" and "CC-2"), who were acting on behalf

7

of large-scale cocaine traffickers based in Colombia and Venezuela, traveled to Liberia in order to establish a new base of operations in West Africa. CC-1 and CC-2 expected that Liberia could serve as a suitable trans-shipment point for South American cocaine — a secure location where vast quantities of cocaine arriving by ship or plane could be received, and then distributed into other markets. During this trip, CC-1 and CC-2 made efforts to establish contact with the son of the President of Liberia and began to cultivate a relationship with CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," the defendant, and his associates.

      b. On or about May 15, 2009, in Liberia, UMEH and JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," the defendant, met with two individuals they knew to be Liberian government officials – the Director and Deputy Director of the Republic of Liberia National Security Agency ("RLNSA"), both of whom (unbeknownst to UMEH and SALAZAR CASTANO) were working jointly with the United States Drug Enforcement Administration ("DEA") in an undercover capacity ("UC-1" and "UC-2", respectively). UC-1, the Director of the RLNSA, is also the son of the President of Liberia, and the same official with whom CC-1 and CC-2 attempted to establish contact during their trip to Liberia in or about June 2007, referenced in paragraph 11(a) above. During the meeting on or about May 15, 2009, UMEH and SALAZAR CASTANO agreed

to pay UC-1 and UC-2, who were acting in coordination with the DEA, in connection with the shipment of, at first, several hundred kilograms of cocaine from South America to Liberia.

        c.    On or about May 17, 2009, in Liberia, UMEH and SALAZAR CASTANO met with UC-1 and UC-2, as well as a confidential source working with the DEA (the "CS"). During this meeting, UMEH and SALAZAR CASTANO discussed paying $400,000 to UC-1 and UC-2 to ensure the safe passage of a shipment of approximately 700 kilograms of cocaine from South America to Liberia. Approximately 100 kilograms of this cocaine - the CS's share, as payment for his/her assistance to UMEH and SALAZAR CASTANO in Liberia - was then to be imported into the United States.

        d.    During the same meeting in Liberia, on or about May 17, 2009, UMEH stated that he, SALAZAR CASTANO, and their associates had previously sent an aircraft containing 900 kilograms of cocaine into Guinea Bissau. UMEH also stated that in addition to this shipment, they had previously sent aircraft containing cocaine into Liberia and Guinea Conakry.

        e.    On or about October 10, 2009, UMEH met in Liberia with UC-1, UC-2, and the CS. During this meeting, UMEH discussed paying an initial deposit of $200,000 to UC-1 and UC-2 in connection with the shipment of approximately 2,000 kilograms of cocaine from South America to Liberia, approximately 50 kilograms of which (representing the CS's payment) was to be

imported illegally into the United States. UMEH also discussed sending a separate shipment of an additional 2,000 kilograms of cocaine from South America to Liberia before the end of the year. During this meeting, UMEH indicated that the South American drug suppliers would provide an additional security payment of $1.4 million to UC-1 and UC-2 following the safe arrival of the cocaine in Liberia.

    f. On or about October 12, 2009, UMEH met with UC-2 and the CS in Liberia, and agreed to wire a $200,000 security payment, in connection with the planned shipment of 2,000 kilograms of cocaine, to a bank account designated by the CS.

    g. On or about October 21, 2009, during a telephone conversation, UMEH stated that he would deliver the security payment owed to UC-1 and UC-2 of approximately $200,000 in cash in Lagos, Nigeria, in connection with the planned shipment of 2,000 kilograms of cocaine to Liberia.

    h. On or about October 26, 2009, at UMEH's direction, one of his associates delivered $100,000 in cash in Lagos, Nigeria as a down payment for the security services to be provided by UC-1 and UC-2.

    i. In or about February 2010, after being introduced to the CS by UMEH, CC-1 contacted the CS and asked if the CS knew of any airplanes available in Africa that could

assist CC-1's Colombian drug trafficking organization in the transportation of 4,000 kilograms of cocaine.

j.  In early March 2010, KONSTANTIN YAROSHENKO, the defendant, met in Ukraine with the CS.  During a series of meetings in the first week of March 2010, YAROSHENKO agreed to provide an aircraft and crew in order to transport the 4,000 kilograms of cocaine referenced above from South America to Liberia, and thereafter to transport at least a portion of that cocaine (representing the CS's commission) from Liberia to Ghana, so that this portion of cocaine could be loaded onto a direct flight from Accra, Ghana, to New York.

