# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                :

    - v. -                                                :
                                          S9 09 Cr. 524 (JSR)

KONSTANTIN YAROSHENKO, et al.,   :

         Defendants.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        I, SAM GAYE, Supervisory Special Agent, Drug Enforcement Administration ("DEA"), pursuant to Title 28, United States Code, Section 1746, hereby declare under penalty of perjury:

        1.     I make this affidavit in response to the pre-trial motion to dismiss (and accompanying exhibits) filed by KONSTANTIN YAROSHENKO, the defendant, in the above-captioned matter.

        2.     I am a Supervisory Special Agent with the DEA. I have been with the DEA for approximately 23 years, and I am currently assigned to the DEA's Office in Lagos, Nigeria. As a Supervisory Special Agent, I have participated in investigations involving, among other things, the unlawful importation and distribution of controlled substances in violation of 21 U.S.C. §§ 812, 841(a)(1), 846, 952, 959, 960 and 963.

        3.     Beginning in or about 2007, I became involved in an investigation into whether several individuals – including certain defendants in the above-captioned matter – were conspiring to transport narcotics from Colombia to Liberia with knowledge that a portion of the narcotics would be imported into the United States. As alleged in the Indictment, certain of the defendants agreed to pay money to Republic of Liberia National Security Agency ("RLNSA") officials (who were working in an undercover capacity) for safe passage of narcotics from Colombia to Liberia. During this investigation, we eventually identified one of the suspects as KONSTANTIN YAROSHENKO.

        4.     During the course of this investigation, I worked with officials from the Government of Liberia and a Confidential Source (the "CS") who was involved in this case. My role in this investigation was, among other things, to supervise and oversee the portion of this investigation that was conducted in Africa. My duties included meeting with RLNSA officials, updating them about the case, and meeting with the CS and the RLNSA undercover officers who were involved in this case.

1

5.   The facts in this affidavit are based upon my own personal observations, as well as on conversations I had with foreign and United States law enforcement officers involved in this investigation. Since this affidavit is made for the limited purpose of responding to YAROSHENKO's pre-trial motions, I have not set forth each and every fact learned during the course of this investigation. Unless otherwise indicated, where actions, conversations, and statements of others are related herein, they are related in substance and in part.

6.   The investigation into YAROSHENKO and his co-defendants involved, among other things, several video and audio recorded meetings between YAROSHENKO and the CS. On Friday, May 28, 2010, in the late afternoon, I learned from DEA special agents involved in this investigation that the CS had called YAROSHENKO on the telephone and asked YAROSHENKO to attend a meeting at RLNSA Headquarters (in Monrovia, Liberia) that same day. I was not present for this call, but learned from DEA agents that the purported purpose of the meeting was to discuss a planned narcotics transaction. The CS told YAROSHENKO that someone from RLNSA would pick him up, outside YAROSHENKO's hotel in Monrovia, Liberia.

7.   Subsequently, I directed an RLNSA officer to travel (in an undercover capacity) to YAROSHENKO's hotel, to pick YAROSHENKO up, and to bring him back to RLNSA Headquarters for YAROSHENKO's purported meeting with the CS. At approximately 5:30 or 6:00 p.m. (on May 28, 2010), I observed YAROSHENKO arrive at RLNSA Headquarters (in Monrovia, Liberia). When YAROSHENKO arrived at RLNSA Headquarters, his head was not covered in any mannner and he was not handcuffed.

8.   RLNSA officers brought YAROSHENKO to a fourth floor conference room, near the RLNSA Director's Office. I was present in this room (with approximately two RLNSA officers) when YAROSHENKO entered. YAROSHENKO had a computer with him and appeared normal and was dressed in street clothes; he was laughing and appeared to be expecting to meet the CS. Shortly after YAROSHENKO arrived in the fourth floor conference room, I observed RLNSA officers arrest him. When RLNSA officers arrested YAROSHENKO, he initially expressed his belief that this was a joke. YAROSHENKO did not resist arrest in any way. Instead, he was calm and relaxed.

9.   After YAROSHENKO was arrested, I observed RLNSA officers bring YAROSHENKO to a conference room on the first floor of RLNSA Headquarters (the "RLNSA Conference Room"). YAROSHENKO was in this conference room for approximately twenty minutes and I was present in this conference room for portions of this meeting. In the RLNSA Conference Room, I observed RLNSA officials instruct YAROSHENKO to remove his clothes, so that YAROSHENKO could be physically examined for possession of weapons or any contraband. YAROSHENKO complied with this directive.

2

10. I personally observed YAROSHENKO during this physical examination. I did not observe any physical bruises, wounds, or injuries on YAROSHENKO's body that indicated he had been mistreated or abused before arriving at RLNSA Headquarters. Similarly, during this physical examination, I did not hear YAROSHENKO complain about ever being mistreated in any way before he arrived at RLNSA Headquarters.

