UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | **SENTENCING SUBMISSION** |
| - v. - | : |  |
| KONSTANTIN YAROSHENKO, | : | S9 09 Cr. 524 (JSR) |
| Defendant. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - x

**SENTENCING SUBMISSION OF
THE UNITED STATES OF AMERICA**

PREET BHARARA
*United States Attorney for the
Southern District of New York
Attorney for the United States
of America*

RANDALL W. JACKSON
CHRISTOPHER L. LAVIGNE
Assistant United States Attorneys,
Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

UNITED STATES OF AMERICA                **SENTENCING**
                                        :                **SUBMISSION**

     - v. -
                                         :

KONSTANTIN YAROSHENKO,            S9 09 Cr. 524 (JSR)
                                         :

            Defendant.
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          The Government respectfully submits this memorandum in advance of the

sentencing of defendant Konstantin Yaroshenko, scheduled for September 7, 2011.

          For the reasons discussed below, the appropriate range under the United States

Sentencing Guidelines (the "Guidelines") for Yaroshenko is a term of imprisonment of 360

months to life. Taking into account the facts and circumstances of this case, along with the

factors enumerated under Title 18, United States Code, Section 3553(a), a sentence of

imprisonment within this Guidelines range is a fair and reasonable sentence.

## BACKGROUND

          Starting in or about June 2009, Konstantin Yaroshenko – a Russian pilot who had

spent years transporting cocaine within and around Africa – began speaking with an individual

named "Paddy McKay" about purchasing an Antonov-12 airplane (located in Liberia) with an

extended fuel bladder system. (Tr. 313, GX 300T-1.)[1] Unbeknownst to Yaroshenko at the time,

"McKay" ("CS-2") actually was working with the United States Drug Enforcement

---

[1]      Throughout this brief, "Ind." refers to the ninth superseding Indictment in this
case; "Tr." refers to the transcript of trial which began on April 4, 2011; "GX" refers to the
Government's exhibits admitted at the trial; "[NAME] Aff." refers to various affidavits that were
submitted to the Court regarding Yaroshenko's motion to dismiss the Indictment.

Administration ("DEA") as a confidential source. During his conversations with CS-2, Yaroshenko expressed a keen understanding of piloting cocaine around the world, and about the mechanics of aircraft in general.

Around this same, general time-frame (*i.e.* the spring of 2009), Yaroshenko's co-defendant Chigbo Peter Umeh initiated a series of meetings with government officials in the Republic of Liberia.. (Ind. ¶¶ 12b-c.) At these meetings, Umeh, accompanied by several of his Colombian business partners, proposed that the Liberian government officials agree to assist a Colombian drug trafficking organization with the movement and storage of several tons of cocaine. In exchange, Umeh and his partners agreed to pay the officials over one million dollars cash and to release a large quantity of cocaine to the government officials, a portion of which would subsequently be distributed in the United States. (GX 300-T-36.) The central target of Umeh's attempted bribe was Mr. Fomba Sirleaf, the Director of the Liberian National Security Agency ("NSA"), who was also the son of the President of Liberia. (Ind. ¶ 12b; Tr. 509.)

Unbeknownst to Umeh at the time, these Liberian officials – including Fomba Sirleaf – were working with the DEA in an operation to expose the membership and objectives of the Colombian drug trafficking organization. (Tr. 148-50.) Further, as part of this investigation, the DEA utilized another confidential source ("CS-1"), who used the name "Nabil Hage" and who introduced himself to Umeh as Sirleaf's business manager. (Ind. ¶ 12c; Tr. 149-52, 509-11.) CS-1 then recorded his meetings between Umeh, his Colombian counterparts, and the Liberian government officials. (Tr. 157-58.) CS-1 became the main point of contact for Umeh, and purportedly functioned as the voice for Sirleaf and the NSA, having the power to negotiate with Umeh on their behalf.

