UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                         :

UNITED STATES OF AMERICA        :      Docket No. 09 CR 524 (JSR)
                                           :

        - v -                 :      **SENTENCING MEMORANDUM**
                                           :

                                           :

KONSTANTIN YAROSHENKO,      :

                Defendant.     :
---------------------------------------------------------------x

        This memorandum is submitted on behalf of Konstantin Yaroshenko, who is scheduled to be sentenced on September 7, 2011, at 4:00 p.m. For the several reasons set forth below, and consistent with the sentencing factors listed in 18 U.S.C. § 3553(a), it is respectfully requested that the Court impose a sentence of 10 years.

**I.    Procedural Background**

        Konstantin Yaroshenko was taken into custody in Liberia on May 28, 2010. Following a number of days in the custody of Liberian authorities, he was handed over to agents of the Drug Enforcement Agency. He was presented in the Southern District of New York on June 1, 2010.  Approximately 10 months later, he was found guilty following a jury trial. Mr. Yaroshenko faces a mandatory minimum sentence of 10 years.  The architect of the offense, Chigbo Umeh, was also found guilty and, on July 28, 2011, was sentenced to 30 years in jail. Two other members of Umeh's organization, Nathaniel French and Kudufia Mawuko were acquitted of all charges.  Other individuals named in the indictment include Jorge Ivan Salazar Castano, aka "EI Chavel," and Marcel Acevedo Sarmiento, aka "Jota."

Whether these individuals will ever be prosecuted in the Southern District of New York is unknown to the defense.  What *is* clear from a review of the evidence is that all of these men, with the exception of Konstantin Yaroshenko, were criminal associates of lead defendant, Chigbo Umeh, a man prosecutors described as *"the driving force behind the conspiracy."*[1]  By contrast, Umeh attempted to hire Yaroshenko to perform a limited function for his organization. Mr. Yaroshenko's anticipated role in the offense was limited to transporting Umeh's drugs from point A to point B.

At his sentencing hearing, Umeh did little to dispel the notion advanced by the government that he was the engine that drove the offense. Among other things, he acknowledged having spent most of his life distributing narcotics around the world. The prior drug offense for which he spent almost ten years in the custody of the Bureau of Prisons amounting to just a small sample of his overall body of work.  By contrast, Mr. Yaroshenko, now 42 years old, had never been arrested or charged with a crime before his indictment in this case.

## II.    The Personal History and Characteristics of the Defendant

### A.    Family Background

Konstantin Vladimirovich Yaroshenko was born in the city of Rostov-on-don, located at the south western edge of Russia, slightly northeast of the Black Sea, at a time when it was still part of the Soviet Union.  Both the city, and as described in the many letters attached to this submission, Mr. Yaroshenko's family, have a rich history going back many years. His family has long been associated with a factory located in Rostov that operated during the Soviet

---

[1] See government submission filed on 7.21.11 (ecf # 97).

years and continues to operate today.  He is also part of a fiercely patriotic military family that has suffered many losses. As will be described below, both of his grandfathers died fighting the Nazis.  During that time period, much of the city was reduced to rubble by the German forces who occupied it twice during World War II. The first occupation was in the autumn of 1941. Historical accounts of the time[2] indicate that Rostov was a city of special importance to the Germans and it took many years to rebuild the city following the end of the war.

Mr. Yaroshenko was born in 1968.  By that time, both of his grandfathers had died hero's deaths defending their homeland.  His mother's father, Mikhail Ivanovich Oshaev, participated in war actions outside Moscow, and was wounded repeatedly. After the battle of Stalingrad, Mikhail Ivanovich was promoted to the rank of  Captain and awarded the post of Battalion commander.   In July or August of 1943, he wrote his last letter to Konstantin's grandmother and said, "Masha, my dear if I die I know that what remains on the earth [is] my daughter. I am covered with wounds and I will not return to you."  He was never heard from again.  For many years the family searched for him but with so many dead, they eventually gave up hope.  Then, in 1980, the family received an invitation from the village of Drobyshevo. At the ceremony attended by then 12 year old Konstantin Yaroshenko, and other members of his family, they saw a monument erected to honor his grandfather for the efforts of his battalion to save the village from the German army. Mr. Ivanovich was only 28 years old when he died.

