**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

United States,

Plaintiff

vs.

Konstantin Yaroshenko,

Defendant.

09-cr-00524

**MOTION FOR NEW TRIAL**
**BASED ON**
**NEWLY DISCOVERED EVIDENCE**

**NOW INTO COURT COMES** defendant Konstantin Yaroshenko, by and through his

undersigned counsel, and, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Fed.

R. Crim P. 33., hereby submits the foregoing motion for a new trial based on newly discovered

evidence. As grounds for granting this motion, Defendant would show the following:

**Procedural History**

On April 28, 2014, the jury found Konstantin Yaroshenko guilty of a conspiracy to

transport narcotics from South America to Africa, with the knowledge that some of those

narcotics would enter the United States. On September 7, 2011, this Court sentenced Konstantin

Yaroshenko to a 20-year term of imprisonment. On September 21, 2011, Konstantin Yaroshenko

timely appealed to the Court of Appeals for the Second Circuit. A three-judge panel of the

Second Circuit issued a decision to affirm the judgment on June 10, 2013. On June 24, 2013,

Konstantin Yaroshenko filed a Petition for Rehearing and Rehearing *En Banc* in the Second

Circuit. That petition was denied on August 14, 2013. While Konstantin Yaroshenko's

codefendant proceeded to file a petition for a writ of *certiorari* with the U.S. Supreme Court,

Konstantin Yaroshenko did not seek review from the Supreme Court by way of any *certiorari* petition.

## Factual Background

Defendant Konstantin Yaroshenko's first contact with anyone in connection with the investigation had to do with the possible purchase of an airplane. (225).[1] In June 2009, Konstantin Yaroshenko, a Russian citizen who worked in the aviation business in Africa, responded to an advertisement for the sale of a Russian-made turboprop Antonov 12 that was located in Liberia. (226). Unknown to Konstantin Yaroshenko, the airplane was the property of the DEA. *Id.* A man named Paddy McKay, a DEA confidential source, advertised the sale of the aircraft on behalf of that agency. *Id.*

Konstantin Yaroshenko's initial communication regarding the airplane was with a man named James Scott, an aviator in West Africa, who had no connection to the drug trade. (227). This contact regarding the airplane was occurring totally separate and apart from the myriad of meetings involving codefendant Chigbo Umeh that the latter participated in since 2007. *Id.*

In the course of time, Scott introduced Konstantin Yaroshenko to McKay. (226). After the initial communication that McKay had with Konstantin Yaroshenko, there were several telephone calls and face-to-face meetings regarding the sale or lease of the aircraft. (227). At some point after McKay established a dialogue with Konstantin Yaroshenko, it was decided by DEA agents running the investigation in Liberia to introduce Hage into the ongoing conversation that Konstantin Yaroshenko was having with McKay. (228).

In early March 2010, at the direction of case agents, Hage traveled to Kiev, Ukraine to meet with Konstantin Yaroshenko. *Id.* Without having obtained permission from Ukrainian law-enforcement agencies to conduct surveillance within the country of Ukraine, DEA informants

---

[1] Citations to trial transcript pages are in parenthesis.

recorded the meetings and the phone calls between Konstantin Yaroshenko and other members

of the group. (Memorandum for Motion to Dismiss Indictment, Document #58, at 8). While in

Kiev, DEA informants talked in Konstantin Yaroshenko's presence about transporting shipments

that involved narcotic substances from South America to Africa. (Exhibit 300T-16 at 1, 33).

During the meetings in Kiev conducted in the first week of March 2010, Konstantin Yaroshenko

was asked to provide an aircraft for transporting four tons of cargo from South America to

Liberia. *Id.* at 12.

In Kiev, DEA confidential sources executed a contract with Konstantin Yaroshenko for

the future purchase of an Antonov 12 airplane in exchange for "valuable consideration." (387).

Yet, for all the conversations, at the end of the discussions in Kiev, there was no agreement with

Konstantin Yaroshenko, and Hage complained about the need for further negotiations. (1387).

On May 11, 2010, Konstantin Yaroshenko came to Monrovia, Liberia. (857). While it is

true that Konstantin Yaroshenko came to Liberia after Hage asked him to come, his principal

task in Liberia was to inspect the Antonov 12 airplane. *See* (861). Furthermore, Konstantin

Yaroshenko could find the means to travel to Liberia only because at the time he was contacted,

he was in Africa in a nearby country and did not need to fly to Monrovia all the way from

Russia. (Exhibit KY-S at 15 [passport stamp for leaving Russia in April 2010], 18, 25 [passport

stamp for leaving Mali for Liberia in May], 35); *see also* (564).

When Konstantin Yaroshenko arrived in Liberia, he found himself to be under constant

surveillance by the Liberian National Security Agency ("RLNSA"). In particular, he had two

men Alex and Joe, introduced to him as his "bodyguards," watching over him at all times. (858-

860). Under close surveillance, Konstantin Yaroshenko was restricted in his ability to move

about the city. (861). Konstantin Yaroshenko's bodyguards also thwarted his attempts to purchase tickets to fly out of Liberia. (879).

DEA informants did not get Konstantin Yaroshenko acquainted with Chigbo Umeh, the only other alleged conspirator whom Konstantin Yaroshenko knew, until a meeting on May 13. (880). Hage served as an intermediary for most of the conversation, relaying answers to and from Umeh and Konstantin Yaroshenko. (881). Yet, the parties could not reach an agreement as to the price for Konstantin Yaroshenko's flights. Umeh noted that a down payment of three million was too much. (Exhibit 300-T-29R2 at 14). Umeh said that he would not have to pay a down payment for using the other air transportation alternative involving the G5 airplane because "[those] people" are part of the business. *Id.* at 15.

On May 15, Hage organized one more meeting between Konstantin Yaroshenko and Umeh. (598). At the meeting, the confidential informant tried to mediate the situation and to the best of his abilities persuade Konstantin Yaroshenko to agree to do the flights. First, Hage asked Konstantin Yaroshenko to lower his price because the diplomatic bags, which were to be used for transportation, would take out some of the risk involved in the shipping. (Exhibit 300T-34 at 11). Hage next offered to Umeh and Konstantin Yaroshenko to cover 50 percent of the flight cost himself. *Id.* at 12. Still, when Umeh next said that "the money [is] gonna be given later, that means when the thing comes here," Konstantin Yaroshenko replied "No, no." *Id.* at 24. The meeting concluded with Hage's remark: "You should have accepted and asked for 250 more." *Id.* at 31.

On May 18, when Konstantin Yaroshenko went to see the Antonov 12 airplane in Monrovia that was to be used in the transportation scheme, he noted how bad the plane's condition was and that it was in need of at least $900,000 worth of repairs before it could fly.

(861). The airplane also had to go through a lengthy re-registration process. (1096). The problems surrounding the Antonov 12 airplane, prompted Chigbo Umeh to raise the subject of using a G5 or a G4 aircrafts, planes whose use would not involve Konstantin Yaroshenko. (879).

On May 28, Konstantin Yaroshenko was arrested in Liberia at the direction of American DEA agents. (1098). Umeh was also arrested the same day. *Id.*

Following Konstantin Yaroshenko's arrest, he was detained for three days from May 28 to 30 at what appeared to be a police facility by unknown individuals, some of whom defendant later identified as DEA agents. (Memorandum for Motion to Dismiss Indictment, Document #58, Exh. A, at ¶7). Konstantin Yaroshenko maintained that he was subjected to brutal torture by his captors. *Id.* In particular, Konstantin Yaroshenko asserted that he was physically restrained and beaten and that every time he tried to speak, he was punched, kicked, and hit with a rubber truncheon in the legs, stomach, head, and genitals and ordered to be silent. *Id.* at ¶¶11-18. Each time that Konstantin Yaroshenko tried to curl to protect his internal organs, the agents who held him in custody beat him in the genitals area from the back. *Id.* at ¶¶19-24. One guard put a nylon rope around Konstantin Yaroshenko's neck and pulled from the back until he could not breathe and his eyesight began to darken. *Id.* The individuals holding Konstantin Yaroshenko in detention kicked the defendant in the jaw, causing him to lose his teeth. *Id.* at ¶30. The guards also put Konstantin Yaroshenko in a chair with three legs, where he sat for two days, trying to maintain his balance. *Id.* at ¶20. Whenever he fell from the chair, the guards pulled the chain that bound Konstantin Yaroshenko putting him in sharp pain from the metal handcuffs cutting through his skin. *Id.*

On May 30, Konstantin Yaroshenko was transported out of Liberia to the United States on a private chartered airplane. (178).

While detaining Konstantin Yaroshenko in Liberia and transporting him to the United States, American agents failed to notify the Russian government of his arrest under the Vienna Convention on Consular Relations. (Memorandum for Motion to Dismiss Indictment, Document #58, Exh. B). The Russian Federation issued vigorous protests against the unlawful arrest and the manner in which Konstantin Yaroshenko was brought to the United States and treated by the U.S. authorities. *Id.*

### The Government's Case and Trial Evidence

In order to gauge properly the value of any new evidence, the Court should first consider what evidence at trial actually led to Konstantin Yaroshenko's conviction and assess its strength. To prove that Konstantin Yaroshenko is guilty of the charges in the indictment, the government had to establish beyond reasonable doubt that he conspired with his codefendant Chigbo Umeh to ship cocaine with the knowledge that a portion of it would be imported into the United States. The essential elements of a conspiracy are: (1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that common goal. *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). By far the most detailed discussion of what evidence was used to convict Konstantin Yaroshenko is contained within the government's appellate brief that was filed in the court of appeals.

