**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

United States,

Plaintiff

vs.

Konstantin Yaroshenko,

Defendant.

---

09-cr-00524

**DEFENDANT'S MOTION**
**FOR COMPASSIONATE RELEASE**
**PURSUANT**
**TO 18 U.S.C. § 3582(c)(1)(A) WITH**
**MEMORANDUM OF LAW**

On behalf of Defendant Konstantin Yaroshenko, the undersigned respectfully moves this Court to grant him compassionate release under 18 U.S.C. § 3582(c)(1)(A), so that Mr. Yaroshenko could depart to his home country of Russia, where he could quarantine at his home. This motion should be granted for "extraordinary and compelling reasons," specifically Mr. Yaroshenko's particular vulnerability to COVID-19 due to his incarceration and underlying health issues.

Mr. Yaroshenko is 52 years old and suffers from serious health issues, including hypertension, hyperlipidemia, osteoarthritis, hemorrhoids, varicocele, benign prostatic hyperplasia, chronic prostatitis, presbyopia, abrasion of teeth, disorder of pigmentation, muscle spasms with panic attacks, post-traumatic stress disorder, and diarrhea. *See* Exhibit "C." He also has a history of other infectious and parasitic disease. If he contracts COVID-19, he faces a significant risk of severe illness or death. Mr. Yaroshenko is not a danger to the community, and his immediate release under these circumstances adheres to the mandates of 18 U.S.C. § 3553(a), particularly in light of the cataclysmic events of the current pandemic. Counsel for Mr. Yaroshenko asks the Court to consider this motion on an expedited basis, as the risk of the pandemic multiplies exponentially with each passing day.

## I.    Factual Background

On April 28, 2011, the jury found Konstantin Yaroshenko guilty of a conspiracy to transport narcotics from South America to Africa, with the knowledge that some of those narcotics would enter the United States. Mr. Yaroshenko was sentenced to a 20-year term of imprisonment. Mr. Yaroshenko's release date from the Bureau of Prisons is June 12, 2027. *See* Fed. Bur. of Prisons, Find an Inmate, available at https://www.bop.gov/inmateloc/.

Mr. Yaroshneko has served more than half of his term of imprisonment. Mr. Yaroshenko has been sentenced to 240 months.[1] Good time credit applies in this case. Based on Mr. Yaroshenko's arrest date of May 28, 2010[2] and his projected release date of June 12, 2027 that is listed on the B.O.P. website, the total sentence to be served is 6,224 days, or seventeen (17) years and fifteen (15) days, excluding the end date. Mr. Yaroshenko has already served 3,857 days, or ten (10) years, six (6) months, and twenty (20) days as of the date of this writing. The time Mr. Yaroshenko has served translates to roughly 62 percent of his sentence.

Mr. Yaroshenko is currently incarcerated at the Federal Correctional Institution, Danbury ("FCI Danbury") in Connecticut. As of the writing of this motion, there are at least ninety-five (95) confirmed cases of COVID-19 among the inmates at this facility. *See* Fed. Bur. of Prisons, Open COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/. It thus appears that there is now a new outbreak of the virus at FCI Danbury. Previously, Attorney General Barr has found that the COVID-19 pandemic has created "emergency conditions" in the Bureau of Prisons (B.O.P.) and that FCI Danbury experienced "significant levels of infection." *See* Exhibit "A."

---

[1] At sentencing, Mr. Yaroshenko faced a mandatory minimum term of imprisonment of 10 years because the conspiracy involved the distribution of more than five kilograms of cocaine.
[2] Mr. Yaroshenko was arrested in Liberia on May 28, 2010.

For B.O.P. as a whole, the virus has now spread to over 5,771 federal inmates and 1,694 B.O.P. staff, killing 168 of the inmates and two staff members as of December 18, 2020.[3] *See* Fed. Bur. of Prisons, Open COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.

According to his B.O.P. medical records, Mr. Yaroshenko suffers from, *inter alia*, hypertension and hyperlipidemia. *See* Exhibit "C" at pp. 3 and 12. The Center for Disease Control ("CDC") emphasizes that there exists a higher risk of COVID-19 infections and complications in people with high blood pressure.[4] Analysis of data from both China and the U.S. shows that high blood pressure is the most commonly shared preexisting condition among those hospitalized, affecting between 30% to 50% of the patients.[5] Another COVID-19 comorbidity that Mr. Yaroshenko exhibits is hyperlipidemia. The WebMD organization describes hyperlipidemia as marked by high levels of fat in the blood, such as cholesterol and triglycerides.[6] With respect to hyperlipidemia, the latest research published in Emerging Infectious Diseases, an open access, peer reviewed journal issued by the Centers for Disease Control, singles out this condition as one of the three most common concurrent conditions among COVID-19 patients[7], alongside hypertension and diabetes.[8] *See* Ferguson, J., Rosser, J.I., Quintero, O., Scott, J., Subramanian, A., Gumma, M. Kappagoda, S. (2020). *Characteristics and Outcomes of Coronavirus Disease Patients Under Nonsurge Conditions, Northern California, U.S.A., March-April 2020.* Emerging

---

[3] Currently, 27,767 inmates and 2,532 staff have recovered.