k.  On or about March 11, 2010, at the request of CC-1, YAROSHENKO emailed pictures and detailed specifications for two airplanes, an Antonov 12 and an Ilyushin 76, which airplanes YAROSHENKO had initially proposed using to transport cocaine from Liberia to other points within Africa.

l.  On or about May 11, 2010, YAROSHENKO arrived in Monrovia, Liberia, in order to meet with UMEH and members of the Colombian drug trafficking organization whom UMEH represented for the purpose of discussing logistics, pricing, and security for transatlantic drug shipments as well as drug shipments between Liberia and Ghana.

m.  On or about May 11, 2010, in Monrovia, Liberia, YAROSHENKO met with the CS and discussed YAROSHENKO's ability to transport cocaine within Africa.  During this meeting,

YAROSHENKO explained that he had aircraft that could be ready to provide such transportation within a matter of days.

        n.    On or about May 12, 2010, in Monrovia, Liberia, YAROSHENKO met with the CS and discussed what YAROSHENKO would charge in order to transport 4,000 kilograms of cocaine from Venezuela to Liberia, and thereafter to transport a portion of the cocaine from Liberia to Ghana, in order to assist the CS's efforts to import that portion of the cocaine into the United States. At the May 12 meeting, YAROSHENKO stated that he would charge $4.5 million to transport the cocaine from Venezuela to Liberia, and an additional $1.2 million to transport the cocaine from Liberia to Ghana.

        o.    On or about May 12, 2010, in Monrovia, Liberia, UMEH met with the CS and discussed the details of several shipments of cocaine. UMEH explained that a maritime shipment of approximately 500 kilograms of cocaine had already departed for Liberia, and requested UC-1's assistance in order to obtain a Liberian military vessel to offload the cocaine some distance from the Liberian coast. UMEH also discussed the above-referenced 4,000 kilogram shipment of cocaine, which was to be sent to Liberia from Venezuela by airplane. Finally, UMEH discussed the planned arrival of an additional shipment of approximately 1,500 to 2,000 kilograms of cocaine, which was to be sent from Venezuela to Liberia, on an airplane originating in

Panama.  UMEH told the CS that he had arranged for all of these shipments to arrive within a few weeks of each other.

    p. On or about May 13, 2010, at a meeting in Monrovia, Liberia, YAROSHENKO discussed with UMEH the provision of aircraft for the purpose of transporting cocaine from South America to Liberia, and thereafter from Liberia to Nigeria and Ghana (for distribution in Ghana, as well as for further transport to the United States on behalf of the CS).  During this meeting, UMEH also asked YAROSHENKO whether he had people who could assist UMEH in distributing cocaine in Ukraine and Russia.

    q. On or about May 13, 2010, in Monrovia, Liberia, UMEH, NATHANIEL FRENCH, a/k/a "The Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, attended a meeting.  During the meeting, FRENCH and MAWUKO provided coordinates for a maritime location off the shore of Liberia at which a ship that had recently departed Venezuela with approximately 500 kilograms of cocaine would arrive.  During this meeting, UMEH explained that this shipment of 500 kilograms of cocaine was the first of four maritime shipments to be received off the coast of Liberia within the next few weeks.

    r. On or about May 13, 2010, during a meeting in Monrovia, Liberia, UMEH and YAROSHENKO agreed upon a price of $4.5 million for a future air shipment of five tons of cocaine from South America to West Africa.  UMEH and YAROSHENKO also discussed prices for future shipments of cocaine into Russia.