11. At the conclusion of this examination, I observed RLNSA officials handcuff YAROSHENKO and then take him to an office on the first floor of RLNSA Headquarters(the "RLNSA Office"). Based on discussions with RLNSA officers, and based on my own personal observations (as described below), I know that YAROSHENKO was held in the RLNSA Office – as opposed to a prison cell – during his time in RLNSA custody, which was from the evening of May 28, 2010 until approximately the afternoon of Sunday, May 30, 2010.

12. I saw the RLNSA Office and was present when YAROSHENKO was first brought there. The RLNSA Office appeared like a regular, business office. It had a desk, chairs, and a window. I did not see any stains of blood or excrement anywhere in the RLNSA Office. Nor did I see any bats, metal hooks, or rope in the RLNSA Office. After a brief period, I left the RLNSA Office. When I left, YAROSHENKO was still in the RLNSA Office and appeared relaxed. I requested that no RLNSA officers question or speak with YAROSHENKO about the offenses for which he had been indicted in this District.

13. While YAROSHENKO was in RLNSA custody, and before DEA agents processed him at RLNSA on May 30, 2010 (discussed below), I visited RLNSA Headquarters and observed YAROSHENKO on approximately 3-4 occasions. My visits spanned from approximately the evening of May 28, 2010 until the morning of May 30, 2010. Each time I observed YAROSHENKO during these visits, he was in the RLNSA Office. I visited RLNSA Headquarters during this time-frame in order to check on YAROSHENKO and other individuals, including Ali Sesay, Gennor Jalloh, Gilbrilla Kamara, and YAROSHENKO's co-defendant Chigbo Peter Umeh (the "Additional Defendants") (collectively, the "Defendants"). I made these visits to ensure that the Defendants were still in custody, to verify that they were being properly guarded by RLNSA officers and had not escaped, and to confirm that they were being treated professionally and appropriately.[1]

   a. Each time I observed YAROSHENKO in the RLNSA Office, I saw one guard outside the Office and I saw YAROSHENKO inside the office, detained with leg irons.

---

[1] Ali Sesay, Gennor Jalloh, and Gilbrilla Kamara are defendants in *United States v. Gilbrilla Kamara*, 10 Cr. 457 (WHP).

3

    b. During these occasions, I never saw anyone physically abuse or mistreat YAROSHENKO. Similarly, I never observed any bruises, wounds, or injuries on YAROSHENKO's body that indicated he was physically abused or mistreated while he was in RLNSA custody.

    c. During one of my visits, I saw YAROSHENKO eating a sandwich in the RLNSA Office. During a separate visit, I saw YAROSHENKO sleeping on a chair in the RLNSA Office.

    d. During these occasions, YAROSHENKO appeared relaxed, composed, and a bit tired. While I did not question YAROSHENKO during these visits, YAROSHENKO never expressed to me – or to anyone else in my presence – that he had been mistreated in any way during his time in RLNSA custody.

    e. During these visits, I did not see any RLNSA official (or any other law enforcement official (foreign or domestic)) question YAROSHENKO about the offenses for which he was indicted or about anything related to those offenses. At no point during these visits did I see the CS or any DEA special agent or employee at RLNSA Headquarters.

  14. In addition to observing YAROSHENKO in RLNSA custody, I also called RLNSA Headquarters periodically (about every 4-5 hours) to check on the status of the Defendants. I did this for the same reasons outlined paragraph 13 above. During these phone calls, RLNSA officials advised me that YAROSHENKO and the Additional Defendants were provided three meals per day. In addition, RLNSA officials advised me that they had a medical director available to check on YAROSHENKO's and the Additional Defendants' medical conditions, if needed. No RLNSA official ever told me that YAROSHENKO had been mistreated or had ever complained about his treatment in RLNSA custody. RLNSA officials told me that YAROSHENKO was eating and had been permitted to shower.

  15. On Sunday, May 30, 2010, in the late morning, DEA special agents arrived at RLNSA Headquarters. I was present when DEA agents arrived. Eventually, the DEA agents were brought to the RLNSA Conference Room. Each of the Defendants was separately brought into the RLNSA Conference Room and processed. I was present for portions of the processing of YAROSHENKO. During the portions at which I was present, I did not observe anyone mistreat or harm YAROSHENKO. In addition, I did not observe any bruises, wounds, or injuries on YAROSHENKO's body that indicated he had been mistreated or abused while in custody at RLNSA Headquarters.

  16. After each Defendant was processed, the Defendants were brought to a bus outside RLNSA Headquarters. A convoy (with a police escort) then drove the Defendants to the Roberts International Airport in Liberia (the "Airport"). I was in one of

4

the cars that was part of this convoy.   Once we arrived at the Airport, I did not see (or interact with) YAROSHENKO.   After the plane carrying YAROSHENKO and the Additional Defendants departed, I left the Airport.

17. Since YAROSHENKO and the Additional Defendants arrived in the United States, I have continued to communicate with RLNSA officials about this case. No RLNSA official has ever advised me that YAROSHENKO was mistreated while in RLNSA custody.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on
this 27th day of October 2010

Lagos, Nigeria

SAM GAYE
Supervisory Special Agent
Drug Enforcement Administration