CS-1 first met with Umeh in Liberia on May 17, 2009, and thereafter in mid-

October 2009.  During one of CS-1's meetings with Umeh in October, Umeh acknowledged that he and his Columbian co-conspirators needed an airplane.  Umeh stated that the airplane "is the most important part of the business because without an airplane we get no business."  (GX 300-T-5 at 5.)  One of Umeh's co-conspirators also expressed to CS-1 in February of 2010 that he and Umeh needed pilots and aircraft available to help with the movement of 4,000 kilograms of cocaine. (Ind. ¶ 12i.)  Umeh reiterated this need to CS-1 over email in early March 2010; Umeh referenced some "head way" he had made in looking for "transport," but expressed interest in CS-1's contact with an "aviation expert" (*i.e.* Yaroshenko) in Kiev.  (GX 501-DD.)

CS-1 and CS-2 then met with Yaroshenko in Kiev, Ukraine in early March 2010. CS-1 outlined to Yaroshenko the opportunity to assist Umeh and CS-1 in moving cocaine from South America to Africa, and then (for a portion of the cocaine) to the United States.  (GX 300-T-16 at 12-13, 33.)  Yaroshenko agreed to assist with this endeavor, and understood that a portion of the cocaine he brought from South America to Africa would be sent to the United States.  Thereafter, Yaroshenko agreed to travel to Liberia to meet with the Colombian cocaine suppliers and to negotiate a price for the services he would provide.

Yaroshenko traveled to Liberia on May 11, 2010, and met with CS-1 and Umeh on May 13 and May 15, 2010 to discuss this deal.  (GX 300-T-29R2; 300-T-34.)  On May 15, 2010, Umeh agreed to pay Yaroshenko $4.5 million to transport several tons of cocaine from Venezuela to Liberia, and about $1.8 million to fly cocaine from Liberia to Ghana (from where a portion of the cocaine would be sent to the United States) and to Nigeria.  (GX 300-T-34 at 12-13, 29-31.)

After this agreement on payment, Yaroshenko stayed in Liberia until his May 28, 2010 arrest.  During this two-week period, Yaroshenko met with CS-1, dealt with registering his

planes in Liberia, and awaited the arrival of cocaine from South America. On May 28, 2010 (the day of Yaroshenko's arrest), he provided Nabil with registration documents for the planes Yaroshenko would be using for this conspiracy. (Tr. at 601-02; GX 225, 225T.)

Before any cocaine arrived in Liberia, Yaroshenko was arrested by Liberian officials on May 28, 2010. (Tr. at 178.) Less than two days later (on May 30, 2010), the DEA took custody of Yaroshenko, Umeh, and others, and transported them to the United States. (Tr. at 178.) On June 1, 2010, Yaroshenko was presented in Magistrate's Court in this District, and was arraigned on Indictment S8 09 Cr. 524 (JSR).

On July 1, 2010, a grand jury sitting in the Southern District of New York returned a superseding indictment in this case (S9 09 Cr. 524 (JSR)). Count One (the sole count of the Indictment) charged Umeh, Yaroshenko, Nathaniel French, Kudufia Mawuko ("the defendants") and others with conspiring to manufacture and distribute 5 kilograms and more of cocaine, with knowledge that some of the cocaine would later be imported into the United States, in violation of Title 21, United States Code, Sections 963, 959(a), and 960.

On October 13, 2010, Yaroshenko moved to dismiss the Indictment on a number of grounds, including that he was subject to outrageous government conduct by being tortured after his detention in Liberia, and that the DEA "manufactured jurisdiction" in his case. The Court denied all of Yaroshenko's motion in a January 3, 2011 opinion.

On April 4, 2011, trial commenced against the defendants. On April 28, 2011, the jury found Umeh and Yaroshenko guilty and acquitted the other two defendants.

## GUIDELINES CALCULATION

For the reasons outlined below, the applicable sentencing range under the Guidelines for Yaroshenko's conviction is a term of imprisonment of 360 months to life.