Konstantin's grandfather on his father's side, Ivan Ivanovich Yaroshenko, also fought in the battle of Stalingrad. He also helped defend the town of Taganrog, Rostov during the second German invasion. And in the Spring when Rostov was liberated, Konstantin's

---

[2] http://russiatrek.org/rostov-on-don-city

grandmother, Lida, received a notice that Ivan Ivanovich was *"killed in battle"*.   Konstantin Yaroshenko also served in the military for three years.  During his service, he received training as a aviation mechanic and was stationed in various places including Vladivostok and Vietnam.

Konstantin's father, Vladimir Ivanovich, was born in Rostov in 1936.  He served in the Navy for 4 years. He was awarded with a medal, the Veteran of Labor of the USSR and was an honorary "Veteran of Labor" of the Rostov Helicopter plant where he worked for more than 50 years. During the Soviet years, he was a talented designer and was recognized for his innovations in changing the design of helicopter blades. Vladimir Ivanovich died in 2004. Konstantin's mother, Lyubov Mikhailovna, also spent 50 years of her life devoted to domestic helicopter construction at the Rostov plant.

The Yaroshenkos have always been a very close family. This is due, at least in part, to the relatively humble financial means at their disposal as well as the close quarters in which they lived. Living together in small apartment in Rostov-on-don were Konstantin and his sister as well as their parents and surviving grandparents.  This apartment was "allocated" to the Yaroshenko family in 1968 when Konstantin was born.[3] Many years later, when his sister Olga married, she was given her own apartment. Soon after her departure,  Olga gave birth to her son, Valentin. Sadly, Olga's husband deserted her when the child was just four years old and she returned to the Yaroshenko home with her son. Following the loss of her husband, Olga began to suffer from severe bouts of depression.  She left the family home and moved into a dormitory at the Rostov Helicopter plant where she worked and left Valentin with Konstantin and the boy's grandparents.

---

[3] The apartment was "privatized" following the fall of the Soviet Union in 1991.  It was sold in 2010 to pay legal fees in this case.

By all accounts from family members, Konstantin Yaroshenko was a devoted and loving son, husband, father, brother and uncle.  While still just a young single man himself, he devoted much of his time to his nephew, Valentin, who was 12 years younger than he.  Family members describe how Konstantin tried to be a surrogate father to the boy after Valentin's father deserted his mother.  Konstantin displayed the same paternal instinct toward his nieces, Irina and Natalia.

**B.    Employment**

When he was released from his military service in 1989, Konstantin returned to Rostov-on-don and to the small apartment in which he grew up and shared with his extended family.  It was this same apartment that his family sold in order to hire trial counsel in this case some 20 years later.  Shortly after his return, Konstantin enrolled in a civilian flight school and eventually earned a certificate that enabled him to return to the Rostov helicopter factory and learn how to fly various planes and helicopters.  In this capacity, he was part of a flight crew that was assigned to transportation duties.

The Rostov helicopter plant is still operating today. Indeed, many of the letters attached to this submission come from people who have worked with Konstantin and his family at the plant. Almost every member of his family, including his father, mother, sister and nephew, has worked there with pride.  In many ways, the plant defines who the Yaroshenkos are as people.  Konstantin worked at the plant for almost 10 years prior to the collapse of the Soviet Union.

Following the collapse of the Soviet Union in 1991, the Rostov Helicopter factory fell on hard times, as did Konstantin Yaroshenko. There was an abundance of workers with

aviation training but little or no work because the State sponsored economy had collapsed.  And although there were many airplanes on the ground, few were flight worthy.  During this time period, Konstantin began to supplement the meager income that he earned from the factory by using the family car as a taxi to support his family which then included his wife, Victoria. They had married in October 1992, in Rostov, Russia, and lived with Konstantin's parents until sometime in 2003. Victoria Yaroshenko is deeply devoted to her husband despite the difficult times that they have been through. They have one child, a daughter named Ekaterina, who is just 15 years old.