## I.   THE GOVERNMENT HAS OFFERED NO HARD EVIDENCE TO THE EFFECT THAT KONSTANTIN YAROSHENKO ENTERED INTO AGREEMENT WITH CHIGBO UMEH.

In its appellate submission that government alleged that on the issue of whether a criminal agreement was formed between Konstantin Yaroshenko and Chigbo Umeh, it directed the jury first to consider Paddy McKay testimony to the effect that Konstantin Yaroshenko responded to an advertisement for an airplane that had been modified in a way "only useful for

the transportation of narcotics across the Atlantic Ocean." (Gov't App. Br. at 10). It is difficult to fathom how the testimony of McKay could show that Konstantin Yaroshenko entered into an agreement with Umeh many months following his initial response to the ad, especially in view of the fact that the airplane was physically rotting away in Monrovia. (861). Besides, McKay never explicitly said that the plane was modified only for the transportation of narcotics, only of "valuable cargo." (323).

Next, the government referred in its brief to the factual allegation, as testified to by McKay, that Konstantin Yaroshenko had meetings with Hage, an individual whose sole purpose for meeting with Konstantin Yaroshenko was to integrate him into a plan to traffic large quantities of cocaine through West Africa. (Gov't App. Br. at 10). Yet, Konstantin Yaroshenko's discussions with Hage could not have led to an inference that he joined any conspiracy because Konstantin Yaroshenko could not have as a matter of law conspired with a government operative.

Third, the government in its brief recounted Hage's description of a meeting in Liberia on May 13, 2010 between Konstantin Yaroshenko and Umeh, at which, according to Hage, they "agreed" on the details and price of Konstantin Yaroshenko's services for transporting a large quantity of cocaine. *Id.* Aside from the fact that the testimony of a paid government source is inherently unreliable, Hage does not even come close to saying that Konstantin Yaroshenko and Umeh reached an agreement in his testimony on the pages cited. Instead, he says that Konstantin Yaroshenko was asking for 4.5 million to transport 5,000 kilograms from Bolivia to Liberia. (576). His testimony offers no evidence that an agreement was reached at any point in time.

Fourth, the government emphasized to the jury the significance of Hage's later statement that he had further meetings with Konstantin Yaroshenko, at which Konstantin Yaroshenko

further described his plans with regard to his alleged participation in the conspiracy. (Gov't App. Br. at 10). While it is true that in the record fragments the government cited on this point Hage was asked "What was the total amount that Mr. Umeh and yourself acting as Nabil agreed to pay Mr. Konstantin Yaroshenko?" and answered "1.8 million," (600), the transcripts of this recording do not warrant the conclusion that Konstantin Yaroshenko agreed to accept 1.8 million. At best, Hage's reply to the question posed can be taken as evidence of his joint decision with Umeh to offer Konstantin Yaroshenko 1.8 million for a flight.

Fifth, the government at trial directed the jury's attention to a recording of the May 13, 2010 meeting between Konstantin Yaroshenko, Umeh, and Hage, at which Hage stated "it's going to be one shipment . . . of 700 kilos . . . Because he has the 500 and I need 200 that I promised thanks to you one year ago," that would be shipped with diplomatic baggage, to which Konstantin Yaroshenko replied "That's very good, that's very good." (Gov't App. Br. at 11). Relatedly, the government calls attention to the factual allegation that Konstantin Yaroshenko during the same meeting agreed on the price for the transportation of the narcotics by saying to Hage that "for the job to Ghana and for uh Nigeria . . . Diplomatic flights it's very good. Just now I don't see zero problem . . . Yes, Yes, yes. It's very good." *Id.* Konstantin Yaroshenko's phrase "that's very good" should not in and of itself lead to the conclusion that he agreed to transport drugs. First, Konstantin Yaroshenko's use of the phrase "very good" does not seem to follow common English usage. As such, during May 13, 2010 recording, Konstantin Yaroshenko used that same phrase at least five times, often in places where it does not belong. At an earlier part in the recording, Konstantin Yaroshenko made the following undecipherable statement using that phrase: "With official flights then I need to uh program to Bolivia only with careful is very good only cargo official from Europe to Peru is the best due to this area is uh . . . ." (Umeh's

App. Appendix 61). Second, Konstantin Yaroshenko said "very good" when questioned if he would ship diplomatic baggage, not drugs. During the entirety of the May 13 recording, nobody ever made references to drugs, narcotics, or cocaine.

In the sixth place, to secure a conviction, the government endeavored to persuade the jury with allegations to the effect that Konstantin Yaroshenko was familiar with smuggling from South America to Africa and Europe. (Gov't App. Br. at 11). However, for all the names of South American countries thrown around in nearly random order, Konstantin Yaroshenko never even came close to mentioning that he had firsthand knowledge as to how to fly in those countries. In fact, Konstantin Yaroshenko explicitly said that he doesn't know Columbia or Peru. (Umeh's App. Appendix 62). Also, in answering the question "This is your area?" posed by Umeh, Yarshenko simply answered "Europe." *Id.* Konstantin Yaroshenko's recitations of the names of Latin American countries cannot give inference to his involvement in transatlantic smuggling operations.

Seventh, the government argued to the jury that Konstantin Yaroshenko prepared to use the ruse of flying to a location to address maintenance or the ruse of shipping flowers. (Gov't App. Br. at 11). In effect, it was Umeh who prompted Konstantin Yaroshenko to say "flowers." (Umeh's App. Appendix 63). Still, even assuming that Konstantin Yaroshenko and Umeh talked about formulating some pretended reason for flying to Africa in the abstract, there is no evidence that one agreed to pay the other for actually performing such a flight.

In the eighth place, the government argued in its summation that a handwritten note by Konstantin Yaroshenko listing out numbers purportedly reflecting the price that Konstantin Yaroshenko would charge for transporting cocaine from Venezuela to Liberia and from Liberia to Ghana, (Gov't App. Br. at 11), constitutes evidence of agreement. The handwritten note,

however, is at most evidence of Konstantin Yaroshenko's demand for payment, and not of the formation of an agreement between him and Umeh. Importantly, the note originated during meetings in Kiev, long before Umeh came into the picture.

Lastly, the government proffered at trial a contract executed by Konstantin Yaroshenko for the Antonov 12 aircraft. (Gov't App. Br. at 12). While the contract provided for the sale of the plane for a nominal consideration of one euro, there is nothing unusual in that type of an agreement. McKay testified that "[it] is absolutely standard procedure even here in the United States, on an FAA bill of sale, to transfer the ownership of an aircraft for one U.S. dollar." (456). None of the items on the government's list taken individually supported the conclusion that an agreement was reached between Umeh and Konstantin Yaroshenko, according to which Konstantin Yaroshenko would fly a plane loaded with drugs and Umeh would pay him millions of dollars for the job. The evidence also calls for no such inference if taken cumulatively.

## II.   NO EVIDENCE WAS PRESENTED TO SHOW THAT KONSTANTIN YAROSHENKO KNEW THE DRUGS WOULD GO TO THE UNITED STATES.

To buttress its argument that Konstantin Yaroshenko had knowledge that a portion of the cocaine was going to the United States, the government, as stated in its appellate brief, directed the jury to a recording of a March 4, 2010 meeting in Kiev between McKay and Konstantin Yaroshenko, during which McKay stated that he will introduce Konstantin Yaroshenko to Hage, who wanted to talk to him about Liberia "because he has big potential to do something there." (Gov't App. Br. at 12). During the dialogue, McKay said that the man to whom he would introduce Konstantin Yaroshenko "wants to talk about other possibilities – they have another idea which is not so complicated and not such a long distance and also using diplomatic cover." *Id.* If anything, McKay's statement to the effect that the "other idea" of the person to whom he would introduce Konstantin Yaroshenko did not involve "a long distance" undermines the

government's argument that Konstantin Yaroshenko knew that drugs would be shipped to the U.S.

Second, the government pointed out to the jury a recording of a March 5, 2010 meeting in Kiev between McKay, Konstantin Yaroshenko, and Hage, at which McKay stated to Konstantin Yaroshenko, before the arrival of Hage, "Okay he's interested only in the drug business. You understand," to which Konstantin Yaroshenko replied "I understand. I understand." (Gov't App. Br. at 12). Not only does this contention fail to buttress in any way the argument that Konstantin Yaroshenko knew that the drugs would go to the United States, it also calls for a legally impermissible inference that Konstantin Yaroshenko could have conspired with a confidential source.

Third, the government endeavored to emphasize in the eyes of the jury the evidentiary value of Hage's statement to Konstantin Yaroshenko during the March 5, 2010 meeting "for the moment, uh, Delta is not flying . . . So because I have clients as you, you know . . . . we go from Colombia to Africa and then Africa, America . . . But I want for my clients in America I want every month about 200, 300 kilos," to which Konstantin Yaroshenko replied "Uh huh." *Id.* While this split-second reference to "America" was in fact made, (Yar. App. Br. at 21), the word "America" may not be taken to mean United States, especially when the parties so frequently referred to other South American and Latin American countries in their conversations.