[4] CDC, People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#:~:text=Having%20other%20cardiovascular%20or%20cerebrovascular,from%20COVID%2D19 (last accessed on December 18, 2020).

[5] WebMD, *Coronavirus and High Blood Pressure: What's the Link?*, available at https://www.webmd.com/lung/coronavirus-high-blood-pressure#1 (last accessed on December 18, 2020).

[6] WebMD, *What Is Hyperlipidemia?*, available at https://www.webmd.com/cholesterol-management/hyperlipidemia-overview (last accessed on December 18, 2020).

[7] Hyperlipidemia was found in 34.7% of COVID patients.

[8] Concurrence rate of 27.8%.

Infectious Diseases, 26(8), 1679-1685.[9] According to a study published in the Journal of Lipid and Atherosclerosis, findings suggest that dyslipidemia plays a role in the severity of COVID-19 infection. *See* Choi, G.J., Kim, H.M., & Kang, H. (2020). *The Potential Role of Dyslipidemia in COVID-19 Severity: an Umbrella Review of Systematic Reviews*. Journal of Lipid and Atherosclerosis, 9(3), 435-448.[10]

In relation to Mr. Yaroshneko's other condition, osteoarthritis, *see* Exhibit "C" at p. 10, COVID-19 constitutes a challenge for patients with inflammatory arthritis for several reasons, in particular with regard to the safety of immune interventions during the pandemic. *See* Schett, G., Manger, B., Simon, D. et al. *COVID-19 revisiting inflammatory pathways of arthritis*. Nat'l Rev. Rheumatology 16, 465-470 (2020).[11]

With respect to the coronavirus (or COVID-19), Harvard Health Publishing, of Harvard Medical School, explains:

> **Underlying conditions, including heart disease, lung disease, and diabetes, increase risk even further in those who are older.**
>
> **In addition, <u>anyone with an underlying medical condition, regardless of their age</u>, faces increased risk of serious illness.[12]**

The CDC suggests the following preventative measures for those who are at higher risk to avoid contracting the coronavirus:

> **Obtain several weeks of medications and supplies in case you need to stay home for prolonged periods of time.**
>
> **Take everyday precautions to keep space between yourself and others.**

---

[9] Available at https://dx.doi.org/10.3201/eid2608.201776 (last accessed December 18, 2020).
[10] Available at https://doi.org/10.12997/jla.2020.9.3.435 (last accessed December 18, 2020).
[11] Available at https://doi.org/10.1038/s41584-020-0451-z (last accessed on December 18, 2020).
[12] Harvard Health Publishing, Coronavirus Resource Center, available at https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (emphasis added) (last accessed on December 18, 2020).

> When you go out in public, keep away from others who are
> sick, limit close contact, and wash your hands often.
>
> Avoid crowds.
>
> […]
>
> During a COVID-19 outbreak in your community, stay home
> as much as possible to further reduce your risk of being
> exposed.[13]

Within an institutional setting Mr. Yaroshenko is not able to take any of the

recommended precautions and hence stands particularly vulnerable to suffering a bad outcome.

Mr. Yaroshenko's reliance on immunosuppressants and the inability of his body to control blood

pressure place him in especially dangerous territory with this virus.[14]

More than 30 days prior to the filing of this motion, on or about April 2, 2020, Mr.

Yaroshenko submitted and filed an administrative relief request with the Federal Bureau of

Prisons seeking compassionate release. *See* Exhibit "A." The request was subsequently denied.

Because of the urgency of the spread of COVID-19, both nationally and within the prison

system, we respectfully ask the Court to waive the administrative appeals process, which could

take months. By the time the administrative process runs its course, it could be too late.

II.   **This Court Should Waive the Administrative Exhaustion Requirement Applied
      to Compassionate Release Motions.**

Because of the urgency of the spread of COVID-19, this Court should waive the

exhaustion requirement for filing a motion for compassionate release under 18 U.S.C. §

3582(c)(1)(A). Requiring Mr. Yaroshenko to appeal the warden's decision administratively

would be futile under the circumstances and could lead to irreparable harm. Mr. Yaroshenko

---

[13] *Id.*
[14] *See* Mayo Clinic, *COVID-19 and high blood pressure: Am I at risk?*, June 30, 2020, available
at https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663 (last accessed on December 18, 2020).

faces an increased risk of contracting the virus because of the conditions of confinement in prison, where social distancing is impossible and disease spreads fast. If Mr. Yaroshenko contracts COVID-19, which is likely, he faces grave risk of serious illness or death. In these dire and unusual circumstances, the Court can and should waive the administrative exhaustion requirement in § 3582.