During the same meeting, the CS indicated - and UMEH and YAROSHENKO acknowledged - that a portion of each shipment of cocaine arriving in Liberia would be sent to Ghana, from where it would be loaded, on behalf of the CS, onto a direct flight to New York.

    s. On or about May 14, 2010, in Monrovia, Liberia, UMEH, FRENCH, and MAWUKO met with UC-2 and the CS. During this meeting, UMEH, FRENCH, and MAWUKO discussed the coordinates for the maritime shipment that was to arrive from Venezuela, and discussed the transport of this cocaine from Liberia to Ghana by plane. UMEH, FRENCH, and MAWUKO told the CS that they all had an ownership interest in the cocaine that would be flown from Liberia to Ghana. During this discussion, the CS explained to FRENCH and MAWUKO that they would not be competing for customers in the cocaine distribution market in Ghana, because the CS planned to transport his/her portion of each cocaine shipment on the direct flight from Ghana to New York for distribution in the United States.

    t. During this same meeting on or about May 14, 2010, UMEH explained that he and his South American drug suppliers, whom he identified as the partners of FRENCH and MAWUKO, had been working to put together a 2,000 kilogram shipment of cocaine in February 2010, but the cocaine and the crew had been lost at sea, when their airplane crashed due to

14

mechanical problems on the way from Curacao to Santo Domingo, Dominican Republic.

u.  During this same meeting on or about May 14, 2010, UMEH, FRENCH, and MAWUKO tried to enlist the help of UC-2 to recover from the Liberian Government the "Blue Atlantic," a ship that had been seized off the coast of Liberia on or about January 31, 2008, by French naval vessels, with approximately 1,200 kilograms of cocaine on board, and thereafter turned over to the Liberian government.  UMEH, FRENCH, and MAWUKO explained that the same Colombian drug supplier who was responsible for sending the pending maritime shipment referred to in paragraph 11(q) above was also the owner of the "Blue Atlantic" and the cocaine that was seized in 2008.

v.  On or about May 15, 2010, at a meeting in Monrovia, Liberia, YAROSHENKO discussed his ability to transport future shipments of cocaine in quantities as high as 6 to 7 tons.

w.  During that same meeting on or about May 15, 2010, UMEH explained that the four-ton shipment of cocaine being discussed originated from the FARC.  UMEH explained that the FARC was fully supportive of the cocaine shipments, and that there was no reason to be concerned about the security of the shipments while in Colombia, because the FARC would guarantee their security when the cocaine was transported within Colombia.

x.  On or about May 17, 2010, in Monrovia, Liberia, UMEH met with the CS and discussed his current

involvement in Nigeria in the clandestine production of Ecstasy, as well as the purest form of methamphetamine, commonly referred to as "ice." UMEH proposed to the CS a business plan to construct a laboratory in Liberia and to utilize UC-1's power and influence in order to import ephedrine, a constituent chemical for the production of methamphetamine, from China, India, the Czech Republic, and Germany, in order to support the production of 20 kilograms of "ice" every few days. UMEH told the CS that he had ten Mexican chemists who would operate the laboratory, and he identified the best markets for the consumption of "ice" as Japan and the United States, claiming that the sale price of the "ice" would be $80,000 per kilogram.

(Title 21, United States Code, Section 963.)

## FORFEITURE ALLEGATION

12. As a result of committing the controlled substance offense alleged in Count One of this Indictment, CHIGBO PETER UMEH, a/k/a "Emeka Okonkwo," a/k/a "Chigbogu Umehwunne," a/k/a "Mike," a/k/a "Chibue," a/k/a "El Negro," JORGE IVAN SALAZAR CASTANO, a/k/a "El Chavel," KONSTANTIN YAROSHENKO, NATHANIEL FRENCH, a/k/a "The Frenchman," a/k/a "The Expert," and KUDUFIA MAWUKO, a/k/a "Marco," the defendants, shall forfeit to the United States, pursuant to 21 U.S.C. § 970, any and all property constituting and derived from any proceeds that the defendants obtained directly and indirectly as a result of the said violation and any and all property used and intended to be used

in any manner or part to commit and to facilitate the commission of the violation alleged in Count One of this Indictment, including but not limited to, a sum of money representing the amount of proceeds obtained as a result of the offense described in Count One of this Indictment.

<u>Substitute Assets Provision</u>

13.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 970, to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property.

(Title 21, United States Code, Sections 963 and 970.)

_____          _____
FOREPERSON                               PREET BHARARA
                                         United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

- v -

CHIGBO PETER UMEH,
JORGE IVAN SALAZAR CASATNO,
KONSTANTIN YAROSHENKO,
NATHANIEL FRENCH,
KUDUFIA MAWUKO,

Defendants.

---

**SEALED INDICTMENT**

S8 09 Cr. 524

(Title 21, United States Code,
Sections 963 and 970.)


PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.