Section 2D1.1 of the Guidelines is the applicable guideline to the instant offense. Because the conspiracy involved the distribution of over 150 kilograms of cocaine, and pursuant to Guidelines Sections 2D1.1(a)(5) and (c)(1), the base offense level for Yaroshenko is 38.  This offense level is increased by two levels, pursuant to U.S.S.G. §3B1.3, because Yaroshenko used a "special skill" (*i.e.* his pilot expertise) in the commission of this offense.  Yaroshenko's offense level is increased two additional levels, pursuant to U.S.S.G. § 3C1.1, because Yaroshenko willfully attempted to obstruct the administration of justice regarding the prosecution of this offense, by submitting a materially false affidavit to the Court in support of his motion to dismiss the Indictment.  There are no downward departures for Yaroshenko's offense and his final offense level is therefore 42.[2]  Because Yaroshenko has no criminal history points, he is in criminal history category is I..

Accordingly, the applicable sentencing range under the Guidelines is 360 months' to life imprisonment.  In addition, Yaroshenko faces a mandatory minimum term of imprisonment of 10 years because the conspiracy involved the distribution of more than five kilograms of cocaine.

## APPLICABLE LAW

The Guidelines still provide strong guidance to the Court about the appropriate sentence the Court should impose, notwithstanding *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that

---

[2]        The Government understands that Yaroshenko will be seeking a minor role adjustment at sentencing.  The Government submits that no such departure is warranted, based on the arguments set forth below regarding the special skill enhancement and the application of the 3553(a) factors.  If necessary, the Government will file a response to any submission made by the defense on this issue, in accordance with the Court's individual practices.

district courts must "consult" the Guidelines and "take them into account" when sentencing. 543

U.S. at 264. In fact, "a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range" — that "should be the starting point and the initial

benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors

outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the

offense and the history and characteristics of the defendant" (section 3553(a)(1)); the four

legitimate purposes of sentencing (section 3553(a)(2)); "the kinds of sentences available"

(section 3553(a)(3)); the Guidelines range itself (section 3553(a)(4)); any relevant policy

statement by the Sentencing Commission (section 3553(a)(5)); "the need to avoid unwarranted

sentence disparities among defendants" (section 3553(a)(6)); and "the need to provide restitution

to any victims" (section 3553(a)(7)). *Gall*, 128 S. Ct. at 597.

In determining the appropriate sentence, the statute directs judges to "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing,

which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

While courts may not presume that the appropriate sentence necessarily lies

within a Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider

the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 597 n.6. The Guidelines' continued relevance throughout sentencing stems (in part) from the fact that "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 126 S. Ct. at 597.

## DISCUSSION

As discussed below, Yaroshenko's base offense level is 38 and a two level "special skill" enhancement applies. In addition, another two level enhancement is warranted because Yaroshenko obstructed justice by submitting a false affidavit to the Court.

### A. Yaroshenko's Base Offense Level is 38

Pursuant to Guidelines Section 1B1.3, a defendant is responsible at sentencing for "all acts and omissions committed, aided, abetted . . . or willfully caused by the defendant," and "in the case of jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Under Guidelines Section 2D1.1(a)(5) and (c)(1), the base offense level is 38 where more than 150 kilograms of cocaine are involved in the offense.

It cannot be disputed that this conspiracy involved the distribution of thousands of kilograms of cocaine throughout the world, and that the base offense level for this offense is therefore 38.  *See* U.S.S.G. § 2D1.1(c)(1) (assigning base offense level of 38 if the offense involved 150 kilograms or more cocaine).

Indeed, in sentencing Umeh to 30 years' imprisonment on August 5, 2011, the Court concluded that the conspiracy involved more than 150 kilograms of cocaine; an amount that should likewise be attributable to Yaroshenko, who was Umeh's co-conspirator and who was well aware of the scope of this conspiracy.  *Cf. United States* v. *Young*, 609 F.3d 348, 357-59 (4th Cir. 2010) (noting that "' [r]elevant conduct' under the Guidelines, of course, often includes a broader range of conduct than the conduct underlying the offense of conviction" and affirming district court's inclusion of acquitted conduct in calculating appropriate amount of cocaine to be considered in calculating offense level).  Indeed, during a May 2010 conversation with CS-1 and Umeh, Yaroshenko made abundantly clear how massive the volume of this conspiracy was, when he declined to fly one shipment of 1,000 kilograms of cocaine, because transporting such a small quantity was not worth the risk of making the flight.  (*See* GX 300-T-29R2 at 14 ("I'm telling you. . . . .  It's 1,000 for this one I don't fly.").