In 1999, the Rostov factory owners sold their one remaining serviceable plane, along with a flight crew, to a newly formed company named "Trans-charter." The plane, an Antonov 32, or "An-32", was flown to Angola, Africa.  Konstantin was a member of the crew. For the next two years, he was part of a crew that rotated back and forth between Rostov and Angola, transporting goods throughout Africa on behalf of Trans-charter.  The company had a single plane, the Soviet era Antonov 32. Unfortunately, this plane was destroyed on February 2, 2002, when it crashed during a landing in Angola.[4]  Mr. Yaroshenko was not on board at the time of the crash.

During that time period, Mr. Yaroshenko learned a great deal about aviation but received meager financial compensation.  Thus, he left Trans-charter and returned home to Rostov following the crash in 2002. It is important to note that Mr. Yaroshenko's role at Trans-charter was not as a pilot.  And although he had some flight training, he was not capable or skilled enough to fly large cargo planes such as the Antonov 32 or any other cargo planes.

---

[4] See: http://www.icao.int/icaonet/adrep/files/2002/02000780.htm

Instead, Mr. Yaroshenko's role was that of a flight manager.  He arranged for flight crews, maintained transportation logs, ensured that the plane was properly serviced, and the other non-flying aspects of operating an airplane. But he was hardly a pilot.  His last pilot's license issued by the Russian Federation was terminated in 1999 since he was unable to keep up with the rigorous, and expensive flight training necessary to maintain it. Even when he was licensed, he was at best a "co-pilot" and not capable of flying a plane on his own.

Back in Rostov-on-don, Mr. Yaroshenko continued to help support his family, using his car as a taxi, while trying to make a better living in the aviation industry.  Over the next two years, he made relatively unsuccessful efforts to do so. However, in 2005, he was given an opportunity to work with a new aviation company named "GR-Avia."   At first, Mr. Yaroshenko was engaged in marketing for the fledgling company but eventually he went to the West African country of Guinea, Conakry.  While there, he was in charge of a single plane and, as he had done in his previous time in Africa, managed the flight crew.  It was a difficult time in this unstable part of the world.  His crew was present for the overthrow of two different governments and spent a considerable time evacuating people from various embassies during the fighting that accompanied the changes in regimes. He left Guinea in 2007 and returned to Rostov.

Mr. Yaroshenko returned to Guinea for a time in 2008 and 2009.  In late 2009, he was negotiating with an individual named "Paddy McKay" about purchasing an Antonov-12 airplane that McKay told him was located in Liberia. Unbeknownst to Mr. Yaroshenko, there was no plane at all. McKay was actually a confidential informant working for the DEA.  Using the plane as bait, McKay convinced Mr. Yaroshenko to come to Liberia so he could inspect the

plane. Once in Liberia, McKay introduced Mr. Yaroshenko to another confidential informant who pretended to be a corrupt Liberian government official. Eventually, on May 28, 2010, these DEA agents introduced Mr. Yaroshenko to Umeh.  Two weeks later, Mr. Yaroshenko was arrested by the Liberian National Police.  He has been in continuous custody since that time.

## III.    Advisory Guideline Range

As set forth in the objection letter sent to the United States Probation Department and as described below, the defendant respectfully requests that the Court adopt the following advisory guideline range:

```
Base Offense Level [2D1.1(a)(5)(iii)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
Mitigating Role Adjustment [3B1.2(b)]. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -2
TOTAL OFFENSE LEVEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
Criminal History Category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  I
Advisory Sentencing Range. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  121-151
```

### A.    Mr. Yaroshenko is Entitled to a Two Point Reduction for Minor Role in the Offense

Mr. Yaroshenko seeks a downward adjustment based on his minor participation in the overall conspiracy to import drugs into the United States.  The application notes following §3B1.2 contemplate a circumstance similar to the one present in this case:

3. Applicability of Adjustment.—

(A) Substantially Less Culpable than Average Participant.—This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant. A defendant who is accountable under §1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. *For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the*

-8-

> quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.