The government in the fourth place put much emphasis before the jury on Hage's statement to Konstantin Yaroshenko during the March 5, 2010 meeting "Because then there is a flight from Ghana that we can arrange to ship them there . . . So uh, would, are you able to help us to fly from Monrovia to Ghana?" to which Konstantin Yaroshenko replied "Yes, yes I working to, yes it's possible to have . . . ." (Gov't App. Br. at 13). However, Konstantin

Yaroshenko's saying that he can theoretically fly from Monrovia to Ghana during the first

meeting with Hage is not indicative of his understanding that some yet unspecified and in fact

unmentioned narcotics would wind up in the United States.

Fifth, the government at trial made efforts to find support for its position in a recording of

a meeting in Kiev on March 6, 2010 between McKay, Hage, and Konstantin Yaroshenko, during

which Hage stated "I told you I get every shipment I get 300 . . . and then from Accra I sent to

New York and that is my profit . . ." to which Konstantin Yaroshenko replied "Uh huh." *Id.* Yet,

the fact that on March 6, 2010 Hage said that from every shipment that he got up to that point, he

"sent" in the past (emphasis added) to New York does not mean that the narcotics that

Konstantin Yaroshenko purportedly agreed to transport many months later would similarly be

bound for New York.

In the sixth place, the government, through witness testimony, explained to the jury the

ostensible importance of a portion of the March 6, 2010 recording where Hage stated "You can

take it home if you wish and think about it if you need any help with bank accounts let me

know," to which Konstantin Yaroshenko replied "cash money if its possible to send me." (Gov't

App. Br. at 13). Contrary to the government's assertion, this record fragment discredits its claims

for two reasons. First, Hage's statement "you can take it home" makes clear that Konstantin

Yaroshenko has not agreed to join in any criminal enterprise. Second, Konstantin Yaroshenko's

reply "cash money" to a question of whether he needed help with banking arrangements shows

that he completely misunderstood the question posed to him, casting doubt on his comprehension

accuracy during this exchange and other exchanges.

Seventh, the government made much at trial of a May 13, 2010 recording of the meeting

in Liberia between Konstantin Yaroshenko, Umeh, and Hage, in which Hage stated "I don't want

your Ghanaian clients to know. I don't want anybody to know. I don't tell the Americans I'm

going to send it to Ghana . . . [t]o get onto the Delta flight . . . . I don't want them to know that I

am sending to the U.S." *Id.* This direct reference to the United States falls short of establishing

knowledge on his part that the cocaine he purportedly agreed to distribute in the future would be

bound for the U.S. When Hage spoke about delivering shipments to the U.S., he was speaking in

the present tense. The argument that Hage was supplying drugs to the United States at the time

the parties were talking on May 13, 2010 may not compel the conclusion that the drugs

Konstantin Yaroshenko might have agreed to supply, if any, would go to the United States.

At last, in summarizing its trial evidence for the appellate court, the government referred

to Umeh's statement in the May 13, 2010 meeting that they had agreed to ship the cocaine in

diplomatic baggage, stating "the one that drop off in Ghana and the one that drop of[f] in

Nigeria," to which Hage responded "So 500 in Nigeria?" and Konstantin Yaroshenko responded

"That's no problem." (Gov't App. Br. at 14). First, there is no reference to the U.S. in any of

these statements. Even if, through some logical quantum leap, the government could suggest that

Konstantin Yaroshenko agreed to send drugs to a place, from where he knew they would be

distributed to the U.S., it would strain credulity to assert that Konstantin Yaroshenko's "[t]hat's

no problem" could be taken to mean that he actually agreed to fly anywhere without negotiating

more specific terms, such as what airplane he would use or how he would get paid.

Not a single item of evidence presented against Konstantin Yaroshenko by itself militated

for a conclusion or even allowed for a reasonable inference to the effect that Konstantin

Yaroshenko and Chigbo Umeh entered into an agreement with each other and that Konstantin

Yaroshenko somehow knew the drugs were destined for the United States. Even when taken as a

whole, the trial evidence largely was weak.

# ARGUMENT

## STANDARD OF REVIEW

In line with Rule 33 of the Federal Rules of Criminal Procedure, a court may vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim P. 33. Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (internal quotation marks and citation omitted). The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," and be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted).

The Second Circuit has held that in order for a motion for new trial based on newly discovered evidence pursuant to Rule 33 to be granted, the defendant must show: (1) that the evidence could not, with due diligence, have been discovered before or during the trial; (2) that the evidence is material; (3) that the evidence is not merely cumulative; and (4) that the admission of the evidence would probably lead to an acquittal. *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) (citing *United States v. Alessi*, 638 f.2d 466, 479 (2d Cir. 1980)).

# I. THE COURT SHOULD GRANT A NEW TRIAL TO KONSTANTIN YAROSHENKO BECAUSE THE EVIDENCE BROUGHT FORTH TOGETHER WITH THE INSTANT MOTION PLAINLY ILLUSTRATES THAT THE COURT'S PRETRIAL RULING ON DEFENDANT'S MOTION TO DISMISS WAS ERRONEOUS. DEFENDANT'S NEW EVIDENCE SHOWS THAT THE COURT'S RULING WAS BASED ON GOVERNMENT WITNESS'S AFFIDAVITS AND THE GOVERNMENT'S CONTENTIONS THAT WERE DEMONSTRABLY FALSE.

### A. Konstantin Yaroshenko's new evidence firmly buttresses the contentions he made in his pretrial motion to dismiss, which the government falsely denied.

In the case before the Court's review today, defendant contends that he is entitled to a new trial under Rule 33 because the Court made significant pretrial errors and erroneously allowed in evidence at trial, which deprived him of a fair proceeding. The Court made these pretrial errors because it was confused by the government's false statements to the effect that (1) Konstantin Yaroshenko was not tortured in Liberia; (2) the arrest of Konstantin Yaroshenko was a purely local Liberian police action; (3) the United States Drug Enforcement Administration received permission from the government of Ukraine to conduct a sting operation in Kiev and clandestinely record defendant's conversations. The Second Circuit has held that newly discovered evidence warrants a new trial where defendant's evidence directly contradicts core evidence in the government's case. *United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995). In the matter at hand, the factual contentions supported by Konstantin Yaroshenko's new evidence were expressly rejected at trial in government affidavits and pleadings.

Against the backdrop of these new facts, which confirm and positively establish outrageous misconduct on the part of the government, the Court should reevaluate its conclusion on the application of *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974) to defendant's prosecution. It is widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *See United States v. Munoz*, 605 F.3d 359,

373 (6th Cir. 2010). In ruling on the foregoing motion for a new trial, the Court should

reevaluate its conclusion on the application of *Toscanino*, particularly in light of the Second

Circuit's decision in Konstantin Yaroshenko's case. While the appellate court was presented

with an opportunity to abrogate *Toscanino* in resolving defendant's appeal, it chose not to do

that, saying instead that the facts in the case of Konstantin Yaroshenko were different from those

in *Toscanino. See U.S. v. Umeh*, 11-3898, at 13 (2d Cir. 2013). In particular, the appellate court

cited *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 (2d Cir. 1975) for the proposition

that *Toscanino* did not apply where a defendant was abducted, but not tortured. The new

evidence before the Court's review today plainly and undeniably shows that Konstantin

Yaroshenko was in fact tortured while in Liberia.

**(1) Defendant's new evidence shows that Konstantin Yaroshenko was brutally tortured in the African country of Liberia, a circumstance that significantly fortifies his claim of government misconduct.**

Defendant Konstantin Yaroshenko submitted five affidavits from Liberian nationals who

were involved in the police operation leading up to his arrest. The affidavits shed light on what

really happened with Konstantin Yaroshenko after he came to the African republic where the

sting operation was unfolding in May 2010. Many of the contentions set forth in the affidavits

directly contradict the affidavits submitted to this Court by the agents of the Drug Enforcement

Administration, the statements made by assistant U.S. attorneys in their written submissions, and

trial testimony. The affidavits are authentic, as they are signed by the respective affiants in

Liberia, confirmed by other witnesses, and are accompanied by identification documents of the

persons setting forth their testimony.

### a. Konstantin Yaroshenko has presented affidavits from law enforcement officers, including an officer of the Liberian National Security Agency, all of whom are knowledgeable as to the details of his capture.