On December 21, 2018, the First Step Act became law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense-brought motion for the reduction of a sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is* earlier[.]" First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Accordingly, the statute ordinarily requires that a defendant must either (a) fully exhaust administrative rights to appeal the B.O.P.'s failure to move for compassionate release itself, or (b) wait until 30 days have elapsed from a warden's receipt of the defendant's request for compassionate release, before a court may grant such a motion filed by the defendant. *See* § 3582(c)(1)(A).

But neither of these alternatives – administrative exhaustion or a 30-day waiting period, whichever occurs sooner – are jurisdictional prerequisites to judicial review of a defendant's compassionate release motion. This Court has previously held that the provision of the First Step Act requiring a federal inmate seeking compassionate release to exhaust administrative remedies prior to filing a motion in federal court was not jurisdictional. *United States v. Haney*, 454 F.Supp.3d 316 (S.D.NY. 2020).

Requiring Mr. Yaroshenko to challenge the warden's decision through the administrative process would amount to ignoring the fast-moving nature of the coronavirus pandemic during what appears to be a second major COVID-19 outbreak at FCI Danbury. Prisoners at FCI Danbury received a memo from the Warden on December 3 stating that there were seven (7) active cases among them. *See Martinez-Brooks v. D. Easter*, 3:20-cv-00569, ECF No. 263, p. 14 (MPS). That number has grown vastly in just days.

### III.    Sentence Reduction Authority

This Court has authority to order Mr. Yaroshenko's immediate release (for subsequent removal to Russia) under the compassionate release statute in 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act. Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

In *Brooker*, the Second Circuit held that the current version of U.S.S.G. § 1B1.13 does not apply to compassionate release motions other than those made on behalf of a prisoner by the B.O.P. *United States v. Brooker*, No. 19-3218-cr, 2020 WL 5739712, at *6-7 (2d Cir. Sept. 25, 2020). Instead, district courts enjoy broad authority to modify sentences for extraordinary and compelling reasons:

> **A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. … Beyond this, a district court's discretion in this area – as in all sentencing matters – is broad. *See United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*) (noting a district court's "very wide latitude" in sentencing). The only statutory limit on what a court may consider to be extraordinary and compelling is that "[r]ehabilitation ...**

**alone shall not be considered an extraordinary and compelling reason."**
**28 U.S.C. § 994(t) (emphasis added).**

*Id.*

With the enactment of the First Step Act, the authority shifted to district courts to decide

whether extraordinary and compelling reasons warrant a sentence reduction in a given case

without deference to any administrative agency. In the context of compassionate release, courts

around the country have considered a defendant's vulnerability to COVID-19 in deciding

whether there is an "extraordinary and compelling reason" in favor of compassionate release.[15]

_____

[15] *See, e.g., Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (granting compassionate release); *United States v. Tran*, 8:08-cr-197, ECF No. 405 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release in light of COVID-19); *United States v. Smith*, No. 1:12-cr-133, ECF No. 197 (S.D.N.Y. Apr. 13, 2020) (granting release; finding exhaustion waivable and waived); *United States v. Sawicz*, No. 08-cr-287, ECF No. 66 (E.D.N.Y. Apr. 10, 2020) (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Trent*, No. 16-cr-178, ECF No. 106 (N.D. Cal. Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. Clagett*, No. 2:97-cr-265, ECF No. 238 (W.D. Wash. Apr. 9, 2020) (granting stipulated motion for compassionate release in light of severe risks posed by COVID-19); *United States v. Plunk*, No. 3:94-cr-36 (D. Alaska Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release and waiving exhaustion requirement for defendant at serious risk from COVID-19); *United States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and medical problems justify a seven-month reduction in sentence); *United States v. Oreste*, No. 1:14-cr-20349, ECF No. 200 (S.D. Fla. Apr. 6, 2020) (compassionate release); *United States v. Zukerman*, No. 1:16-cr-194, ECF No. 116 (Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19: "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Foster*, No. 1:14-cr-324-02, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (noting "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-cr-3, ECF No. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ("[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release. . . .") *United States v. Hernandez*, No. 18-cr-20474, ECF No. 41 (S.D. Fla. Apr. 2, 2020) (granting

Here, Mr. Yaroshenko is asking this Court to similarly find that that his particular vulnerability

to COVID-19 is an "extraordinary and compelling reason" to grant compassionate release.

IV.    **The COVID-19 Outbreak Presents an Extraordinary and Compelling Circumstance that Warrants Compassionate Release for Mr. Yaroshenko, Who Is at Risk of Health Complications Due to His Preexisting Conditions.**

A.    **COVID-19 presents a national and global emergency.**

It is difficult to overstate the impact the rapid spread of COVID-19 has had across the

globe. In the United States, all the 50 states have declared states of emergency and the President

declared a national emergency.[16] The number of confirmed cases in the United States is

---

unopposed motion for compassionate release); *United States v. Jepsen*, 2020 WL 1640232 (D. Conn. Apr. 1, 2020) (waiving exhaustion in the context of a non-B.O.P. institution and granting compassionate release to immunocompromised defendant); *United States v. Perez*, No. 1:17-cr-513, ECF No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271, ECF No. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Gonzalez*, No. 2:18-cr-232, ECF No. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10-month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, ECF No. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release for defendant with elevated risk of dire health consequences due to the current COVID-19 outbreak); *United States v. Muniz*, No. 4:09-cr-199, ECF No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, No. 1:18-cr-382, ECF No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justifies his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316, ECF No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant).