CS-1 also made clear to Yaroshenko that more than 150 kilograms of the cocaine transported by Yaroshenko (both into and within Africa) would be sent to the United States.  During a March 5, 2010 meeting with Yaroshenko, CS-1, and CS-2, for example, CS-1 advised Yaroshenko: "I want for my clients in America I want every month about 200, 300 kilos."  (GX 300-T-16 at 33; *see also* GX 300-T-18 at 9 (CS-1 noting that for each shipment of cocaine to Liberia, he gets 300 kilograms, which he sends from Accra, Ghana to New York).)  Similarly, at

a May 13, 2010 meeting with Umeh, Yaroshenko and CS-1 explicitly discussed that from the 700 kilograms of cocaine that Yaroshenko would send to Ghana, at least 200 kilograms of that would be sent to the United States. (GX 300-T-29R2 ("Of 700 kilos . . . . Because he has 500 and I need 200 that I promised thanks to you one year ago . . . . It's going to be with diplomatic baggage."); GX 300-T-34 at 12 (Nabil stating to Yaroshenko: "we're talking 500 and 500 is 1000, plus 200 mine is 1200 kilos").)

Moreover, the thrust of CS-1's and Umeh's conversations with Yaroshenko was that a relationship between them would continue; with Umeh supplying cocaine from South America, with Yaroshenko arranging for its transport to Liberia, and with Yaroshenko taking it to Ghana, from where some of it would be sent to the United States. (GX 300-T-26 at 3 (CS-1 noting that the Colombians "want to establish the long term transaction with you"). Thus, even disregarding the massive amounts of cocaine for which a specific final market was not explicitly designated, the amount of cocaine in this conspiracy that was intended for the United States exceeded 150 kilograms.

The appropriate base offense level therefore is 38.

## B. The Two Level Special Skill Enhancement Applies to Yaroshenko

Furthermore, the base offense level is increased two additional levels because Yaroshenko used a special skill – *i.e.* his pilot expertise – in committing this offense.

Section 3B1.3 of the Guidelines provides that: "[i]f the defendant . . . used a special skill in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. The application notes to this section elaborate on what is considered a "special skill," noting that it "refers to a skill not possessed by members

of the general public and usually requiring substantial education, training, or licensing." *Id*. app. 3. The note specifically lists "examples" of such special skills to include "pilots." *Id.*

A plain reading of the Guidelines and accompanying notes make clear that this enhancement applies. Yaroshenko's express role in this conspiracy was to use his pilot expertise to help fly thousands of kilograms of cocaine across the Atlantic Ocean (from South America to Africa) and then within Africa (from Liberia to Ghana), so that a portion of it could be sent to the United States.

Yaroshenko's pilot expertise is apparent from the numerous recorded conversations he had with DEA sources.

Yaroshenko repeatedly discussed with CS-1 and CS-2 his prior experience in piloting cocaine around the world. (*See*, *e.g.*, (GX 300-T-16 at 14 ("I have five years working around Guinea."); (GX 300-T-16 at 13-14) (Yaroshenko discussing various countries from which he could pick up cocaine and transport it to Africa, noting that "Venezuela is closed."). After learning of the opportunity to assist CS-1 and Umeh, Yaroshenko made clear that he "know this job" and that he "know this country [referring to Africa]." (GX 300-T-29R2 at 8.) Yaroshenko also talked about his prior involvement in "black flights" – meaning flights that were not officially registered – of narcotics. (Tr. at 349-50; GX 300-T-11-1 at 15-16.)

Indeed, the entire reason CS-1 and CS-2 presented this opportunity to Yaroshenko was because of Yaroshenko's pilot expertise. Quite simply, Yaroshenko was asked – and he readily agreed – to be responsible for flying pilot cocaine around the world for this conspiracy. On March 4, 2010 in the Ukraine, for example, CS-2 asked Yaroshenko if he would be willing to "organize" moving quantities of cocaine, which Yaroshenko agreed to do. (GX 300-T-14 at 17.)