(Emphasis added)

The Second Circuit has described the standards for assessing a defendant's request for a role reduction as follows:

> An adjustment for a defendant's minor role under U.S.S.G. § 3B1.2(b) "is warranted only if the defendant is 'substantially less culpable than the average participant.' " United States v. Jeffers, 329 F.3d 94, 103 (2d Cir.2003) (quoting U.S.S.G. § 3B1.2 cmt. n.3 (A) (2002)). The burden of proof to establish that a defendant qualifies for a minor role adjustment is on the defendant. In making this "highly fact-specific" determination, United States v. Shonubi, 998 F.2d 84, 90 (2d Cir.1993), a district court looks to factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise," United States v. Yu, 285 F.3d 192, 200 (2d Cir.2002).... United States v. Ravelo, 370 F.3d 266, 269-70 (2d Cir. 2004).

The United States Sentencing Commission has recently promulgated an amendment to the mitigating role adjustment permitting courts more leeway in determining if such a reduction is warranted. The proposed amendment deletes two sentences from the commentary to §3B].2 (Mitigating Role).  In Application Note 3(C), it deletes *"As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted,"* while retaining the "totality of the circumstances" language by incorporating it into the preceding sentence. In Application Note 4, it deletes *"It is intended that the downward adjustment for a*

*minimal participant will be used infrequently."*  According to the commission, these "sentences are unnecessary, and concerns have been raised by some that they may have the unintended result of discouraging courts from applying the adjustment."[5]

In this case, Mr. Yaroshenko was less culpable than any of his co-conspirators. He was drawn into the conspiracy in December of 2009 more than two years after the venture was alleged to have commenced in June of 2007. Unlike Umeh, the acknowledged *"driving force"* of the conspiracy, and the other members of the venture, Mr. Yaroshenko's sole role was to provide air transpiration for the narcotics.  Under the government's own theory, he was subordinate to his co-defendant, Arsenio Rodriguez, who directly negotiated with Mr. Yaroshenko during the meeting.

Moreover, Mr. Yaroshenko had no prior relationship with any of the conspirators. Indeed, he only met Umeh and Santiago on May 15, 2010, just two weeks before he was taken into custody on May 28 of the same year.  And, of course, prior to that, Mr. Yaroshenko did not even know them.  Up until that point, Mr. Yaroshenko had been dealing exclusively with government agents and other members of the investigative team and not with anyone who was a member of the conspiracy.

In addition, Mr. Yaroshenko was not aware of how the cocaine was to be distributed; did not handle any money, and was not previously known to *any* of the participants. And, significantly, he did not know any of their respective roles in the organization.  By contrast, Umeh was very familiar with the details of the conspiracy in South America, Africa and Europe.

---

[5] See: http://www.ussc.gov/Legal/Amendments/Official_Text/20110428_Amendments.pdf.  While the amendment will not be effective until on or after November 1, 2011, the defendant respectfully requests that the Court apply the amendment retroactively or, in the alternative, adjourn the sentencing until November, 2011.

During secretly recorded meetings with investigators, he discussed the wide scope of his criminal venture and, to the extent that there was any doubt, confirmed at his own sentence hearing that he was a prolific drug distributor.   Notwithstanding the ubiquitous nature of his criminal activities, Umeh had never laid eyes on Konstantin Yaroshenko until May 15, 2010, 13 days before they were arrested.

Unlike Umeh, there is no evidence that Mr. Yaroshenko was involved in the drug trade prior to his involvement in this case. And while the government will likely argue that the defendant himself discussed his own involvement in transporting drugs, a fair evaluation of the evidence makes it more likely than not that Yaroshenko was simply exaggerating his own experience.  This is established by the simple fact that despite the enormous expenditure of time and resources in this case over the almost 5 years, the government does not have a single witness who can connect Mr. Yaroshenko with any other narcotics offense.  This despite that fact that Yaroshenko has been working in and exploring business opportunities in the aviation industry in various parts of Africa for more than a decade.  Surely after all of this time and with all of the resources available to the government, someone would know of his involvement in other narcotics ventures.