Konstantin Yaroshenko has included together with his new trial motion a verified affidavit from a current officer of the Liberian National Security Agency by the name of Othello Mathis. In his statement, the officer indicates that he has worked for the Liberian National Security Agency for four and a half years. *See* Exhibit "A." He next points out that, as part of his job for the NSA, he is from time to time assigned to perform work for the American Drug Enforcement Administration. *Id.* Specifically, the officer stated in his affidavit that he had been tasked with conducting intelligence gathering and interrogations for the U.S. agency. *Id.* Next, Officer Othello Mathis recounts in his affidavit that he remembers taking certain law enforcement measures relative to a Russian subject by the name of Konstantin Yaroshenko in May 2010. *Id.* Specifically, it is Officer Othello Mathis' written testimony that DEA agents requested a group of Liberian law enforcement agents, of which he was a part, to pick up Konstantin Yaroshenko from the Royal Hotel in Monrovia. *Id.*

Further in his written statement, Officer Othello Mathis admits that the DEA agents paid him $100.00 "to interrogate the Russian." *Id.* Later, Officer Othello Mathis states that he was a member of the squad assigned to take Konstantin Yaroshenko to the airport. *Id.* The officer next states in the affidavit that he witnessed how the American agents took Konstantin Yaroshenko onto their airplane and left. *Id.*

Toward the end of his affidavit, the Officer indicates that Konstantin Yaroshenko was arrested outside of the Royal Hotel and kept for a couple of days at the RLNSA office. *Id.* Officer Othello Mathis next makes mention of the fact that in early June a number of Russians, presumably diplomatic officials, came to Liberia and were asking questions about Konstantin

Yaroshenko. *Id.* The officer recounts that he had strict orders to keep them away and to say

nothing. *Id.* The Liberian law enforcement agent concludes his affidavit by saying that the

American DEA agents paid him and his colleagues a few extra dollars for their cooperation. *Id.*

Konstantin Yaroshenko's new evidentiary submissions also feature a statement from a

Liberian private security officer. *See* Exhibit "B." On the day of Konstantin Yaroshenko's arrest,

security officer Joseph Allen, with seven years of professional experience, was patrolling the

premises of the Royal Hotel in Monrovia. *Id.* At one point in time on that day, American agents

came up to him and offered him and his assistant $20.00, telling them to leave for 15 minutes. *Id.*

The succession of the events that followed is also chronicled in Joseph Allen's affidavit. *Id.*

National Security Agency Employees arrived, took Konstantin Yaroshenko into custody, and

drove off. *Id.* The security officer looked on from the corner of the parking lot as a bag got

placed over Konstantin Yaroshenko's head. *Id.* The officer particularly noted that Konstantin

Yaroshenko was beaten as he was dragged into the vehicle. *Id.* Officer Joseph Allen next states

that the manager of the hotel ordered hotel security to pursue the vehicle taking the guest away

because the guest's hotel bill had not yet been paid. *Id.* When hotel security finished trailing the

car that Konstantin Yaroshenko got taken away in, the forward-most vehicle stopped near the

headquarters of the Liberian National Security Agency. *Id.*

   **b.  The new evidence marshaled by defendant Konstantin Yaroshenko along with
        the foregoing motion includes verified affidavits from hotel staff.**

Among other affidavits of Liberian origin submitted together with Konstantin

Yaroshenko's motion for a new trial are statements from hotel personnel, who witnessed

defendant's arrest. As such, included in the appendix of newly discovered evidence, is an

affidavit of a Liberian national Samuel Eastman. *See* Exhibit "C." In it, Mr. Eastman states that

he has worked at the reception desk at Royal Hotel in Monrovia for the last nine years, quitting

only recently. *Id.* He further sets out in the affidavit that he was working at the front desk on

May 28, 2010, when American agents came to pay the hotel bill of Konstantin Yaroshenko. *Id.*

Mr. Eastman declares in the affidavit that he remembers that the Americans collected Konstantin

Yaroshenko's belongings from his room. *Id.* A short time prior to receiving payment for

Konstantin Yaroshenko's room, Mr. Eastman saw how the agents of the National Security

Agency came and took Konstantin Yaroshenko away from the parking lot. *Id.* Specifically, the

hotel receptionist recounts that Konstantin Yaroshenko was seized by several men, got put into a

vehicle, and disappeared. *Id.* Mr. Eastman further recalls in his written statement that a report of

the incident was given to the hotel personnel that evening and that this report was placed into

hotel management records. *Id.* Mr. Eastman's affidavit states that Konstantin Yaroshenko stayed

at the hotel for approximately three weeks prior to his capture and that the hotel security staff

knew him well. *Id.*

 Also included in the collection of exhibits comprising Konstantin Yaroshenko's new

evidence submission is an affidavit from other Royal Hotel Monrovia employee, one named

Joshua Yeah. *See* Exhibit "D." That affiant indicates that he has worked at the Royal Hotel in

Monrovia, Liberia for five years and is currently a communications student at a local university.

*Id.* According to Mr. Yeah, Konstantin Yaroshenko stayed at the Royal Hotel in May of 2010,

until he was apprehended outside of the hotel by American and Liberian officers. *Id.* According

to the affiant, an American officer was giving the orders during Konstantin Yaroshenko's

capture. *Id.* In painting the scene of Konstantin Yaroshenko's arrest, the guest services clerk

states in his affidavit that a vehicle drove up to the Royal Hotel and Konstantin Yaroshenko

approached it. *Id.* As he did so, he was captured, and a bag was placed over his head. *Id.* The car

then drove away. *Id.* Mr. Yeah also states in his submission that there were two men that stayed

at the Royal Hotel along with Konstantin Yaroshenko that watched his movement at all times. *Id.* Finally, the hotel staff person notes in his affidavit that he saw RLNSA officers go to his room and take all of his belongings. *Id.*

Among the affidavits submitted, there is also a document from Wilson Kpakelah, a guest services worker at the Royal Hotel in Monrovia, Liberia, who has had the same job for the last 10 years. *See* Exhibit "E." The affidavit of Mr. Kpakelah sets out the details of what happened to Mr. Konstantin Yaroshenko in May of 2010. *Id.* First, the affiant states that Konstantin Yaroshenko was captured outside of the Royal Hotel by American and Liberian officers. *Id.* The hotel employee specifically remembers that an American officer was the one issuing the orders for his capture. *Id.* The hotel clerk next states that a bag was placed over the head of Konstantin Yaroshenko. *Id.* The affiant asserts that defendant was then beaten, put into a vehicle, and taken away. *Id.* Next, Mr. Kpakelah states in his submission that there were two men who stayed with Konstantin Yaroshenko at the hotel and tracked his movements at all times. *Id.* The hotel clerk concludes his affidavit by saying that the commotion surrounding Konstantin Yaroshenko's arrest caused unrest for other guests at the hotel for several days. *Id.*

**(2)  The evidence indicates that Konstantin Yaroshenko's arrest in Liberia was done at the direction of American Drug Enforcement Administration agents, who acted extraterritorially in contravention of the Mansfield amendment.**

The new evidence collected indicated that the extraterritorial arrest of Konstantin Yaroshenko at the behest of U.S. Drug Enforcement Administration agents violated American law. The affidavits obtained from Liberia indicated that on May 28, 2010, a U.S. Drug Enforcement Administration agent, who was physically present in Liberia, directed an RLNSA officer to arrest Konstantin Yaroshenko by taking him into custody near his hotel and bringing

him to RLNSA headquarters. It was therefore on the order of U.S. DEA agent that Konstantin Yaroshenko was apprehended in the parking lot of the Royal Hotel.

**(3) The evidence indicates that Konstantin Yaroshenko was kidnapped from Liberia, and not deported from that country on an order of any lawful authority.**

Konstantin Yaroshenko also acquired new evidence from the Russian Embassy in the country of Ghana that indisputably shows that he was sent out of Liberia to the United States without lawful authority. In effect, in Diplomatic Note No. 242, Consular Officer Voronin, a senior official with the Embassy of the Russian Federation in the Republic of Ghana, has indicated that high-ranking representatives of the Liberian government, upon being contacted by the Russian side in June 2010, stated that they did not know anything about the case of Konstantin Yaroshenko and that they would begin an investigation. *See* Exhibit "F." The embassy in Ghana is the closest Russian diplomatic outpost to the country of Liberia. The apparent lack of awareness of Konstantin Yaroshenko's arrest on the part of high-level Liberian officials called upon by the Russian government contradicts the prosecutors' contention made in pretrial submissions that defendant was properly extradited to the United States pursuant to an expulsion order of May 30, 2010. The new evidence Konstantin Yaroshenko has now discovered shows that there is a high degree of likelihood that the expulsion warrant was either fabricated or backdated when defendant's trial counsel asked for it in discovery.

**(4) Konstantin Yaroshenko's new evidence shows that the U.S. Drug Enforcement Administration agents violated his rights under the Due Process Clause by running an unauthorized sting operation in the country of Ukraine.**

The new evidence that Konstantin Yaroshenko presents to this Court along with the foregoing submission also includes undeniable proof of the fact that the U.S. law enforcement agents had no authorization to conduct a sting operation targeting defendant in the country of Ukraine. Included together with this motion are two (2) letters from the Office of the Prosecutor

General of Ukraine. The first letter is a letter from the Deputy Prosecutor General of Ukraine to the undersigned affirming the fact that Ukraine did not give authorization to the United States to conduct a sting operation. *See* Exhibit "G." The second letter is a letter from the Acting Prosecutor General of Ukraine to the United States Attorney General Eric Holder, in which the American side is officially notified as to the lack of consent on the part of Ukraine for the sting operation against Konstantin Yaroshenko. *See* Exhibit "H."