[16] President Donald J. Trump, "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak" (Mar. 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited December 18, 2020).

currently at 17,401,700, and that number is widely considered to be understated. More than

312,500 people have died in this country.[17] To date, the state of Connecticut where FCI Danbury

is situated has amassed 160,102 confirmed cases of the virus, with 5,552 deaths.[18] Experts have

warned that even with the extreme measures currently in effect – containment zones in a number

of communities, social distancing orders, the mandatory closures of nonessential businesses and

activities – the number of deaths could eclipse 561,669 by April 1, 2021. *See* Institute for Health

Metrics and Evaluation, University of Washington.[19] The exponential rate of the coronavirus

infection is unparalleled.

Courts have taken substantial steps to respond to this crisis. This Court, in particular, has

issued a series of general orders recognizing the serious risk posed by COVID-19 and

implementing unprecedented measures to minimize the spread of the virus, such as restricting

visitors and closing portions of the courthouse, postponing deadlines, continuing criminal

matters, and tolling the speedy trial clock. *See*, *e.g.*, Standing order suspending in-person

operations until January 15, 2021, No. 20-mc-622. Federal courts around the country are

granting release to criminal defendants pre-trial and pre-sentencing, in addition to allowing

delayed self-reports to prison, all in response to the COVID-19 pandemic.[20] As noted in lengthy

---

[17] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (December 18, 2020), available at  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited December 18, 2020).

[18] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (December 18, 2020), available at  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited December 18, 2020).

[19] Available at https://covid19.healthdata.org/united-states-of-america?view=total-deaths&tab=trend (last visited December 18, 2020).

[20] *See*, *e.g.*, *United States v. Meekins*, No. 1:18-cr-222, ECF No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to the extraordinary danger that COVID-19 poses to individuals in detention); *United States v. Davis*, No. 1:20-cr-9, 2020 WL 1529158, at *9 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community); *United States v. Hector*, No. 2:18-cr-3, ECF No. 748 (W.D. Va. Mar. 27, 2020) (granting release

footnote above, courts around the country have considered the danger of COVID-19 a

significant factor in finding "extraordinary and compelling reasons" to grant compassionate

release.

Finally, this Court should recognize that if Mr. Yaroshenko is required to remain

incarcerated during this pandemic, he faces both an increased risk of contracting COVID-19 and

an elevated risk of developing health complications or dying from it. These are enhanced

punishments that were not foreseen or intended at sentencing.

### B. Mr. Yaroshenko faces a significantly higher risk of contracting COVID-19 and suffering complications because of the conditions of confinement and his serious preexisting health problems.

Conditions of confinement create the ideal environment for the transmission of

contagious disease.[21] "Prisons are petri dishes for contagious respiratory illnesses."[22] Inmates

cycle in and out of jails and prisons, and people who work in the facilities leave and return daily,

without screening. According to public health experts, incarcerated individuals "are at special

risk of infection, given their living situations," and "may also be less able to participate in

proactive measures to keep themselves safe;" "infection control is challenging in these

settings."[23] The conditions of confinement not only affect incarcerated individuals, but also the

community at large. "With 2.3 million people in the United States in prison or jail on any given

---

pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to individuals in prison).
[21] Joseph A. Bick (2007). *Infection Control in Jails and Prisons.* Clinical Infectious Diseases, 45(8):1047-1055, available at https://doi.org/10.1086/521910 (last visited December 18, 2020).
[22] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), available at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration (last visited December 18, 2020).
[23] *"Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States"* (Mar. 2, 2020), available at https://bit.ly/2W9V6oS (last visited December 18, 2020).

day, an outbreak in these facilities poses a threat to the entire country."[24] Given what we know

about COVID-19, the B.O.P.'s attempts to contain the infection seem futile. Coronavirus is

highly contagious. On average, one person with the coronavirus will infect from two to three

other individuals.[25]

 While many jails have halted in-person visitation, "there is no way to stop the daily flow

of guards, food service, and healthcare workers. Someone is certain to bring the virus in and take

it back out while they are asymptomatic."[26] Because COVID-19 vaccine is not being distributed

among the inmates within the B.O.P. yet, the primary focus is on preventing the spread of the

virus. To prevent new infections, the CDC strongly recommends the following actions: thorough

and frequent handwashing, cleaning surfaces with disinfectants approved by the Environmental

Protection Agency, keeping at least six feet of space between people, and social distancing.