The following day, Yaroshenko told CS-1 and CS-2 that he would help them, noting that he is a pilot, "a professional for this job," and had been working in Africa for about five years  (Tr. at 367-368, GX 300-T-16 at 5.)  CS-1 made clear to Yaroshenko at this meeting that the Liberian government allowed Colombians to bring a shipment of cocaine to Liberia every month; that the Colombians had a problem with their plane and could not find a new one; and that CS-2 said Yaroshenko would do it.  (GX 300-T-16 at 12-13.)  In agreeing to help, Yaroshenko succinctly stated: "[m]y job is to transport from point a to point b." (GX 300-T-16 at 14.)  And after hearing more specifics from CS-1, Yaroshenko stated that he was prepared to fly his own plane for the job.  (GX 300-T-22 at 12; *see also* GX 300-T-26 at 5 (Yaroshenko noting on May 11, 2010 that he had planes to use for this job).)

Throughout his involvement in this conspiracy, Yaroshenko also provided general advice about flying cocaine into and out of Africa.  During his initial conversations with CS-2, for example, Yaroshenko provided advice on different types of engines and planes that could be used to transport narcotics overseas.  (*See, e.g.*, Tr. at 346; GX 300-T-11-1 at 12 (Yaroshenko advising CS-2 that the tank in CS-2's plane was not ideal); Tr. at 349, GX 300-T-11-1 at 15 (Yaroshenko showing pictures of his various airplanes to CS-2); Tr. at 354-56, GX 300-T-14 at 8 -12 (Yaroshenko discussing with CS-2 the different types of planes that could fly narcotics over various distances).)  At subsequent meetings Yaroshenko went on to discuss the types of planes that could fly the distances that were being discussed.  (GX 300-T-16 at 18 (noting how the "Illusion 76" was the plane that could be used and that its maximum distance was 10,000 kilometers); GX 300-T-17 at 4-5 (answering questions as to whether the Antonov could carry 4,000 kilograms of cocaine); GX 502-A and 502-B (Yaroshenko emailing to CS-1 various

photographs of the airplanes that could be used in the venture).)  Yaroshenko also assisted with planning for the registration of the planes that would be used in this conspiracy.  (Tr. at 384-86; GX 300-T-21 at 12 (Yaroshenko noting in response to CS-1's comment that CS-1 was not familiar with technical aspects that Yarosheko was "professional for this job")).)

To be sure, given that Yaroshenko was arrested before any cocaine arrived in Africa, Yaroshenko did not personally fly any of the cocaine referenced above.  That is immaterial, however, given that Yaroshenko explicitly made clear his agreement and commitment to do so, and undoubtedly would have, in the event the cocaine actually arrived in Liberia.  (*See*, *e.g.*, GX 300-T-34 at 10-13 (Yaroshenko agreeing to fly cocaine from Liberia to Nigeria and to Ghana); GX 300-T-34 at 29-31 (Yaroshenko agreeing to fly cocaine from South America to Africa).)  In *United States* v. *Downing*, 297 F.3d 52 (2d Cir. 2002), the Second Circuit ruled that Section 3B1.3 "like most specific offense characteristics, applies to inchoate offenses provided the court determines with reasonable certainty that the defendant actually intended to use his or her special skill or position of trust to facilitate or conceal significantly the corresponding substantive offense," *id.* at 65.  Here, the proof at trial unequivocally demonstrated this to be the case – the Government's theory was that Yaroshenko agreed to transport cocaine to Africa and within Africa by plane (knowing that some of the cocaine would be sent to the United States), and the jury convicted Yaroshenko of this offense beyond a reasonable doubt.

Accordingly, the two level "special skill" enhancement applies to Yaroshenko's base offense level.

**C.      Yaroshenko Obstructed Justice**

For the reasons outlined below, the Court should impose an obstruction of justice enhancement against Yaroshenko because he submitted a false affidavit to the Court.

**1.      The Law**

Under Guidelines Section 3C1.1, "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels."  U.S.S.G. § 3C1.1. Conduct covered under this section includes "committing, suborning, or attempting to suborn perjury."  U.S.S.G. § 3C1.1, App. 4(B).