In light of these facts, Mr. Yaroshenko was "plainly among the least culpable of those involved in the conduct of [the] group" and therefore a minor participant in the offense under USSG § 3B1.2(b).   See id. Application Note 4.   There is no evidence that he had knowledge of the scope or structure of Umeh's international, multi-shipment criminal enterprise. See id.  He had no knowledge of other deals by Mr. Umeh and his cohorts.  See United States v. Castillo, 277 Fed. Appx. 77, 79-80 (2d Cir. 2008) (trial court was "clearly erroneous" in

denying a mitigating role reduction to a conspirator who was not aware of other conspirators' additional drug transactions and merely accompanied his superior in the organization).  Given that Mr. Yaroshenko had to literally beg the government agent Nigel for cash so he could remain in Liberia until Umeh and his cohorts arrived, his importance to the success of the venture was negligible.  See, e.g. United States v. Fernandez, 312 F.Supp.2d 522 (S.D.N.Y. 2004) (explaining minor role adjustment for drug courier);  United States v. Ruiz, 246 F. Supp.2d 263, 264-67 (minor role adjustment for defendant who picked up over 300,000 ecstasy pills originating in the Netherlands); United States v. Martinez, 00 Cr. 1306, 2002 WL 1041318 at *1 (S.D.N.Y. May 22, 2002) (same for defendant who "had transported a substantial amount of heroin in five separate trips to Detroit within a four-month period, and had on at least one occasion helped handle, prepare, and package the heroin for shipment").

**B.  Abuse of Trust Enhancement**

In calculating the defendant's offense level, the Probation Department concluded that a two-level enhancement to the sentence was warranted pursuant to U.S.S.G. §3B 1.3 for abuse of a position of trust. However, a review of the applicable precedent and the facts of this case support the conclusion that the abuse of trust enhancement is unwarranted. Section 3B1.3 of the United States Sentencing Guidelines provides in part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

A "special skill" as described in § 3B1.3 is an expertise not possessed by members of the general public, usually requiring substantial education, training, or licensing.  U.S.S.G. §

3B1.3, cmt. n.3.  Examples provided by the commission in the same application notes include "pilots, lawyers, doctors, accountants, chemists, and demolition experts." One court has noted that "[ d]etermining what constitutes a position of trust for the purposes of §3Bl.3 is not a simple task". United States v. Iannone, 184 F.3d 214, 222 (3d Cir. 1999). The reason for this difficulty is that the determination is highly fact-specific. United States v. Hart, 273 F.3d 363, 375 (3d Cir. 2001).

In United States v. Downing, 297 F. 3d 52, 64 - (2nd Cir. 2002), the Court held that Section 3B1.3 "applies to convictions for conspiracy provided the district court concludes with 'reasonable certainty,' U.S.S.G. § 2X1.1(a), that the defendant conspired to use "'a position of public or private trust, or ... a special skill, in a manner that significantly facilitated the commission or concealment of the offense.'" See also, United States v. Gandy, 36 F.3d 912, 915 (10th Cir.1994).  Under the provisions of U.S.S.G. § 3B1.3, a defendant's sentence is increased two levels if he "use[s] a special skill, in a manner that significantly facilitate[s] the commission or concealment of the offense." Id. "Special skill" is defined in Application note 2 in the Commentary to § 3B1.3 as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3, Application n. 2.

The mere fact that a defendant possesses a special skill is not enough to warrant the enhancement. United States v. Gould, 983 F.2d 92, 94 (7th Cir.1993) (police officer/defendant did not trigger enhancement for abuse of trust unless it was demonstrated that the officer used his position to facilitate the offense).  If the government does not show that the defendant employed his skill to facilitate the commission of his offense, then the court may not properly enhance the defendant's sentence under § 3B1.3. See, e.g., United States v. Garfinkel, 29 F.3d 1253 (8th Cir.

-13-

1994) (enhancement for psychiatrist/defendant not applied; court concluded defendant used his *managerial skills*, not his professional training to commit his offense).

Judged by the foregoing standards, it is clear that the enhancement pursuant to §3B1.3 should not be applied in this case. As a threshold matter, as indicated above, Mr. Yaroshenko does not concede that, at the time of the offense, he had the skill necessary to be considered a "*pilot*" as that term is used in §3b1.3. And in any event, he *never* possessed the skills necessary to fly the types of planes that were under discussion. Furthermore, whatever feeble piloting skills Mr. Yaroshenko possessed at the time, he did not intend to use them to facilitate the offense. Instead, Mr. Yaroshenko's contribution to the venture was to use his knowledge of the aviation industry, his experiences in Africa and his managerial experience to arrange for suitable transportation.[6]

In sum, the Probation Department erred when it concluded that the offense level should be increased by two levels based on a determination that Mr. Yaroshenko had used a special skill to facilitate the offense. Accordingly, Mr. Yaroshenko's advisory guideline range should therefore be calculated without the inclusion of this enhancement.