The issue of whether American Drug Enforcement Administration ("DEA") agents, as well as DEA-paid covert operatives and informants, were authorized to conduct a sting operation targeting Konstantin Yaroshenko in the country of Ukraine in December 2009 and March 2010 was not conclusively resolved in the district court. Konstantin Yaroshenko's defense team contended that the U.S. government violated the laws of Ukraine and the U.S.-Ukraine MLAT treaty provisions when it conducted audio and video recordings in Ukraine. (Gov't App. SA at 185). Konstantin Yaroshenko's defense team asked for an order suppressing the recordings obtained in violation of the laws of Ukraine. *Id.* Additionally, Konstantin Yaroshenko's defense team argued that the violation of Ukrainian law that American DEA agents perpetrated in pursuing their sting operation constitutes part of the third pillar[2] of outrageous government misconduct under *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). (Gov't App. SA at 185).

The U.S. Attorney's Office flatly disputed the contention that the DEA was not given authorization for its operations in the territory of Ukraine. (Gov't App. SA at 235). Specifically, the government's brief stated that the DEA did obtain concurrence from Ukrainian authorities to undertake investigative measures in that country. *Id.* The government, however, offered no evidence to the effect that it had consent from the Ukrainian side.

---

[2] The elements required under *Toscanino* for a Court to entertain dismissal of a criminal action include (1) torture, (2) kidnapping, and (3) the violation of the laws of other countries.

It is abundantly clear that a statement from the highest ranking law-enforcement authority of the country of Ukraine, namely the Office of the Prosecutor General, is dispositive as to whether American DEA agents in fact received authorization to conduct a sting operation targeting Konstantin Yaroshenko in that country.

**B.   The evidence presented warrants a new trial.**

**(1)   The evidence is in fact newly discovered and was not known to defendant at the time of trial. The evidence could not have been discovered prior to or during the trial with due diligence.**

In Konstantin Yaroshenko's situation, the newly discovered evidence is in the form of affidavits from government representatives and private parties residing abroad. These include (1) officers of state security service in Liberia, (2) highest-ranking officials within the Prosecutor General's Office in Ukraine, (3) diplomats of the Russian Federation stationed in the Republic of Ghana. The existence of the evidence now assembled was clearly not known to defendant and his legal counsel at the time of trial. First, Konstantin Yaroshenko had no knowledge as to the fact that officers with the Liberian National Security Agency, who had just been involved in his arrest, kidnapping, and torture, would ever be prepared to give testimony supporting his allegations. Second, Konstantin Yaroshenko's defense team was told in no uncertain terms that the DEA obtained authorization from the government in Kiev to conduct a special operation against defendant in Ukraine.

Neither could this newly-discovered information have been located by Konstantin Yaroshenko's former defense counsel. For one, it is apparent that neither defendant nor members of his trial defense team had the degree of international connections and experience to facilitate the acquisition of documents from Liberia, Ukraine, Ghana, and Russia. As such, requests sent by his former counsel to various Ukrainian authorities went unanswered. Based on the

undersigned's knowledge, it takes months of planning, coordination, networking, as well as intense long-distance and international traveling to acquire documents from foreign sources, especially government sources, in highly-sensitive and heavily-publicized cases, such as the case of Konstantin Yaroshenko. It took the undersigned nearly two years from commencing to work on this matter to acquire the evidence submitted with this motion. The time factor was clearly working against prior counsel, as the trial began in April 2011, less than one year after defendant was arrested. Besides, trial counsel, who mostly work in the federal courts in New York, were engaged with other matters and could not have afforded to travel extensively in a quest to collect exculpatory evidence on behalf of Konstantin Yaroshenko halfway across the globe.

**(2) The evidence is material and not cumulative or merely impeaching.**

The newly discovered evidence from witnesses and foreign government representatives who signed the letters and the affidavits is clearly material and not cumulative or impeaching, but goes directly to the central issue in the case: whether or not the government's conduct was so outrageous as to deprive the court of jurisdiction.

**(3) The admission of the newly discovered evidence would probably lead to the dismissal of charges against Konstantin Yaroshenko.**

**a. The introduction of new evidence would likely result in this Court's granting of Konstantin Yaroshenko's motion to dismiss based on outrageous government misconduct.**

The elements required under *Toscanino* for compelling a court to be divest itself of jurisdiction in a criminal action include (1) torture, (2) kidnapping, and (3) the violation of the laws of other countries. *United States ex. rel. Lujan v. Gengler*, 510 F. 2d 62 (2d Cir. 1975). Grounded in the Due Process Clause, the *Toscanino* rule applies if jurisdiction over a defendant "has been acquired as the result of the government's deliberate, unnecessary, and unreasonable invasion of the accused's constitutional rights." *Toscanino*, 500 F.2d 267, 275 (1974). While this

Court in its original decision on defendant's motion to dismiss called *Toscanino* a "dead letter," *United States v. Umeh*, 762 F. Supp. 2d 658, 665 (S.D.N.Y. 2010),  the fact of the matter is that no other federal decision explicitly held that *Toscanino* was no longer valid. Now, having the benefit of access to the Second Circuit's opinion in Konstantin Yaroshenko's case and the new facts discovered by defendant, this Court should grant a motion for new trial, reopen discovery, and allow defendant to renew his motion to dismiss for outrageous misconduct.

Contrary to this Court's earlier opinion, the rule in *Toscanino* continues to have legal effect, and the appellate court's decision not to abrogate *Toscanino* in its opinion issued in Konstantin Yaroshenko's case is indicative of the value that precedent still has. To recapitulate, the appeals court simply said that the facts in Konstantin Yaroshenko's case are different from those in *Toscanino.* To give an explanation of how defendant's case differed from Toscanino, the Second Circuit then cited a case where a defendant was kidnaped, but not tortured. *See U.S. v. Umeh*, 11-3898, at 13 (2d Cir. 2013). What the appellate court did not have before it on review was evidence of Konstantin Yaroshenko's kidnapping and torture, which is now presented.

Otherwise, this Court should recognize that *Toscanino* still retains vitality. In the 1988 decision of *United States v. Yunis*, the D.C. Circuit reaffirmed that "the purpose underlying the *Toscanino* rule is to deter police misconduct by barring the government from using the fruits of its deliberate lawlessness," and that the remedy of dismissing all charges is appropriate. *United States v. Yunis*, 681 F. Supp. 909, 920 (D.C. Cir. 1988), reversed on other grounds *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988). The *Yunis* case came up after the Supreme Court reaffirmed *Ker-Frisbie* in *INS. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984), and held that an illegal arrest, without more, is not a bar to subsequent prosecution, *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975). The latter two were the cases this Court relied on in its prior decision for the

proposition that *Toscanino* is not authoritative. This Court's further reference to *Brown v. Doe*, 2 F.3d 1236 (2d Cir. 1993), and *United States v. Ghailani*, 751 F. Supp. 2d 502 (S.D.N.Y. 2010) in its original order on defendant's motion to dismiss, as standing for the proposition that no remedy is mandated even if a defendant is repeatedly beaten after his arrest, is inapposite. *Brown* was decided on the basis of classic exclusionary rule jurisprudence, including the cases of *Mapp v. Ohio*, 367 U.S. 643 (1961) and *Wong Sun v. United States*, 371 U.S. 471 (1963), which in substance taught that a prosecution may be foreclosed only through the exclusion of evidence tainted by a Fourth Amendment violation. *Ghailani* may not diminish the power of *Toscanino* first because it is a district court case, and second because it dealt with the CIA's use of enhanced interrogation techniques authorized by the highest levels of the U.S. government. *Ghailani*, 751 F. Supp. 2d 502, 504 (2010). More fundamentally, in deciding the foregoing new trial motion, this Court should conclude that its earlier decision was erroneous because Second Circuit precedent embodied in *Toscanino* requires cumulative government misconduct analysis. This Court's earlier opinion analyzed each ground of Konstantin Yaroshenko's *Toscanino* claim separately, and concluded that each by itself is not sufficient enough to dismiss the indictment.

The Second Circuit thoroughly went through the *Toscanino* analysis without rejecting it as recently as in 2003 while considering a due process challenge based on allegations of torture. *United States v. Yousef*, 327 F.3d 56, 137 (2d Cir. 2003). Since appellate courts refused to consider *Toscanino* a dead letter even after Supreme Court's decisions dealing with police brutality and extraordinary rendition, this Court should find that Konstantin Yaroshenko is entitled to relief based on new evidence. Konstantin Yaroshenko's newly-discovered evidence attesting to the facts of kidnapping, violence, brutality to the person, and the deliberate misconduct on the part of United States agents in violation of international treaty obligations to

respect the territorial sovereignty of Ukraine, warrant overturning his conviction under

*Toscanino,* and ordering a new trial.

b. **The new evidence discovered would lead to a different ruling of this Court on defendant's motion to dismiss because it shows that the government agents violated the Mansfield amendment.**

Separate and apart from entertaining Konstantin Yaroshenko's arguments under

*Toscanino*, this Court should consider the government agents' violation of the Mansfield

Amendment in adjudicating the new trail motion. The newly discovered evidenced marshaled by

defendant dispels any doubt that the arrest of Konstantin Yaroshenko was the work of Liberian

law enforcement officers. In effect, the affidavits presented clearly show that American DEA

agents were principally responsible for the operation. Representatives of the Drug Enforcement

Administration issued commands to take defendant into custody; they bribed the hotel clerks and

gave orders at the scene of the arrest. Furthermore, these U.S. operatives paid cash to the

Liberian National Security Agency personnel to interrogate and torture Konstantin Yaroshenko.