Maintaining six feet of distance from other inmates is all but impossible in a correctional facility

where most individuals are bunked with cellmates, sharing a toilet and sink with cellmates and a

common shower with at least a dozen or more other people. Courts have acknowledged these

concerns. *See, e.g., United States v. Kennedy*, No. 18-20315, No. 2020 WL 1493481, at *2 (E.D.

Mich. Mar. 27 2020) (quoting CDC, "Interim Guidance on Management of Coronavirus Disease

2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020) and noting that

---

[24] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks,* The Justice Collaborative, available at
https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf  (last visited December 18, 2020).
[25] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), available at https://www.msn.com/en-us/health/medical/scientists-are-racing-to-calculate-a-crucial-measure-of-the-coronavirus-spread-it-suggests-the-virus-may-be-far-more-contagious-than-the-flu/ar-BB11byhL (last visited December 18, 2020).
[26] *Letters to the Editor:* A *prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), available at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration (last visited December 18, 2020).

challenges to the control of COVID-19 include "low capacity for patient volume, insufficient

quarantine space, insufficient on-site medical staff, highly congregational environments,

inability of most patients to leave the facility, and limited ability of incarcerated/detained

persons to exercise effective disease prevention measures (*e.g.*, social distancing and frequent

handwashing).").

Mr. Yaroshenko is at risk in several ways: he lives in a confined environment, and he has

serious health problems, most notably hypertension, hyperlipidemia, and arthritis.

**(1) Conditions of confinement make isolation impossible.**

According to Mr. Yaroshenko, the G Unit at FCI Danbury currently houses

approximately 60 men. The men sleep in rows of bunk beds. Mr. Yaroshenko's living space

consists of a bunk bed shared with another inmate, and only 46 inches away from the next set of

bunks. *See United States v. Michael Tatro*, 2007-cr-00143, ECF No. 66, p. 5. (D.R.I. Apr. 13,

2020). Even more problematic, the head of an inmate's bed is only 18 inches away from the

bunk immediately behind each individual prisoner, where two other inmates live. *Id.*

Consequently, Mr. Yaroshenko sleeps with his head exposed within less than six feet of other

inmates. The dormitory setup does not include any large common areas. *Id.* There are two small

rooms used for television viewing and one smaller room for using the facility's Corrlinks email

computers. *Id.* These rooms are crowded and do not foster safe social distancing. *Id.* Simply put,

there is no place to go. *Id.* Medical sick call is offered daily but represents an overworked and

understaffed endeavor. *Id.* at 6. According to Mr. Yaroshenko, there are men in the unit that are

currently exhibiting symptoms of COVID-19, such as coughs. The ventilation system is poor,

and bathrooms are tiny and cramped.[27] One prisoner, Anthony David Gentile, whose bed was

---

[27] There are four toilets and two urinals, as well as six sinks and six small showers. The sinks are
so close together that inmates are practically touching each other when washing.

next to Mr. Yaroshenko's bed, died earlier this year on April 9, 2020 from COVID-19. *See* Inmate Death at FCI Danbury, BOP.[28] As of early December, there has been no facility-wide testing conducted since May, and thus the number of reported positive cases almost certainly understates the extent of the outbreak. *See Martinez-Brooks v. D. Easter*, 3:20-cv-00569, ECF No. 263, p. 14 (MPS). Temperature and symptom checks are not being performed consistently. *Id.* There continues to be movement of prisoners and staff across the complex, and social distancing is still impossible for prisoners housed in crowded dorms. *Id.* Although some incarcerated at FCI Danbury when the pandemic began were released to home confinement or via compassionate release orders, the B.O.P. resumed transfers of new prisoners into the facility this summer. *Id.* As of early December, 899 individuals were incarcerated at the facility, up from 825 from the time of the initial outbreak at FCI Danbury.[29] *Id.* FCI Danbury is situated within Fairfield County, which is currently Connecticut's COVID-19 epicenter, having the state's largest number of confirmed COVID-19 infections. As of the date of this writing, that translated to 50,036 of the state's 160,102 cases – with 1,619 of the state's 5,552 deaths.[30]

### (2) Mr. Yaroshenko faces complications from a possible COVID-19 infection as a result of experiencing hypertension.

Mr. Yaroshenko is especially at risk for severe illness or death from COVID-19 because of his preexisting health conditions. The following conditions have been specifically identified by the United States Centers for Disease Control as putting individuals at higher risk for severe illness from COVID-19:

---

[28] Available at https://www.bop.gov/resources/news/pdfs/20200418_press_release_dan.pdf (last accessed December 18, 2020).

[29] Latest numbers show that there are 862 total inmates at the facility.

[30] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (December 18, 2020), available at  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited December 18, 2020).