The application of this enhancement may be based on the district court's finding that the defendant submitted a perjurious affidavit or gave perjurious testimony.  *See, e.g., United States* v. *Champion*, 234 F.3d 106, 111 (2d Cir. 2000); *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000).  For an obstruction enhancement to be based on the giving of perjured testimony, "[a] sentencing court must find by a preponderance of the evidence 'that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.'"  *United States* v. *Agudelo*, 414 F.3d 345, 349 (2d Cir. 2005) (quoting *United States* v. *Zagari*, 111 F.3d 307, 329 (2d Cir. 1997)); *see also United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993) (obstruction of justice enhancement applies when a defendant testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or

faulty memory").  The commentary to § 3C1.1 defines "material" in this context to mean "evidence, fact, statement or information that, if believed, would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1, App. 6.

An obstruction enhancement must be supported by a finding that "the defendant's statements unambiguously demonstrate an intent to obstruct."  *United States* v. *Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998); *see United States* v. *Giraldo*, 80 F.3d 667, 680 (2d Cir. 1996) (noting that the sentencing court "must make a finding of specific intent"); *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir. 1999).  When a sentencing court imposes an obstruction enhancement, "separate findings of fact . . . are encouraged but not required as long as a general finding of obstruction . . . tracks those factual predicates necessary to support a finding of perjury."  *United States* v. *Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) (*per curiam*) (internal quotation marks and citations omitted); *see also United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996) ("[I]n a case where the defendant has clearly lied on the stand, the district court need do nothing more . . . than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter.").

The sentencing court is not required to find beyond a reasonable doubt that the defendant testified falsely.  Rather, "the pertinent facts need be proven only by a preponderance of the evidence."  *United States* v. *Cutler*, 520 F.3d 136, 167 (2d Cir. 2008); *see also Zagari*, 111 F.3d at 322-23.

**2.**     **Application**

The two-level obstruction enhancement is warranted because Yarosheko lied in an affidavit to this Court on October 9, 2010 in an effort to get the Indictment dismissed.

Yaroshenko's affidavit spans seven pages, and contains a litany of explosive allegations of severe torture while in Liberian custody and after his arrival in the United States. During a 48 hour period (from May 28 to May 30, 2010), Yaroshenko claimed that he was punched, kicked, and hit with a rubber trucheon in the stomach, head, genitals, and legs. (Yaroshenko Aff. ¶ 11.)  Yaroshenko added that he was beaten "for hours" (Yaroshenko Aff. ¶ 18).  Yaroshenko further averred:

> [m]y teeth became loose and were bleeding after being hit with the truncheon in the neck and the side of my jaw.  Then when I fell one of the guards kicked me in the jaw, my mouth started bleeding, and I spit out one tooth and, then in a few minutes, the second one.

(Yaroshenko Aff. ¶ 30.)  Yaroshenko declared that one of the agents who beat him "walked into this court with me" (Yaroshenko Aff. ¶ 34) and that upon arrival in the United States, "several agents dragged me to the restroom away from the eyes of the customs officers or other employees of the airport and gave me several punches."  (Yaroshenko Aff. ¶ 45.)

The above facts – sworn to by Yaroshenko – are demonstrably false.  This is apparent simply by examining the record in this case.

*First,* the allegations in Yaroshenko's affidavit are completely belied by the physical evidence.  The Government responded to Yaroshenko's motion on October 27, 2010 (the "Government Response").  The Government Response included: (1) an affidavit from DEA Supervisory Special Agent Sam Gaye (the "Gaye Affidavit"); (2) an affidavit from DEA Supervisory Special Agent Louis Milione (the "Milione Affidavit"); and (3) an affidavit from Bureau of Prisons Mid-Level Practitioner Chito Evangelista (the "Evangelista Affidavit").  Attached as Exhibit 1 to the Milione Affidavit are three photographs of Yaroshenko (marked 1-

3) taken after his physical examination at NSA Headquarters in Liberia in the early afternoon of May 30, 2010 – less than 48 hours after Yaroshenko was taken into custody. (Milione Aff. at Ex. 1, labeled 1-3). These photographs do not show any signs of physical abuse, particularly of the sort described by Yaroshenko. No cuts or bruises of any kind appear on Yaroshenko's face, particularly none of the magnitude that one would expect from losing teeth as the result of being kicked in the face. The additional photographs of Yaroshenko attached to the Milione Affidavit show Yaroshenko sitting on a bus, eating on a plane, and walking unassisted. Put simply, these photos do not depict someone who has been a victim of brutal torture over a continuous 36 hour period; they reflect an individual who is relaxed and who does not have difficulty moving about or conversing.