## IV.     The Inadequacy Of The Presentence Report

The PSR's evaluation of the appropriate sentence for Mr. Yaroshenko is premised solely upon a  Guidelines analysis. In addition, the PSR fails to adequately consider Mr. Yaroshenko's particular circumstances as they relate to the factors enumerated in § 3553(a). As such, the PSR does not conform with sentencing practice laid out  by the Supreme Court's

---

[6] In fact, Yaroshenko never intended to transport the narcotics at all.  Regretfully, in light of the jury verdict, it is irrelevant.

decision in United States v. Booker, 543 U.S. 220 (2005). See also Pepper v. U.S. 131 S.Ct. 1229 (2011) (where the Court continued to emphasize the need for individualized sentencing based not only on the crime but on the defendant, holding that a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2)").

   In fashioning a recommendation based on the Guidelines alone, the PSR fails to perform the entirely appropriate and indispensable analysis under the approved post-Booker procedure in which the Guidelines are merely advisory, and constitute only one step in a  more comprehensive and diverse process. Nor does the PSR make any attempt to evaluate Mr. Yaroshenko's sentence under the standard mandated by statute: that it be "sufficient but not greater  than necessary" to comply with the statutorily enumerated purposes of sentencing. See 18  U.S.C. § 3553(a); see also Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 578, 169 L.Ed.2d 481 (2007) (stating that 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of  sentencing . . .").

   In fact, the PSR fails entirely to provide any analysis of the critical and requisite factors enumerated in 18 U.S.C. § 3553(a) other than the Guidelines, and fails to acknowledge – other than in a perfunctory manner – the Supreme Court's decision in Booker, and the changes in  federal sentencing Booker has mandated. In relying solely on the Guidelines, the PSR, in effect, improperly reimposes a mandatory Guidelines system in place of the now advisory framework.  As such, it contravenes Booker, and commits a de facto Sixth Amendment violation of the type Booker specifically and explicitly proscribed.  See also Gall v. United  States, 552

U.S. 38, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)., (noting that one procedural error which can render a sentence unreasonable is "treating the Guidelines as mandatory.").

### A. A Guidelines Sentence is Neither Mandatory Nor Presumptively Reasonable

As a threshold matter, since the Guidelines are now advisory, they no longer determine the sentence. Instead, the focal point is the instruction in the introductory paragraph of §3553(a), referred to as the "parsimony clause," which directs that "the court shall impose a sentence  sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)  of this subsection." 18 U.S.C. § 3553(a); see also Kimbrough, 522 U.S. 85, 128 S. Ct. at 570, 575 (2007).  Gall outlined how District Courts should consider both the advisory Guidelines and  §3553(a). See United States v. Cutler, 520 F.3d 136, 155 (2nd Cir. 2008). First, "'a district court  should begin all sentencing proceedings by correctly calculating the applicable Guidelines  range.'" Id. (quoting Gall, 128 S.Ct. at 596 (citation omitted)).

However, the Guidelines are "not the only consideration." Gall, 128 S.Ct. at 596. In addition, sentencing courts "may not  presume that the Guidelines range is reasonable." Id. at 596-97 (quoted in United States v.  Jones, 531 F.3d 163, 170 (2nd Cir. 2008). "After giving both parties an opportunity to argue for  whatever sentence they deem appropriate, the district judge should then consider all of the   §3553(a) factors to determine whether they support the sentence requested by a party." Gall,  128 S.Ct. at 596. As the Second Circuit has recognized, "the Supreme Court has clearly  signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." Jones, 531 F.3d at 172.