The Mansfield Amendment states in relevant part "No officer or employee of the United States

may directly effect an arrest in a foreign country as part of any foreign police action with respect

to narcotics control efforts, notwithstanding any other provision of law. . . ." 22 U.S.C. §

2291(c)(1). Also, Federal Rule of Criminal Procedure 4(d)(2) states that a warrant may be

executed only within the jurisdiction of the United States or anywhere else a federal statute

authorizes an arrest. Fed. R. Crim. P. 4(d)(2). Konstantin Yaroshenko was arrested in Liberia not

for some crime committed in the territory of that state and not in pursuance of any official

request by the United States. Rather, Konstantin Yaroshenko was arrested in Liberia at the

command of DEA operatives, for whom the local RLNSA officials served in the capacity of

mere proxies or agents.

In *Alvarez-Machain v. United States*, the Ninth Circuit decided that a United States government instigated arrest and kidnapping of an individual from another country violates international human rights law and can be redressed in U.S. courts. *Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003), overruled on other grounds, *Sosa v. Alvarez-Machain, et al*, 542 U.S. 692 (2004). The Ninth Circuit in that case held that American courts have the authority to issue warrants for arrest of individuals in the United States but lack the jurisdiction to issue warrants for an arrest in other countries and that the DEA's arrest of *Alvarez-Machain* was not legal. While the Supreme Court, in *Sosa v. Alvarez-Machain, et al*, 542 U.S. 692 (2004), reversed the Ninth Circuit in part, stating that neither the Alien Tort statute nor the Federal Tort Claims Act provided a remedy for the alien, the justices did not reverse the Ninth Circuit's finding that the DEA lacked authority pursuant to 21 U.S.C. § 878(2) (2010) and Rule 4(d)(2) to arrest a person in Mexico. *Id.* at 699. The Supreme Court's decision does not invalidate defendant's argument that he was illegally arrested in Liberia.

In the case at bar, there was no Liberian or Interpol arrest warrant sought, nor ordered for Konstantin Yaroshenko's arrest. This is the exact lawless activity that the Mansfield Amendment, 22 U.S.C. § 2291(c), was meant to prevent. There was no basis in law for the DEA's actions in directing the arrest of Konstantin Yaroshenko in Liberia and bringing him to the United States. Since Konstantin Yaroshenko's new evidence reflects the fact that his transition from liberty to custody in Liberia was directed and supervised by American DEA agents, the Court should set aside his conviction, order a new trial, and hear any of Konstantin Yaroshenko's subsequent motions to dismiss.

II.   **BASED ON THE NEW EVIDENCE PRESENTED, THE COURT SHOULD
VACATE THE CONVICTION AND ORDER A NEW TRIAL FOR THE REASON
THAT ITS RULING ON KONSTANTIN YAROSHENKO'S SUPPRESSION
MOTION HINGED ON A FACTUAL BASIS THAT WAS MISLEADING AND
INACCURATE.**

**A.  The newly discovered evidence shows that this Court issued an erroneous ruling on
defendant's motion to suppress the documents acquired in Ukraine.**

This Court should set aside the conviction and order a new trial for the reason that

Konstantin Yaroshenko's new evidence with reasonable probability would lead to the

suppression of audio and video recordings the government operatives made of defendant in

Ukraine. Federal courts recognize claims for relief under Rule 33 on the basis of newly

discovered facts that would lead to the suppression of critical evidence and thus to acquittal. *See

United States v. Woods,* 169 F.3d 1077, 1078 (7th Cir. 1999).

Not only does the DEA agents' violation of the laws of Ukraine and the MLAT treaty

provisions in conducting audio and video recordings in the Eastern European country fortify

Konstantin Yaroshenko's argument under *Toscanino*, but also it militates in favor of excluding

the bulk of recordings made of defendant and then later used at trial. As such, the issue as to

whether the sting operation unfolding in Ukraine was authorized or unauthorized by the

government of that nation is critical to the resolution of Konstantin Yaroshenko's suppression

challenge.

**B.  The evidence requires this Court to set aside Konstantin Yaroshneko's conviction.**

**(1)  The evidence proffered is in fact newly discovered, *i.e.*, discovered since the trial.**

The inclusion of the letters received from Ukrainian authorities at trial would be

impossible because they were obtained some two years later, at the end of April 2013, during

the visit of the undersigned to Kiev. In Ukraine, the undersigned met with a high-ranking

official from the Prosecutor General's Office, having title of the Deputy Prosecutor General of Ukraine. On or about April 29, 2013, the undersigned forwarded a request to the Ukrainian Prosecutor General's Office as to whether the Ukrainian law-enforcement agencies had given permission to the Drug Enforcement Administration agents in 2009 or 2010 to conduct an operation targeting Russian citizen Konstantin Yaroshenko. On or about May 30, 2013, the Deputy Prosecutor General of Ukraine hand-delivered to the undersigned a letter stating that "the competent authorities of Ukraine have not given permission to the Drug Enforcement Administration of the United States of America, either in 2009 or in 2010, to conduct an investigation as to the matter involving K.V. Yaroshenko." In late May 2013, sometime after May 22, 2013, the undersigned received via regular postal mail a copy of a letter from the Office of the Prosecutor General of Ukraine addressed to the Attorney General of the United States Mr. Eric Holder. The letter arrived to the office of the undersigned from the Office of the Prosecutor General of Ukraine in Kiev.

Konstantin Yaroshenko's new evidence gathered in Ukraine could not have been received earlier because his previous counsel were unsuccessful in getting a definitive response from the Ukrainian side. As such, their diligence and persistence notwithstanding, members of Konstantin Yaroshenko's trial defense team could not have acquired by the time of this Court's decision on defendant's suppression challenge the evidence now adduced.

**(2) Defendant's newly discovered evidence is material and not merely cumulative or impeaching.**

In bringing the instant new trial motion, Konstantin Yaroshenko is putting forward evidence that is material to the issues involved. The evidence is material in that it has the tendency of buttressing defendant's suppression challenge. The evidence is not cumulative because Konstantin Yaroshenko's defense in pretrial proceedings did not present to this Court

any factual basis upon which to conclude that the Drug Enforcement Administration's surveillance operations in Ukraine were unauthorized.

**(3) Konstantin Yaroshenko's newly-acquired evidence is of such nature that, on a new trial, it would probably produce an acquittal.**

In its earlier ruling on Konstantin Yaroshenko's request to suppress the evidence acquired against him in Ukraine, this Court seemed to give credence to the government's argument that its DEA agents secured authorization from Ukrainian law enforcement agencies to conduct a sting operation in Kiev. In pretrial submission, previous defense counsel argued, albeit with no documentary support, that the Ukrainian government gave no authorization for the sting operation to occur in the Eastern European nation. In the end, this Court denied Konstantin Yaroshenko's motion to suppress the government's evidence on the grounds that it was obtained in violation of Ukrainian law and/or the U.S.-Ukrainian MLAT. *U.S. v. Umeh*, 762 F.Supp.2d 658, 664 (S.D.N.Y. 2011). At trial, the government offered multiple items of incriminating evidence against Konstantin Yaroshenko from his meetings in Ukraine, including audio surveillance and video recordings. As restated in the government's appellate brief, some of the most important items of evidence against Konstantin Yaroshenko were acquired in Ukraine: (1) recordings of meetings of Konstantin Yaroshenko in Kiev in December 2009 with DEA informants, who talked about narcotics; (2) a handwritten note purportedly showing the price Konstantin Yaroshenko was allegedly charging for cocaine-laden flights; (3) a contract executed by Konstantin Yaroshenko for the Antonov 12 aircraft that Konstantin Yaroshenko was purchasing allegedly to transport the cocaine; (4) recordings of meetings of Konstantin Yaroshenko in Kiev in March 2010, during which the government informants dropped references to cocaine's purported destination as the United States. *See*

(Gov't App. Brief at 10-14). Judged against Konstantin Yaroshenko's newly discovered evidence, the Court's earlier decision was erroneous.

The Ukrainian Constitution and laws prohibit unauthorized audio and video recording of private meetings and telephone conversations. Ukrainian law also prohibits foreign law-enforcement activities in the territory of Ukraine. Ukrainian law provides criminal penalties, including jail time, for activities such as these. To ban the evidence obtained abroad by way of exclusionary rules, a defendant must generally show that the search or seizure was "shocking to the conscience." *See United States v. Maturo*, 982 F.2d 57, 60-61 (2d Cir. N.Y. 1992). In this case, the Court should recognize that it was in fact shocking to the conscience that the U.S. agents would heedlessly violate the sovereignty of another state and themselves engage in criminal conduct in order to set up their ill-conceived sting operation. As such, since this search violated foreign law in light of the new evidence presented, its fruits should for that reason be suppressed in a prosecution occurring in the United States.

If all the evidence of Ukrainian origin gets taken out of Konstantin Yaroshenko's trial, it is likely that the jury would return a different verdict. Of all the pieces of evidence used against Konstantin Yaroshenko, the items collected by the prosecution in the country of Ukraine were the most damaging to defendant. As such, all of the written documents admitted into evidence on the act of agreement came from Ukraine, including a contract for the sale of the airplane and a purported note bearing the prices for the transportation of narcotics. On the issue of Konstantin Yaroshenko's knowledge that the drugs were bound for the U.S., nearly all of the few-and-far-between conversations of covert operatives and defendant making mention of the United States took place in the Ukrainian capital. Altogether, without the

evidence obtained in Kiev, the government's case against Konstantin Yaroshenko would be shattered.