- **Asthma (moderate-to-severe)**
- **Cerebrovascular disease (affects blood vessels and blood supply to the brain)**
- **Cystic fibrosis**
- **<u>Hypertension or high blood pressure</u>**
- **<u>Immunocompromised state</u> (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines**
- **Neurologic conditions, such as dementia**
- **Liver disease**
- **Overweight (BMI > 25 kg/m2, but < 30 kg/m2)**
- **Pulmonary fibrosis (having damaged or scarred lung tissues)**
- **Thalassemia (a type of blood disorder)**
- **Type 1 diabetes mellitus.**

**Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 18, 2020).**

The Bureau of Prisons treats Mr. Yaroshenko for one of these preexisting conditions.

Each day, Mr. Yaroshenko is administered ▮▮▮▮[31] for hypertension, with a dose of 12.5 mg

every 12 hours. ▮▮▮▮ is a beta-blocker antihypertensive agent with vasodilating properties.

*See* Moser, M., & Frishman, W. (1998). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ American Journal of

Hypertension, 11(1 Pt 2), ▮▮▮▮.[32] Even after the administration of the drug, Mr.

Yaroshenko's blood pressure remains high: the last time his pressure was checked, it read

147/97.[33] With his conditions, Mr. Yaroshenko is at a high risk of an escalating deadly disease.

---

[31] Carvedilol is used to treat high blood pressure and heart failure.

[32] Available at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (last accessed December 18, 2020).

[33] A normal blood pressure level is less than 120/80 mmHg. *See* Centers for Disease Control, *High Blood Pressure Symptoms and Causes*, available at https://www.cdc.gov/bloodpressure/about.htm#:~:text=%2F80%20mmHg.%E2%80%9D-,What%20are%20normal%20blood%20pressure%20numbers%3F,pressure%20in%20a%20healthy%20range (last visited December 18, 2020).

### (3) Mr. Yaroshenko's hyperlipidemia makes him more vulnerable to contracting the disease.

Mr. Yaroshenko also presents another COVID-19 comorbidity, hyperlipidemia. Hyperlipidemia is characterized by an increase in one or more of the plasma lipids (triglycerides (TG), total cholesterol (TC), cholesterol esters, phospholipids) or plasma lipoproteins (very low-density lipoprotein (VLDL), low-density lipoprotein (LDL)) along with reduced high-density lipoprotein levels (HDL). Garg, H., & Khanna, P. (2020). *COVID and cholesterol (C&C): Something to worry about or much ado about nothing?* Trends in Anaesthesia & Critical Care, Advance online publication.[34] Hyperlipidemia has been postulated as a possible exacerbating factor indicating poor outcomes during COVID-19. *Id.* Dyslipidemia is associated with severe COVID-19. *See* Choi, G.J., Kim, H.M., & Kang, H. (2020). *The Potential Role of Dyslipidemia in COVID-19 Severity: an Umbrella Review of Systematic Reviews*. Journal of Lipid and Atherosclerosis, 9(3), 435-448.[35]

According to the latest testing results in counsel's possession (dated 01/29/2020), Mr. Yaroshenko had the following cholesterol values:



     (a) Cholesterol

     (b) LDL Cholesterol

     (c) HDL Cholesterol

     (d) Triglycerides

When Mr. Yaroshenko was diagnosed with hyperlipidemia on 10/24/2011, he had the following cholesterol indicators:

---

[34] Available at https://doi.org/10.1016/j.tacc.2020.09.003 (last accessed December 18, 2020).
[35] Available at https://doi.org/10.12997/jla.2020.9.3.435 (last accessed December 18, 2020).
[36] *See* https://www.omnicalculator.com/health/cholesterol-units#:~:text=The%20rules%20for%20converting%20cholesterol,mmol%2FL%20multiply%20by%200.02586%20.



(a) Cholesterol ██████████████ [37]

(b) LDL Cholesterol ████████████████ [38]

(c) HDL Cholesterol ███████████████ [39]

(d) Triglycerides █████████████ [40]

Thus, Mr. Yaroshenko has a high level of total cholesterol and LDL, or "bad" cholesterol. Mr. Yaroshenko is receiving medication regarding his cholesterol levels, including ████████████, 5.5 mg daily, and ████████████, 20 mg daily. ████████████ is used to lower high levels of cholesterol in the blood, especially LDL. ████████████ is a cholesterol-lowering medication that lowers LDL, while raising HDL. It appears that even with medication Mr. Yaroshenko's recent cholesterol levels are higher than those observed at the time of his initial diagnosis.

The molecular mechanism as to why high cholesterol levels are conducive to COVID-19 infection has recently been studied. *See* Wang, H., Yuan Z., Arif Pavel, M., Hansen, S.B. (2020). *The role of high cholesterol in age-related COVID-19 lethality*. bioRxiv.[41] Researchers showed that loading cells with cholesterol from blood serum using the cholesterol transport protein

---

[37] Total cholesterol levels less than 200 milligrams per deciliter (mg/dL) are considered desirable for adults. A reading between 200 and 239 mg/dL is considered borderline high and a reading of 240 mg/dL and above is considered high. *See* Medical News Today, *What should my cholesterol level be at my age?*, available at https://www.medicalnewstoday.com/articles/315900 (last accessed December 18, 2020).