*Second*, the medical evidence surrounding Yaroshenko's arrival to the United States rebuts his claims of torture. The Evangelista Affidavit references a medical intake form for Yaroshenko, dated May 31, 2010, which was completed shortly after Yaroshenko was brought to the Metropolitan Correction Center ("MCC") in New York. (Evangelista Aff. ¶ 7). On this medical form – which Yaroshenko himself signed – Yaroshenko indicated (at the time) that: (1) he does not currently suffer from any painful condition; (2) he does not suffer from pain in his teeth or mouth, from swelling in his mouth, jaw, or neck, or from a dental emergency; (3) he has *no history* of physical, emotional, or sexual abuse; and (4) he does not suffer from a head injury. (*See* Evangelista Aff. at Ex. 1). Based on Evangelista's assessment of Yaroshenko, Evangelista determined that Yaroshenko could be housed in the general population at the MCC. (Evangelista Aff. ¶ 9.) Likewise, Yaroshenko's dental examination on July 8, 2010 (attached as Exhibit E to the Government Response) revealed no excessive bleeding, no loose teeth, and no

swelling in the mouth or throat, despite his allegations of repeated beating in the face and head. (Ex. E at 15-16) (under seal).

        *Third,* the affidavits attached to the Government's Response are consistent with the above conclusions, and rebut the contention that Yaroshenko was tortured while in Liberian custody. Agent Gaye witnessed the arrest of Yaroshenko and observed Yaroshenko at NSA Headquarters on approximately three to four occasions between May 28 and May 30, 2010. (Gaye Aff. ¶ 13). During these visits, Gaye never observed Yaroshenko being mistreated. Nor did Yaroshenko appear to have been tortured or mistreated. In addition, Agent Gaye repeatedly contacted NSA officials (about every 4-5 hours) to verify that Yaroshenko was well, and was still in custody. (Gaye Aff. ¶ 14). No one ever advised Agent Gaye that Yaroshenko had been harmed in any way. (*Id.*). Similarly, Agent Milione observed Yaroshenko in NSA custody in the early afternoon of May 30, 2010, less than 48 hours after Yaroshenko was detained. (Gaye Aff. ¶ 8). At that time, Agent Milione and other DEA agents conducted a physical examination of Yaroshenko in which Yaroshenko removed his clothing. (Milione Aff. ¶ 8). Agent Milione observed no bruises, wounds, or injuries that indicated Yaroshenko had been abused. (*Id.*). Yaroshenko never once advised Milione that he had been mistreated while in NSA custody. (*Id.*). Further, Milione – who was consistently in Yaroshenko's presence when the DEA had custody of him – never once observed anyone mistreat Yaroshenko, including in the United States. (Milione Aff. ¶ 18.)

        Accordingly, an obstruction of justice of enhancement is warranted as a preponderance of the evidence shows that Yaroshenko submitted a materially false affidavit in this case, which he did in order to support his argument that the case against him should be

dismissed.  The facts supporting an obstruction of justice enhancement in this case are similar to those in *Lincecum*, 220 F.3d at 80.  In *Lincecum*, the false affidavit at issue related to the defendant's claim that he had asked for an attorney and was denied that right.  *See Lincecum*, 220 F.3d at 79.  There, despite the defendant's argument that the statements in the affidavit were too vague to be found intentionally false, and despite the fact that he withdrew his suppression motion, Judge Kaplan found, with the ultimate approval of the Second Circuit, that the defendant had submitted a perjurious affidavit upon which he intended the district court to rely, and appropriately applied the obstruction enhancement.