As noted, 18 U.S.C. § 3553(a) requires that a sentence be "sufficient but not greater than necessary to comply with the purposes set forth in paragraph (2)." Subsection 2, in turn, enumerates the following purposes:

(2)     the need for the sentence imposed –
(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and,
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [18 U.S.C. § 3553(a)(2)].

The advisory Guidelines do not occupy any superior position among the seven factors listed in § 3553(a) that a court must consider in imposing sentence. Indeed, § 3553(a) does not provide any hierarchy, and if the order in which they appear is any indication, the Guidelines and the attendant policy statements – only two of the seven criteria – rank but fourth. And, of course, the advisory range that is applicable to Mr. Yaroshenko is itself driven by a single factor — the weight of the narcotics. This one factor alone then accounts for 95% of the minimum guideline range.

**B.     The Court Can Impose A Sentence Of 120 Months Because Such A Sentence Is Sufficient But Not Greater Than Necessary To Comply With The Purposes Set Forth In 18 U.S. C. § 3553(a)**

Mr. Yaroshenko's personal history includes characteristics that warrant a non-Guidelines sentence that is sufficient but not greater than necessary to comply with § 3553(a)'s purposes. Within § 3553(a), subsection(1) provides that this Court should consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Although Mr. Yaroshenko was found guilty of a serious offense, his history and characteristics as well as other case specific factors demonstrate that a sentence of 10 years is sufficient but not greater than necessary to provide just punishment.

-17-

**V.      Factors Supporting A Sentence Of 10 years**

1.      A sentence of 10 years for a non-violent inchoate offense for a first time offender is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S. C. § 3553(a)

2.      A sentence that is driven almost exclusively by a single factor is unreasonable (i.e. the base offense level for the drug guideline lacks an empirical basis)

The district court may in considering the Guidelines' recommendation question whether, when it adopted the guideline, the Sentencing Commission fulfilled its "characteristic institutional role." Kimbrough, 128 S. Ct. at 563.  The Sentencing Commission "departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes," Gall, 128 S. Ct. at 594 n.2. Such guidelines, which do not take account of empirical data and national experience, and do not exemplify the Commission's exercise of its characteristic institutional role, are generally entitled to less consideration. See Kimbrough, 128 S. Ct. at 575.

While the Supreme Court has suggested that guidelines based on Commission expertise or study may be entitled to greater consideration, Kimbrough, 128 S. Ct. at 574., the Court has made clear that district courts may reject the advice of guidelines where not so based. See Spears v. United States, 129 S. Ct. 840, 555 US __, 172 L. Ed. 2d 596 (2009).

Here, the total offense level determined by the Probation Department was level 40. This offense level yields a recommended sentence range of 292 - 365 months.  This range is driven by the base offense level of 38.  Thus, 95% of the sentence range is based upon a singe factor that was determined by the United States Sentencing Commission without reliance upon *any* empirical data.

4.      As the Court found at the sentencing of Mr. Umeh, only a small percentage of the narcotics was intended to go to the United States;

5.      Mr. Yaroshenko was a member of conspiracy for only short time and was aggressively encouraged by agents;

The recorded conversations make it clear that not only was Mr. Yaroshenko an actual member of the conspiracy for just 13 days before his arrest, the recorded conversations demonstrate that CS-1 and CS-2 aggressively encouraged him to participate in the offense. This encouragement included providing him with two thousand dollars ($2000.00) on May 19, 2010, for expenses so that he could remain in Liberia awaiting the arrival of Umeh and his associates. Just a day earlier, Mr. Yaroshenko asked CS-1 how much longer it would take because he is "out of cash." This statement is completely inconsistent with the government's effort to characterized him as a prolific drug transporter. Moreover, as noted earlier in this letter, there is simply no evidence to support the government's contention that Mr. Yaroshenko has ever engaged in such illicit activites before. In addition, it is clear that McKay understood from the outset that Mr. Yaroshenko's actual motivation for entering the conspiracy was to procure an airplane.