## III. THIS COURT SHOULD ORDER A NEW TRIAL FOR KONSTANTIN YAROSHENKO BECAUSE GOVERNMENT WITNESSES COULD NOT BE TRUSTED.

**A. The Court should order a re-trail because newly discovered critical evidence tends to impeach the government agent's written affidavits offered in support of pretrial submissions.**

Rule 33 does not preclude retrial in all cases where the newly discovered evidence is merely impeaching, because the Rule itself does not distinguish between categories of evidence. Even as the general practice has been to deny new trials where the only newly discovered evidence was impeaching, that practice should not be taken to imply a rule that even if the defendant proves that his conviction almost certainly rests on a lie, the district judge may not grant a new trial. *See United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991). As such, there are exceptional circumstances justifying a retrial based on newly discovered evidence that is impeaching. *Id.* The Second Circuit recognized this principle and has held that, in certain cases, newly discovered evidence which impacts the credibility of a witness may warrant the granting of a new trial. *See United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975) (new trial required where "the reliability of a particular witness may be determinative of innocence or guilt" and there is a reasonable likelihood that the false testimony affected the judgment of the jury); *see also Alvarez v. United States*, 808 F.Supp. 1066, 1092-93 (S.D.N.Y. 1992) (granting motion for new trial in cocaine case where newly discovered evidence consisting of lies and conflicting testimony by a government informant and government agent was material and would probably produce acquittal).

Even as Konstantin Yaroshenko acknowledges that newly discovered evidence which merely impeaches the credibility of a government witness ordinarily is insufficient to justify the granting of a new trial, he contends that his is not an ordinary case. The prosecution of Konstantin Yaroshenko was in large measure predicated on the testimony of government operatives, including Lou Millione, Robert Zachariaciewicz, Sam Gaye, Spyros Entoiades, and Patrick McKay. The latter three gave testimony at Konstantin Yaroshenko's trial. Yet, in their pretrial affidavits, government agents gave statements that, in light of the new evidence, did not correspond to the truth. As such, in his pretrial submission accompanying the government's memorandum in opposition to Konstantin Yaroshenko's motion to dismiss, DEA Agent Sam Gaye stated that when defendant arrived at the headquarters of the Liberia Security Agency, his head was not covered in any manner and he was not handcuffed. (Document #63, Exhibit B). Further, Agent Gaye indicated that when Konstantin Yaroshenko entered the room where he, *i.e.* the agent, was sitting, defendant had a computer with him, appeared normal, and was laughing. *Id.* Further, Agent Gaye stated in his affidavit that during the times he saw Konstantin Yaroshenko at the RLNSA building, nobody physically abused or mistreated him. *Id.*

Similarly, Supervisory Special Agent Lou Milione in his affidavit stated that at no point did he witness any DEA special agent, RLNSA official, or anyone else physically abuse or mistreat Konstantin Yaroshenko while in Liberia. Agent Milione next indicated that he never observed any bruises, wounds, or injuries on defendant's body or face that indicated he had been physically abused or mistreated. (Document #63, Exhibit C).

It is obvious that the statements of Liberian hotel clerks and RLNSA operatives presented together with Konstantin Yaroshenko's motion for a new trial fly in the face of the agents' pretrial affirmations. To say the least, the new evidence exposes the fact that the agents'

affidavits were incomplete, as they failed to chronicle the violence at the time of Konstantin

Yaroshenko's arrest and his subsequent interrogation at the National Security Agency building.

Moreover, Konstantin Yaroshenko was convicted by a jury based on, *inter alia*, the testimony of

DEA operative Sam Gaye, whose credibility has now been severely undermined by facts which

became known to defendant only following his trial. More importantly, since whether or not

Konstantin Yaroshenko was kidnapped and tortured is nearly dispositive of defendant's entire

criminal prosecution, the Court should order a new trial and allow Konstantin Yaroshenko a *de-

novo* hearing on his motion to dismiss.

**B. A new trial should be ordered because the government's agents committed perjury.**

Not only does Konstantin Yaroshenko's new evidence seriously impugn the credibility of

the witnesses who claim to have enticed defendant into a conspiracy to send cocaine to the

United States, but it also suggests that government operatives committed perjury. Accordingly,

in order to ensure Konstantin Yaroshenko's rights to due process and a fair trial, this Court

should vacate his conviction and grant his motion for a new trial. New trial is warranted because

government operatives offered perjured testimony by way of their affidavits. In *United States v.

Wallach*, 935 F.2d 445 (2d Cir. 1991), the Second Circuit held that perjury of a key government

witness infected the trial proceedings and required reversal of defendants convictions for

racketeering and other offenses. *Id.* at 473. In this case too, the statements of government

operatives on the issue of Konstantin Yaroshenko's treatment at the National Security Agency

building in Liberia constitute for all practical purposes dishonest testimony, *i.e.* testimony that is

false. The statements the agents submitted were calculated to mislead the Court into believing

that Konstantin Yaroshenko was neither kidnapped nor tortured. In the same vein, in its

opposition to defendant's motion to dismiss, the AUSA illegally vouched for the credibility of

the government's claim to the effect that the DEA did obtain the concurrence from Ukrainian authorities to undertake a special operation targeting defendant in the city of Kiev. Beyond simply not being grounded in fact, these assertions have now been exposed as false through Konstantin Yaroshenko's newly discovered evidence.

Defendant is entitled to a new trial for all of the above reasons outlined in this section. In *United States v. Agurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment. . . . " The Court of Appeals has "interpreted Supreme Court precedent as holding that 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009), quoting *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003). That is the remedy required in this case.

## IV. A NEW TRIAL SHOULD BE ORDERED BECAUSE NEWLY DISCOVERED EVIDENCE OBTAINED FROM KONSTANTIN YAROSHENKO'S CODEFENDANT CHIGBO UMEH SHOWS THAT NO CONSPIRACY UNDER THE LAWS OF THE UNITED STATES EVER EXISTED.

### A. Chigbo Umeh's statement dispels the two most important elements of the conspiracy, in which he and Konstantin Yaroshenko allegedly took part.

In view of newly discovered evidence in the form of codefendant's affidavits, the Court should order a new trial, since the facts noted in those submissions establish that the government presented insufficient evidence to the effect that defendants conspired with the knowledge and intent to import cocaine into the United States.

#### (1) The new evidence presented shows that Chigbo Umeh never intended to confederate with Konstantin Yaroshenko. No conspiracy was formed as a result.

There are three significant themes running through Chigbo Umeh's affidavits: (1) the existence of a heretofore-unidentified confidential government informant by the name of

Santiago[3]; (2) Umeh's own reluctance to engage in any conversation about importing narcotics into the United States; and (3) Umeh's total lack of desire to work with Konstantin Yaroshenko. To begin with the last of these, Chigbo Umeh, an experienced supplier of narcotics from Nigeria, never conspired with Konstantin Yaroshenko, whom he viewed as a total stranger to the international drug business. As stated in Chigbo Umeh's affidavit, on or about May 14, 2010 after the group's joint meeting with Hage where Konstantin Yaroshenko was present, Umeh was on his way back to his hotel together with Santiago and Officer Derrick. *See* Exhibit "I" at ¶ 26. Santiago, who Umeh now believes was a confidential source wearing a recorder on his person, asked him as to what party was going to bring the money to pay for Konstantin Yaroshenko to arrange the flights. *Id.* at ¶ 27. Earlier at the meeting, Umeh and Santiago apparently understood that Konstantin Yaroshenko was asking for all of the money upfront. Upon being asked that question, Chigbo Umeh stated to Santiago that he, *i.e.* Umeh, thought Hage was crazy to believe Konstantin Yaroshenko. *Id.* at ¶ 28. Umeh further told his companion that he did not need Yaroshenko because Umeh devised his own plan for transporting drugs that was more cost-effective. *Id.* Umeh also said that he did not take any discussions with Nabil Hage seriously because Cyril Allen, the original link who introduced Umeh to the Director of the Liberian National Security Agency, was far more senior in the decision-making chain. *Id.* As such, codefendant testimony indicated that Umeh did not plan to work with Konstantin Yaroshenko. Umeh's statement to the effect that he had no plans for working with defendant is valuable

---

[3] Chigbo Umeh contended in his affidavit that after his arrest and conviction he realized that there was another more confidential informant for the government, of whom federal prosecutors failed to apprise defendants. *See* Exhibit "J" at ¶¶1-18. That informant, by the name of Santiago, came as a replacement in the Colombian narcotics supply organization of Acevedo Sormiento for Sormiento's underling Humberto, who was arrested in the course of an unrelated law enforcement operation in Mexico. *Id.* In his affidavit, Umeh stated that Santiago's conduct, and in particular his flight paths and travel plans, appeared strange to him in retrospect. *Id.* Also, according to Umeh, Santiago had the same kind of handbag as Nabil Hage made by Monteblanc or Bally. Umeh believes with a high degree of certainty that Santiago used the bag to conceal a recorder that was used to tape their conversations. *Id.*

because it can, in all likelihood, by corroborated. According to Umeh, when he made the statement, he was in the company of a man he since identified as a confidential source, who was wearing a bag containing recording equipment. If an evidentiary hearing is ordered, the Court should compel the government to disclose the recording done by that source, as well as the informant's identity.