[38] LDL cholesterol levels should be less than 100 mg/dL. Levels of 100 to 129 mg/dL are acceptable for people with no health issues but may be of more concern for those with heart disease or heart disease risk factors. *See* Medical News Today, *supra*. A reading of 130 to 159 mg/dL is borderline high and 160 to 189 mg/dL is high. *Id.*

[39] A reading of less than 40 mg/dL is considered a major risk factor for heart disease. *See* Medical News Today, *supra*. A reading from 41 mg/dL to 59 mg/dL is considered borderline low. The optimal reading for HDL levels is of 60 mg/dL or higher. *Id.*

[40] Normal is less than 150 milligrams per deciliter (mg/dL), or less than 1.7 millimoles per liter (mmol/L). *See* Mayo Clinic, *Triglycerides: Why do they matter?*, Sept. 29, 2020, available at https://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/in-depth/triglycerides/art-20048186 (last accessed on December 18, 2020).

[41] Available at https://doi.org/10.1101/2020.05.09.086249 (last accessed December 18, 2020).

enhances the endocytic entry of SARS-CoV-2. *Id.* Super resolution imaging of the SARS-CoV-2

entry point with high cholesterol showed a 10% increase in the diameter of each entry point (to

100 nm) and almost twice the total number of viral entry points on a cell. *Id.*

Regarding COVID-19 treatment, research suggests that protease inhibitor-based

antiretroviral and immunosuppressive drugs that are used to treat COVID-19 may exacerbate

hyperlipidemia. *See* Choi, G.J., Kim, H.M., & Kang, H. (2020). *The Potential Role of*

*Dyslipidemia in COVID-19 Severity: an Umbrella Review of Systematic Reviews*. Journal of

Lipid and Atherosclerosis, 9(3), 435-448.

### (4) The arthritis medication Mr. Yaroshenko is taking suppresses his immune system and weakens the ability of his body to defend against the virus.

Mr. Yaroshenko experiences osteoarthritis and takes 800 mg of ███████ three times a

day and uses ██████████ . He also takes ██████ on a regular basis. Studies report that

broad immunosuppression could be harmful in COVID. Schett, G., Manger, B., Simon, D. et al.

*COVID-19 revisiting inflammatory pathways of arthritis*. Nat'l Rev. Rheumatology 16, 465-470

(2020).[42] ██████ dampens the body's natural immune defense. Graham, N.M., Burrell, C.J.,

Douglas, R.M., Debelle, P., & Davies, L. (1990). *Adverse effects of aspirin, acetaminophen, and*

*ibuprofen on immune function, viral shedding, and clinical status in rhinovirus-infected*

*volunteers*. The Journal of Infectious Diseases, 162(6), 1277-1282.[43]

### C. Courts have granted compassionate release under 18 U.S.C.A. § 3582(c)(1)(A) to defendants suffering from hypertension and hyperlipidemia.

Courts have granted motions requesting release due to the COVID-19 pandemic from the

sentences imposed as a result of the defendants' suffering from maladies that Mr. Yaroshenko

now experiences. In *United States v. Readus*, 2020 WL 2572280 (E.D. Mich. 2020), the court

---

[42] Available at https://doi.org/10.1038/s41584-020-0451-z (last accessed December 18, 2020).
[43] Available at https://doi.org/10.1093/infdis/162.6.1277 (last accessed December 18, 2020).

granted the defendant's motion under 18 U.S.C. § 3582(c)(1)(A)(i) for compassionate release from a mandatory five-year sentence for federal drug and firearms charges, finding that the defendant's preexisting hypertension qualified as extraordinary and compelling circumstance warranting release.[44] Though the defendant was only 33 years old and no inmates at the facility housing the defendant tested positive, the court found that these factors did not diminish the extraordinary and compelling reasons for release. The court concluded that the defendant's medical needs outweighed any additional benefits of spending another two years in prison, and accordingly reduced the sentence to time-served, with 48 months of supervised release.

In *United States v. Hill*, 2020 WL 2542725 (D. Conn. 2020), the court granted the defendant's motion for the reduction of the remaining term of imprisonment to time served, where the defendant's medical conditions of hypertension and being immunocompromised rendered him significantly more vulnerable than the average person to contract COVID-19 and to suffer the worst of its complications. The court also considered that the defendant had served nearly 80% of his prison sentence for unlawful possession of a firearm by a convicted felon. *Id.*

In *United States v. Connell*, 2020 WL 2315858 (N.D. Cal. 2020), the court ruled that extraordinary and compelling reasons warranted the release of a prisoner convicted for child pornography. Observing that the prison in which the prisoner was housed was among the worst COVID-19 hotspots in the nation, the court noted that the prisoner was 69 years old and suffered from hypertension, high cholesterol, and prediabetes, rendering him particularly vulnerable to COVID-19.