This Court should make the same finding – while Yaroshenko's perjury did not directly relate to the offense for which Yaroshenko was convicted, it was made in order to dismiss the criminal charges against him.

**D.     Section 3553(a) Factors**

The factors described in 18 U.S.C. § 3553(a) militate in favor of a Guidelines sentence for Yaroshenko.  In particular, the need for general and specific deterrence, the need for the sentence to reflect the seriousness of the offense, and the need to promote respect for the law are implicated in this case.

Yaroshenko provided key ingredients for this conspiracy to succeed – a pilot (himself), a crew, and planes – all of which Umeh described in October 2009 as "the most important part of the business."  (GX 300-T-5 at 5.)  Yaroshenko agreed to fly astronomical amounts of cocaine – from 2,000 to 10,000 kilograms – across the Atlantic Ocean, and then within Africa so that they could be sent to the United States.  In exchange, Yaroshenko demanded huge sums of money – about $1.8 million for flights within Africa and $4.5 million

for flights across the Atlantic.  The amounts of cocaine and money involved in this conspiracy –
and the casual way in which those subjects were discussed by Yaroshenko and his co-
conspirators – is staggering.

Yaroshenko never wavered in his commitment to this conspiracy.  He stayed in
contact with CS-2 from June 2009 until when CS-2 introduced Yaroshenko to CS-1 in Kiev,
Ukraine (in March 2010).  Thereafter, Yaroshenko traveled to Liberia to meet CS-1 and
remained there until he was arrested on May 28.  The recorded conversations between CS-1,
Yaroshenko, and Umeh, further show that Yaroshenko was not intimidated or pressured into
attending or participating in these meetings.  Rather, Yaroshenko frequently alluded to his five
plus years' experience in piloting cocaine around Africa, and provided advice to his co-
conspirators about the most efficient and cost-effective ways of transporting cocaine by plane.

In short, the recordings provide an unfiltered glimpse into who Yaroshenko is – a
pilot for the highest drug dealing bidder; someone who had zero regard for the potential
consequences of flying tons upon tons of cocaine from the jungles of South America to a global
transshipment point in Africa.  Yaroshenko was in complete command of the subject matter of
transporting narcotics, and shrewdly negotiated his price for transporting Umeh's cocaine loads
to Liberia.

Moreover, Yaroshenko remained committed to the conspiracy despite being
informed that: (1) the conspiracy involved corruption at the highest levels of the Liberian
government; and (2) the cocaine was supplied in Colombia by the FARC  (Ind. ¶¶ 12v-w), a
Colombian guerilla group designated as a foreign terrorist organization by the U.S. State
Department.  When advised of these facts, Yaroshenko did not demurrer.  In fact, Yaroshenko

expressed his satisfaction at having the Liberian government paid off, noting that "diplomatic flights it's very good." (GX 300-T-29R2; *see also* GX 300-T-16 at 11-12 (CS-1 advising Yaroshenko about how the Liberian ruling family permits Colombians to transport cocaine into Liberia.)

Through it all, Yaroshenko carried out these activities with reckless disregard for the individuals and communities that would be harmed by these drugs, with utter indifference to the amount of power and funding his activity was funneling to various dangerous groups in the Americas and elsewhere, and with enthusiasm when he learned he was part of an organization that had corrupted the highest levels of the Liberian government. Ignoring these consequences and embracing these (apparent) realities, Yaroshenko did everything possible to assist this conspiracy, simply because Yaroshenko would be paid millions of dollars.

Finally, after Yaroshenko was caught and apprehended for his crime, Yaroshenko lied to the Court by claiming that he was beaten by Liberian and DEA officials during the approximate 48 hour period that he was in Liberian and DEA custody before being presented in this courthouse. Yaroshenko did this in order to get the charges against his dismissed, so he no doubt could return to piloting cocaine around the globe.

In sum, the Section 3553(a) factors weigh heavily in favor of a Guidelines sentence.

## CONCLUSION

For the foregoing reasons, the Government submits that a sentence within the Guidelines range of 360 months to life imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:    _____/s/_____.
Randall W. Jackson
Christopher L. LaVigne
Assistant United States Attorneys
212-637-1029/2325