6.      Yaroshenko was not the driving force behind the offense;

7.      The guideline range does not adequately take into account his lesser role in the offense;

8.      Other more culpable participants will not face any punishment;

**VI.   Yaroshenko's Positive Character Traits**

    a.   Mr. Yaroshenko is a devoted son, father and husband. A prison term would, therefore, have an unduly harsh effect on his family

        Finally, as the letters attached to this memorandum attest, the Court should also take into consideration the fact that he plays a crucial role in the life of his family and his community.  And although it is hardly surprising for a family member to say something positive about a loved one, the letters to the Court in this case reveal much about the extraordinary man that Konstantin Yaroshenko is.

        The first letter that is attached comes from many of the people in the helicopter factory that employed Mr. Yaroshenko and so many of his family members. In the letter, signed by many of the people who know him best, they say of Konstantin that:

> He was a member of one of the most respected crews, an honest, good-natured and respectful employee. He carried out any work in good faith, was always read to help his colleagues. He clearly knew his responsibilities and faithfully performed them. From the very beginning, after joining the crew of aircraft division he became the heart of the aircraft division. Sociable, cheerful, he always loved to arrange friendly sport holidays with fishing for families and kids. He could share his last penny to help people in trouble.

        A consistent theme found in the letters is that Mr. Yaroshenko is both generous and kind hearted.  A family friend, Olga Voevodina, writes that her friend, Konstantin:

> was always reliable, very kind and sympathetic person, and he always suffered from that. Many times when he was helping other people they used his kindness and failed him, he was like "Ivan-the-fool." He has lost a lot of "friends" because of his kind heart. He was lending them money and they have never paid him back. Konstantin has never followed them or asked for the pay off. He was always saying that "God is all seeing." Also, I want to mention one case when his car was stolen in 2004, and later the

> thief was found but not the car. What do you think Konstantin did with that 17 -year-old boy thief? He didn't put that 17 year old boy in jail; he just took his statement back from the police and said that HUMAN LIFE is more important than that pile of metal.

(Emphasis in original)

Young and old alike, the people who have known Konstantin Yaroshenko say the same things about him. Vitaly Grishchenko, now just 25 years old writes:

> I've known Konstantin Yaroshenko for all my life and he meant a lot to me. Konstantin supported me when I was a teenager, he was my role model. Through his support I devoted my live to aviation and became a pilot. I am grateful him for that.

Many of his neighbors from his home town of Rostov-on-don submitted a joint letter expressing their view of Konstantin Yaroshenko:

> He was a very kind and sympathetic person. We have known him from childhood kind, sympathetic, gentle boy, able to feel the pain of others and help others in difficult times. We knew that when his was a child he often was ill, but he tried to overcome difficulties. Dreaming of the sky, he chose a profession for real men, he wanted to become a pilot and overcoming all diseases, he did sports and enrolled in flight school and went a long difficult way in achieving his goal. He was always kind to his relatives and friends. We always admired him when he went to walk with his little daughter, he jumped and ran with her, paying no attention to strangers. Such fathers are rare, and not every mother loves her child as much as he loves his daughter! Family! Life! Sky!
>
> When a tragedy in Volgodonsk happened, explosion of a residential house,. . . Konstantin organized night-duty, protecting his and the neighboring houses in order to prevent terrorist threat. All the neighbors were sleeping quietly knowing that Konstantin was guarding us.

## CONCLUSION

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  Gall, 128 S. Ct. at 598 (2007), quoting Koon v. United States, 518 U.S. 81, 113 (1996).

In Gall, Kimbrough and Booker, the Supreme Court has made it clear that while judges must consider the Guidelines, the Guidelines are only advisory. However, in making an individual assessment of the appropriate sentence to impose, the district court must contemplate, in addition to the Guidelines, the factors laid out in 18 United States Code § 3553(a). Gall, 128 S. Ct. at 596. The "overarching" command of § 3553(a) is the Parsimony Clause, which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough, 128 S. Ct. at 563 (quoting Gall, 128 S. Ct. at 600).

After considering both the Guidelines and Mr. Yaroshenko's individual circumstances, the Court should conclude that a term of imprisonment in excess of 10 years would be "greater than necessary" to comply with the purposes set forth in 18 U.S. C. § 3553(a)

In any event, all of these factors, when taken together, support the conclusion that a sentence of 10 years is "sufficient but not greater then necessary" to provide just punishment in this case.

Respectfully submitted,

Steve Zissou

Steve Zissou