**(2) Chigbo Umeh's statements clearly show that he did not know that the narcotics would go to the United States. The value of Chigbo Umeh's statements is significant because they can be corroborated.**

Chigbo Umeh's statements to the effect that he at all costs sought to avoid any conversation about sending narcotics to the United States indicates that he did not know that any of the drugs he was trying to transport would end up in the United States. While in Liberia, Santiago proceeded to talk to Umeh about a recent shipment of cocaine that he, *i.e.* Santiago, made to the United States with his brother. *See* Exhibit "I" at ¶15. Some days later, Santiago told Umeh that he was very happy because the drugs he had sent to the U.S. arrived safely in New York. *Id.* at ¶15. When next Santiago asked Umeh for assistance in distributing the drugs in America, he answered that he should stop any drug deals involving the United States. *Id.* at ¶23. Specifically, Umeh told Santiago that he was not safe from prosecution in the U.S., even if he had never set foot there. *Id.* at ¶19. Instead of focusing on the U.S., Umeh advised Santiago to send narcotics to Sao Paula, Brazil. *Id.* at ¶22. In view of the possibility that Santiago was a confidential informant, Umeh's admonitions about transporting narcotics to the United States were likely recorded. If presented at a new trial, this discussion would weigh heavily against the government's assertion that defendants knew the cocaine was bound for America.

Chigbo Umeh also had a conversation about not wanting to participate in any drug deal involving the U.S. with high-ranking National Security Agency officials. As such, on October

10, 2009, Umeh had a meeting with Nabil Hage, Fombah Sirleaf, and his deputy Anothony Souh at the RLNSA headquarters. *See* Exhibit "K" at ¶2. The next day, he was taken to an upscale restaurant for a private reception with Fombah Sirleaf and Anothony Souh, the Director and the Deputy Directors of the Liberian National Security Agency. *Id.* at ¶10. One of the main points that Chigbo Umeh wished to address during the meeting with the two officials was Nabil Hage's repeated references to the United States. *Id.* at ¶26. He made it very clear that he had a big problem with mentioning the United States because he had been to prison in the U.S. for drugs and knew how the DEA operated. *Id.* Umeh further stated that he wanted nothing to do with any shipments of drugs to the United States. *Id.* at ¶24. In hindsight, Umeh is certain that the meeting at the restaurant was witnessed and recorded by the DEA. When he sat down at the table with his two hosts, he noticed there were other white people in the restaurant. *Id.* at ¶14. In his affidavit, Umeh indicated that he remembered the face of one of the ladies, as she was staring at him when he went to get food. *Id.* at ¶16. Later, Chigbo Umeh recognized the same woman in the company of DEA agents who escorted defendant onto the plane to the U.S. *Id.* at ¶17. Taken together, the assertion Chigbo Umeh made in his affidavit cast serious doubt on the government's case.

**B. Reversal of the conviction is mandated based on newly discovered evidence.**

**(1) The evidence obtained from Chigbo Umeh is newly discovered and was not known to the defendant at the time of the trial. Defendant's failure to learn of the evidence was not the result of the lack of diligence.**

Courts in the Second Circuit have recognized that a codefendant's post-trial exculpatory statements may qualify as newly discovered evidence within the meaning of Rule 33. *United States v. Owen*, 500 F.3d 83, 91 (2d Cir. N.Y. 2007). Under circuit precedent, a codefendant's post-trial testimony does indeed constitute newly discovered evidence if a defendant neither knew nor could be held to have known that his codefendant could offer material testimony as to

the defendant's role in the charged crime. This is effectively the situation in the matter *sub judice*.

Konstantin Yaroshenko's newly discovered evidence discussed in this section comes from an individual who was originally charged with being involved in the same conspiracy for which defendant went to trial. This evidence is newly discovered and could have been known to Konstantin Yaroshenko prior to trial, or obtained with due diligence because Umeh's case was pending at the same time as defendant's and the former was represented by counsel. This status continued until Umeh was sentenced. While Umeh was represented by counsel, no attorney for Konstantin Yaroshenko could talk to the Nigerian national based on the canons of ethics. In addition, Konstantin Yaroshenko's contact with Chigbo Umeh was limited because they were incarcerated in separate locations from each other. Additionally, the lack of knowledge on the part of Konstantin Yaroshenko as to the possibility that Chigbo Umeh could offer any exculpatory statements derives from the fact that Konstantin Yaroshenko and Umeh were by no stretch of imagination intimate partners in crime. Prior to their arrest, the two met only a few times in their entire lives. Konstantin Yaroshenko knew virtually nothing about Chigbo Umeh. Besides, it later became apparent to Konstantin Yaroshenko that Umeh volunteered to cooperate with the DEA on a return flight to the U.S. In all, defendant was firmly convinced that Chigbo Umeh was off limits to him as a source of any potentially exonerating evidence.

**(2) The evidence is material and not merely cumulative or impeaching.**

Since the evidence goes directly to the central issues in the case – that is, whether an agreement existed between the only two conspirators and whether the parties knew the drugs would go to the United States – the evidence is material. At the same time, the evidence is not cumulative because there were no recorded statements presented on the issue of whether Umeh

intended to work with Konstantin Yaroshenko. Similarly, the Court's record from the trial of the case is barren of any evidence as to Chigbo Umeh's unwillingness to send the drugs to the U.S.

### (3) The newly discovered evidence is bound to be outcome-determinative in a new trial.

A new trial should be ordered because the evidence would likely result in an acquittal. For all the months of talking about international drug trafficking, DEA informants did not get Konstantin Yaroshenko acquainted with Chigbo Umeh, the only other alleged conspirator, until the very end of the sting operation on May 13, 2010. As a legal matter, Umeh was in fact the only person with whom Konstantin Yaroshenko could have conspired, since a conspiracy cannot exist if one party to the agreement is a government-paid informant. *Cf. People v. Blume*, 443 Mich. 476, 485 (1993). Thus, the evidence of Chigbo Umeh's dealings with Konstantin Yaroshenko is all the more important, as the lack of intent on the part of one of the codefendants to work with the other could unravel the entire conspiracy. In light of the new facts, the problem with the verdict is that Chigbo Umeh never actually entered into an agreement with Konstantin Yaroshenko. In fact, Umeh simply had no need for Konstantin Yaroshenko as a pilot because he already had pilots and airplanes willing to transport the cargo to Africa without any substantial advance payments. The new evidence bears these facts out.

Second, Chigbo Umeh's affidavits give rise – at a minimum – to reasonable doubt that he knew that a portion of the cocaine was to be delivered to the U.S. In assessing whether newly discovered evidence would probably lead to an acquittal, the Court must necessarily look at the strength of the government's case. *United States v. Gallego*, 191 F.3d 156, 161-62 (2d Cir. 1999). Here, the government's case against Konstantin Yaroshenko was weak, as illustrated in the introductory sections of this motion. It is therefore clear that this evidence would have probably led to an acquittal.

## V.   IN ITS DISCRETION, THE COURT SHOULD ORDER AN EVIDENTIARY HEARING ON KONSTANTIN YAROSHENKO'S MOTION FOR A NEW TRIAL.

Defendant Konstantin Yaroshenko demands an evidentiary hearing on all aspects of the foregoing motion. The seriousness of the contentions Konstantin Yaroshenko makes by way of his newly acquired evidence, including allegations of the government agents' corrupting law enforcement operatives in third countries, giving perjured testimony, kidnapping and torturing persons, as well as committing crimes abroad, makes an evidentiary hearing advisable. While Rule 33 motions based upon newly discovered evidence are ordinarily decided without an evidentiary hearing, the trial court has the discretion to conduct a hearing where required by the particular circumstances. *See, e.g., United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). An evidentiary hearing in Konstantin Yaroshenko's case should also be held to give counsel an opportunity to examine the DEA agents and covert government operatives in order to ascertain how they would alter their testimonies at a new trial in view of the new evidence presented.

### CONCLUSION

For the reasons stated above, Konstantin Yaroshenko respectfully requests that a new trial be granted in the interests of justice, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully submitted,
/s/ Alexey Tarasov

Alexey V. Tarasov, Esq.,
Attorney at Law

723 Main Street, Suite 310
Houston, Texas 77002

Tel.: 832-623-6250

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

United States,

     Plaintiff

vs.

     Konstantin Yaroshenko,

     Defendant.

_____

09-cr-00524

**CERTIFICATE OF SERVICE**

     I hereby certify that the attached pleading styled has been served via the ECF system on:

| | |
|---|---|
| Randall Wade Jackson, AUSA | Katherine Polk Failla, AUSA |
| United States Attorney's Office, Southern District of New York | United States Attorney's Office, Southern District of New York |
| 1 Saint Andrew's Plaza | 1 Saint Andrew's Plaza, Room 844 |
| New York, NY 10007 | New York, NY 10007 |

Respectfully submitted
this 28th day of April 2014

/s/ Alexey Tarasov

Alexey V. Tarasov, Esq.,
Attorney at Law

723 Main Street, Suite 310
Houston, Texas 77002

Tel.: 832-623-6250
Fax: 832-495-4168