In *United States v. Lavy*, 2020 WL 3218110 (D. Kan. 2020), the court ordered the compassionate release of the defendant from a custodial sentence for bank robbery, as the defendant's age of 58 years, his hypertension, and his mental disorder made him uniquely

---

[44] The defendant in *Readus* also experienced prediabetes.

susceptible to serious illness or death if infected by COVID-19. The court specifically noted that CDC data showed that individuals between 50 and 64 years old were hospitalized at a rate of three times that of younger adults and that hypertension was a prevalent comorbidity in COVID-19 patients who suffered severe or fatal illnesses as a result of the virus. *Id.* The court also noted that the defendant had no prior criminal history and had served three and a half years of the four-year custodial sentence. *Id.*

In *United States v. Anderson*, 2020 WL 2521513 (C.D. Ill. 2020), the court found that the defendant, who suffered from hypertension and hyperlipidemia, was at a high risk of contracting a deadly illness based on the realities of B.O.P. facilities. The court ordered compassionate release from a 96-month-long sentence for a drug crime even though only four years elapsed from the time of sentencing.

### V.   Releasing Mr. Yaroshenko Is Appropriate Because It Would Comport with the § 3553(a) Sentencing Factors.

Under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate. Counsel submits that a sentence of 10 and a half years for a non-violent inchoate offense for a first-time offender is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a). Upon conviction, Mr. Yaroshenko faced a mandatory minimum sentence of 10 years, which he has already served. The architect of the offense, Chigbo Umeh, was sentenced to 30 years in jail. In contrast to Umeh, however, Mr. Yaroshenko was an actual member of the conspiracy for just 13 days before his arrest. The recorded conversations in this case demonstrate that covert operatives aggressively encouraged Mr. Yaroshenko to participate in the offense. Throughout his life, Mr. Yaroshenko has been a devoted son, father, and husband. The

ten-year prison term that he has already served has had a profound effect on his family. Mr.

Yaroshenko's mother passed away without being able to see her son come back home. *See*

Exhibit "D."

Mr. Yaroshenko does not pose a danger to the community. He is a nonviolent offender.

Aside from the underlying offense, he has no criminal history whatsoever. He has no

disciplinary violations in the ten years that he spent in custody.

Mr. Yaroshenko also has a viable release plan. He will return to his home country of

Russia to live with his wife Viktoria Yaroshenko and daughter Yekaterina in Rostov-on-Don.

*See* Exhibit "D." He will resume medical treatment in Russia. *Id.*

To mitigate the uncertainty involved in the deportation process and the risks of

contracting COVID-19 while awaiting deportation, this Court could issue a Judicial Order of

Removal against Mr. Yaroshenko pursuant to Section 238(c) of the Immigration and Nationality

Act of 1952, as amended, 8 U.S.C. § 1228(c).[45]

This release plan is safer for Mr. Yaroshenko – if he is released to travel back to his

country, he is less likely to contract COVID-19 than he would be in prison. This release plan is

also safer for the community. If Mr. Yaroshenko contracts COVID-19 in prison, not only will he

likely suffer from it, but he will also likely spread the disease to other inmates and staff

members, who will in turn further the spread in the community. Moreover, because he is high-

risk, in the event that he contracts the disease in prison, he will likely require intensive medical

treatment that could otherwise be used by someone else. All of this can be avoided if he is

released to go back to his home country now. Mr. Yaroshenko will be barred from ever re-

---

[45] While this Section authorizes removal orders at the time of sentencing, a sentencing reduction of the kind that Mr. Yaroshenko requests for all practical purposes entails a resentencing proceeding, which should give this Court authority to enter a removal order.

entering the United States. Because Mr. Yaroshenko will leave this country, he will not pose a threat to society in the U.S.

## CONCLUSION

For the reasons set forth above, counsel for Mr. Yaroshenko moves the Court to order his immediate compassionate release, which would allow him to depart the United States and return to Russia. Counsel also respectfully requests expedited consideration of this motion in light of the unique urgency of this situation.

Dated December 18, 2020.
Respectfully submitted,

/s/ Alexey V. Tarasov

Alexey V. Tarasov,
Attorney at Law

Counsel for Defendant

5211 Reading Road
Rosenberg, Texas 77471
Tel.: 832-623-6250
Fax: 832-558-3570
E-mail: alexey@tarasovlaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

United States,

     Plaintiff

vs.

Konstantin Yaroshenko,

     Defendant.

09-cr-00524

**CERTIFICATE OF SERVICE**

     I hereby certify that the attached pleading styled has been served via the ECF system on:

     Jacob Gutwillig, AUSA
     United States Attorney's Office, Southern
     District of New York
     1 Saint Andrew's Plaza, Room 844
     New York, NY 10007

     Dated December 18, 2020.
     Respectfully submitted,

     /s/ Alexey V. Tarasov

     Alexey V. Tarasov,
     Attorney at Law

     Counsel for Defendant

     5211 Reading Road
     Rosenberg, Texas 77471
     Tel.: 832-623-6250
     Fax: 832-558-3540
     E-mail: alexey@tarasovlaw.com