

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 29, 2020

**BY ECF AND EMAIL**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re: <u>United States v. Konstantin Yaroshenko</u>,
> S9 09 Cr. 524 (JSR)

Dear Judge Rakoff:

The Government respectfully submits this letter in opposition to defendant Konstantin Yaroshenko's ("Yaroshenko" or the "defendant") motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 175 ("Def. Mot.")). The defendant is an experienced international drug trafficker who participated in a conspiracy to help distribute thousands of kilograms of cocaine around the world, which involved paying over a million dollars in bribes to foreign officials in furtherance of the scheme and using diplomatic pouches to import hundreds of kilograms of cocaine into the United States from Africa. His network and expertise in transporting cocaine was sufficient to command $4.5 million dollars for his services. In April 2011, the defendant was convicted at trial of violating 21 U.S.C. § 963, and the Court subsequently sentenced him principally to 240 months' imprisonment. Although the Court noted that the 10-year mandatory minimum was grossly inadequate for purposes of the Parsimony Clause, the defendant now seeks to be released after completing 10 years and seven months of that sentence. The Court should deny the defendant's motion for two independent reasons. *First*, the defendant has not shown any extraordinary and compelling reason for a reduction in his sentence. *Second*, even if he had, the factors under Section 3553(a) continue to weigh strongly against a reduction in the defendant's sentence.

**I.      Background**

**A.  Offense Conduct**

Yaroshenko is a Russian citizen who participated in a conspiracy to transport thousands of kilograms of cocaine throughout South America, Africa, and Europe, with several hundred kilograms of those narcotics ultimately destined for the United States. (*See* Aug. 31, 2011 Presentence Investigation Report ("PSR") ¶¶ 13-16). Yaroshenko's role in this conspiracy was to use his aviation expertise to help transport these massive amounts of cocaine on private aircraft. As detailed below, Yaroshenko had deep experience piloting cocaine around the world, and he

brought that to bear on his participation in this conspiracy—agreeing to supply aircraft, pilots, and crew that were to be used to transport the cocaine shipments. (*See* PSR ¶ 20).

By his own admission, prior to his participation in the conspiracy of which he was convicted, Yaroshenko was well-versed in flying cocaine around the world. (*See, e.g.*, GX 300-T-16 at 14 ("I have five years working around Guinea."); GX 300-T-16 at 13-14 (Yaroshenko discussing various countries from which he could pick up cocaine and transport it to Africa)).[1] He made clear that he "know this job" and that he "know this country." (GX 300-T-29R2 at 8). Yaroshenko also talked about his prior involvement in "black flights," *i.e.*, flights that were not officially registered, of narcotics. (Trial Tr. at 349-50; GX 300-T-11-1 at 15-16; *see generally* Gov't Sent. Submission, ECF No. 105, at 10-13).

Yaroshenko's skill set, and his eagerness to use it, made him perfectly tailored to participate in the broader conspiracy. Beginning in or about the spring of 2009, Yaroshenko's co-defendant, Chigbo Peter Umeh, initiated a series of meetings with government officials in the Republic of Liberia. (*See* PSR ¶¶ 24, 25). During the meetings, Umeh and members of a Colombian drug trafficking organization agreed to pay over $1 million in bribes to Liberian officials to facilitate the movement and storage of several tons of cocaine. (*See* PSR ¶¶ 25-29). One of the officials the group sought to bribe was Fomba Sirleaf, the Director of Liberia's National Security Agency, who was also the Liberian president's son and assisting the DEA at the time. (*See* PSR ¶ 24; *see also* Gov't Sent. Submission at 3). In October 2009, Umeh met with, among others, a confidential source acting at the direction of the DEA and purporting to be named "Nabil Hage" ("CS-1"), Sirleaf's business manager. (*See* PSR ¶ 26; *see also* Gov't Sent. Submission at 3). During the meeting, as well as subsequent ones, Umeh discussed needing transportation assistance for 4,000 kilograms of cocaine. (*See* PSR ¶¶ 16(a), 26, 30, 31, 34).

In or about March 2010, in Kiev, Ukraine, Yaroshenko met with CS-1 and a second confidential source acting at the direction of the DEA purporting to be named "Paddy McKay" ("CS-2"). (*See* PSR ¶ 31; *see also* Gov't Sent. Submission at 3). During this meeting, and over the course of a series of communications and subsequent meetings in Monrovia, Liberia, that followed, Yaroshenko discussed with Umeh, CS-1, and CS-2 the specifics of the transaction, including that Umeh would pay Yaroshenko $4.5 million to transport several tons of cocaine from Venezuela to Liberia, and approximately $1.8 million to fly cocaine from Liberia to Nigeria and to Ghana—from where between 200 and 300 kilograms would be sent to the United States. (*See* PSR ¶¶ 31-36). For example, "in a recorded May 13, 2010 meeting attended by Umeh, Yaroshenko, and a DEA confidential source, Yaroshenko approved specific aspects of the distribution conspiracy and helped develop pretexts for a planned flight when he would be transporting cocaine in furtherance of the conspiracy." *United States v. Umeh*, 527 F. App'x 57, 60 (2d Cir. 2013). During the same meeting, Yaroshenko "reaffirmed his approval of the plan to use diplomatic pouches to transport the drugs [to the United States], observing, '[j]ust now I don't see zero problem.'" *Id.* Yaroshenko participated in "numerous conversations discussing the intent to export to the United States some of the drugs that he would fly into Ghana." *Id.* at 60-61.

---

[1] "Trial Tr." refers to the transcript of trial which began on April 4, 2011; "GX" refers to the Government's exhibits admitted at trial.

Once the terms were fixed, Yaroshenko registered planes in Liberia and provided the documentation to CS-1. (Gov't Sent. Submission at 3). On May 28, 2010, Liberian authorities arrested Yaroshenko. Less than two days later, DEA agents took custody of Yaroshenko—as well as Umeh, and others—and transported them to this District.

**B. Trial and Sentencing**

On July 1, 2010, a grand jury in this District returned superseding indictment S9 09 Cr. 524 (JSR) (the "Superseding Indictment"). The sole count of the Superseding Indictment ("Count One") charged Yaroshenko, Umeh, Nathaniel French, Kudufia Mawuko ("the defendants"), and others with conspiring to manufacture and distribute five kilograms and more of cocaine, with knowledge that some of the cocaine would later be imported into the United States, in violation of Title 21, United States Code, Sections 963, 959(a), and 960. On April 28, 2011, following an approximately two-week trial before this Court, a jury convicted Yaroshenko and Umeh of Count One (French and Mawuko were acquitted).

At sentencing, Yaroshenko faced a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 292 to 360 months' imprisonment, with a ten-year mandatory minimum term of imprisonment. (*See* PSR pg. 25; Sept. 7, 2011 Sentencing Transcript ("Sent. Tr.") at 17, attached as Exhibit A). This Guidelines range included a two-level enhancement, pursuant to U.S.S.G. § 3B1.3, for Yaroshenko's use of a special skill—that of a pilot—to further the offense. (*See* PSR ¶¶ 53-62). The Court found that Yaroshenko participated in a conspiracy to "distribute thousands of kilos of cocaine" and, after careful consideration of the Section 3553(a) factors, imposed a sentence of 240 months' imprisonment, which it considered "quite lenient under the circumstances." (Ex. A at 7, 17).

Yaroshenko appealed his conviction. On August 27, 2013, by summary order, the Second Circuit affirmed Yaroshenko's conviction. *Umeh*, 527 F. App'x at 64. Thereafter, Yaroshenko moved, pursuant to Federal Rule of Criminal Procedure 33, for dismissal of the indictment or a new trial. On May 21, 2015, this Court denied that motion. *United States v. Yaroshenko*, 86 F. Supp. 3d 289 (S.D.N.Y. 2015). On May 11, 2016, the Second Circuit affirmed the Court's order. *United States v. Umeh*, 646 F. App'x 96 (2d Cir. 2016). Yaroshenko subsequently made a motion for sentence reduction, pursuant to the First Step Act, which this Court also denied. (*See* ECF No. 160).

**C. Yaroshenko's Compassionate Release Motion**

On April 2, 2020, Yaroshenko filed a compassionate release request with the Warden of FCI Danbury, where he currently is in custody. On April 23, 2020, the Bureau of Prisons ("BOP") denied that request; a copy of Yaroshenko's request and the BOP's denial are attached as Exhibits B and C, respectively.[2] On December 21, 2020, Yaroshenko filed his compassionate release Motion with this Court.

---

[2] Yaroshenko argues in his motion that the Court should "waive the administrative exhaustion requirement applied to compassionate release motions" by not requiring him to appeal

The Motion argues that Yaroshenko should be released because his age (52) and underlying health conditions render him especially vulnerable to COVID-19. He states that he suffers from, among other ailments, hypertension and hyperlipidemia, and that he "has a history of other infectious and parasitic disease." (Def. Mot. at 1, Ex. C).[3] In his Motion, Yaroshenko does not specify a specific type of hypertension from which he suffers; rather, he references particular BOP medical records, certain of which describe the hypertension as "Essential (primary) hypertension."[4] Yaroshenko argues that, if he were to contract COVID-19, he would face a significant risk of severe illness or death. The Motion also asserts also that the Section 3553(a) factors also support his release. (*See* Def. Mot. at 1).

## II.   Applicable Law

### A. Section 3582

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling

---

administratively the BOP's determination. (*See* Def. Mot. at 5-7). In view of Yaroshenko's initial request and the BOP's denial, and without addressing further Yaroshenko's arguments about exhaustion, the Government does not dispute that the defendant has exhausted his administrative remedies with respect to the instant Motion.

[3] The Government obtained a copy of the defendant's medical records from BOP for the periods December 2018 to December 2019 and from December 2019 to December 2020, respectively, which are attached as Exhibits D and E, respectively. The Government respectfully requests that these records be filed under seal.

[4] The defendant cites a BOP medical report, dated December 16, 2019, indicating that Yaroshenko suffers from "Elev blood pressure reading w/o hypertension secondary to pain," for which the status is listed as "Resolved," and also appears to reflect that Yaroshenko denied a history of hypertension. (*See* Def. Mot. at 1, Ex. C at 12; *see also* Gov't Ex. D at 43, 60, 64; Ex. E at 54 (reflecting similar information)). Notwithstanding that record, various other of Yaroshenko's BOP medical records reflect an assessment that he has, and treatment for, "Essential (primary) hypertension." (*See, e.g.*, Ex. D at 43; Ex. E at 7, 12, 15, 16, 18, 21, 50).

> reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* A Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020). Although courts are not constrained by the relevant Sentencing Commission policy statement, it remains instructive. That statement provides that the BOP may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

While the Court is free to consider other circumstances as well, the Application Note describes some of the circumstances under which "extraordinary and compelling reasons" may exist:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at app. note 1(A).

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

As the movant, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive

access to proof on a given issue normally has the burden of proof as to that issue.").

Whether such "extraordinary and compelling reasons" exist, however, is only "[t]he threshold question." *United States v. Daugerdas*, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020) (Pauley, J.). "[T]his Court's analysis does not end with a finding that 'compelling and extraordinary reasons' warrant compassionate release. This Court must also 'consider[] the factors set forth in section 3553(a).'" *Id.* at *4.

Those § 3553(a) factors include, among others:

(1) the nature and circumstances of the offense and the history and
characteristics of the defendant; [and]
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the
    law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct; [and]
    (C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a).

### III. Discussion

#### A. Yaroshenko's Medical Condition Does Not Warrant Release

Yaroshenko has not cleared the threshold question under Section 3582 by establishing "extraordinary and compelling" reasons. In seeking his immediate release, the defendant argues that his age and underlying health conditions place him at high risk for complications from COVID-19 if he contracts the virus, and that the conditions of confinement make it impossible for the BOP to take adequate preventative measures to avoid that outcome. In addition to generalized arguments about the undoubtedly serious nature of the pandemic, Yaroshenko's argument focuses principally on the assertions that he lives in a "confined environment," making prophylactic measures, such as social distancing, impracticable, and that his health issues—most notably, hypertension, hyperlipidemia, and arthritis—render him particularly vulnerable to serious illness from COVID-19. (*See, e.g.*, Def. Mot. at 1, 12-13). None of these conditions, nor any other raised in the defendant's motion or reflected in his BOP medical records, is cited by the Centers for Disease Control and Prevention (the "CDC") as a risk factor that places an individual at risk of severe illness from COVID-19. (*See* Centers for Disease Control and Prevention, "People with Certain Medical Conditions," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 26, 2020)).

The defendant cites a number of health issues, including "hypertension, hyperlipidemia, osteoarthritis, hemorrhoids, varicocele, benign prostatic hyperplasia, chronic prostatitis, presbyopia, abrasion of teeth, disorder of pigmentation, muscle spasms with panic attacks, post-traumatic stress disorder, and diarrhea," as well as "a history of other infectious and parasitic disease." (Def. Mot. at 1, Ex. C). Of these, the defendant's Motion focuses on hypertension,

hyperlipidemia, and the side-effects of arthritis medication. (*See* Def. Mot. at 14-18). Taking each in turn:

- Essential hypertension, also called "primary" or "regular" hypertension—*i.e.*, the type of hypertension reflected by Yaroshenko's BOP medical records—is not a proven COVID-19 risk factor; only *pulmonary* hypertension is.[5] Neither the defendant's BOP medical records obtained by the Government, nor the records cited by the defendant's Motion, indicate that Yaroshenko suffers from pulmonary hypertension or any instances of hypertensive or respiratory distress; rather, the BOP medical records refer to Yaroshenko's hypertension as "Essential (primary) hypertension," (*see, supra* n.4). The BOP provides Yaroshenko with medical treatment for this condition. As noted in his BOP medical records (*see*, *e.g.*, Ex. E at 7), and by the defendant's Motion, he is prescribed 12.5 mgs of Carvedilol twice daily. The records' entries—and the defendant's Motion—demonstrate that BOP medical personnel are monitoring, and treating, his high blood pressure.

- Hyperlipidemia is not among the CDC's identified risk factors. *See*, *e.g.*, *United States v. Santiago*, No. 92 Cr. 563, 2020 WL 2475068, at *1 (E.D.N.Y. May 13, 2020) (finding no extraordinary and compelling circumstances in the case of a forty-eight year-old defendant who alleged that his obesity, myocardial disease, hyperlipidemia, cardiovascular disease, and history as a smoker placed him at a heightened risk of severe illness from COVID-19)). Similarly, as is the case with the defendant's essential hypertension, BOP medical records reflect that BOP medical staff ably is monitoring and treating the defendant's hyperlipidemia. (*See*, *e.g.*, Ex. E at 13 (noting that, for his "unspecified hyperlipidemia," the defendant is prescribed one 20 mg tablet of Atorvastatin at bedtime each day for "control of cholesterol); *see also* Def. Mot. at 16, noting that the defendant was diagnosed with hyperlipidemia in 2011 (which presumably has been treated by BOP since that time)).

- The defendant argues also that medication he takes to treat osteoarthritis—ibuprofen and aspirin, as well as diclofenac sodium—"suppress[] his immune system and weaken[] the ability of his body to defend against the virus." (Def. Mot. at 18). Nowhere does the CDC identify standard over-the-counter pain

---

[5] *See Slater*, No. 04 Cr. 48 (JSR), ECF No. 1251 at 4-5 ("[G]eneric hypertension is a common condition shared by more than 75 million Americans and can usually be effectively managed through monitoring and medication." (citing https://www.merckmanuals.com/professional/cardiovascular-disorders/hypertension)); *see also United States v. Sattar*, No. 02 Cr. 395 (JGK), ECF No. 1089 at 6 (S.D.N.Y. June 17, 2020) (denying compassionate release to a 60-year-old inmate on the grounds that, among other things, "at this point, the [CDC] guidance suggests that pulmonary hypertension, which [the inmate] does not claim to suffer from, is a genuine risk factor, and the guidance does not suggest that regular hypertension, which [the inmate] does claim to suffer from, is a risk factor");

> relief medication as a COVID-19 risk factor. In support of this argument, the defendant notes that "[s]tudies report that broad immunosuppression could be harmful in COVID." (*See id.*). This is, at best, a speculative argument, and the Government is aware of no case in which a defendant's taking aspirin, or its equivalent, qualified as an "extraordinary and compelling circumstance" warranting release.

- Finally, to the extent the defendant bases, at least in part, his argument regarding medical issues amounting to "extraordinary and compelling circumstances" against the backdrop of his age, at 52 years old, he still is well shy of 65, which is the age threshold above which accounts for approximately 80% of all deaths from COVID-19.[6] *See United States v. Haney*, 454 F. Supp. 3d 316, 323 (S.D.N.Y. 2020) (rejecting the proposition, in denying a compassionate release motion filed by a 61 year-old inmate, that age alone was a sufficient factor to grant compassionate release).

There is no reason to believe that BOP personnel cannot continue to monitor and treat these conditions, as they have done throughout the defendant's entire time in prison. *See, e.g.*, *United States v. Merlo*, No. 17 Cr. 738 (LAK), 2020 WL 3001039, at *2 (S.D.N.Y. June 4, 2020) ("Moreover, even assuming that defendant's motion correctly catalogued his ailments, he would not have met his burden of proving that they warrant his early release in light of the COVID-19 pandemic. Critically, defendant has adduced no evidence that these conditions cannot be managed in prison or that his health is unstable.").

      BOP has taken significant steps to mitigate the risks of COVID-19 to inmates and staff. BOP's success in limiting the spread of COVID-19 at most of its facilities is no doubt the result of the many preventative measures that the agency implemented months ago to mitigate risks to the health and safety of all inmates and staff. As the Court is no doubt aware from briefing in other cases, since the COVID-19 outbreak began, BOP quickly and aggressively implemented an Action Plan, which remains in effect.[7] In addition to his generalized claims about BOP's inability to control and mitigate the spread of COVID-19, the defendant also argues that FCI Danbury, specifically, is unable to take adequate preventative measures. The description of conditions within FCI Danbury comes not from a sworn affidavit submitted by Yaroshenko, but, rather, largely from a *pro se* motion for compassionate release submitted in April 2020 by another inmate

---

[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[7] Information about each Phase can be found at the following sites:
https://www.bop.gov/resources/news/20200313_covid- 19.jsp;
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf;
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp;
https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf;
https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf;
https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf
; https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.

at that facility. (*See* Def. Mot. at 13-14 (citing *United States v. Michael Tatro*, 07 Cr. 143 (DRI), ECF No. 66)). A brief order, dated May 14, 2020, granting Tatro's motion noted, among other things, that his preexisting medical conditions included diabetes, that he would not be a danger to the community upon release, and that the Section 3553(a) factors weighed in favor of release. (*Tatro*, 07 Cr. 143 (DRI), ECF. No. 68). Yaroshenko, unlike Tatro, does not provide an "extraordinary and compelling" medical reason supporting his release; and, as discussed below, the Section 3553(a) factors weigh strongly in favor of denying his request.

Yaroshenko's arguments regarding FCI Danbury also are outdated and belied by FCI Danbury's substantial efforts in controlling the spread of COVID-19, which this Court has recognized as effective. *See United States v. Gray*, No. 18-CR-179 (JSR), 2020 WL 4677508, at *1 (S.D.N.Y. Aug. 11, 2020) (noting that, despite the initial spread of COVID-19 at FCI Danbury, including the death of one inmate from the virus, "the authorities at Danbury have now taken corrective measures that have led to only one inmate being currently infected"). In addition to *Tatro*, Yaroshenko relies also on a plaintiffs' filing in *Martinez-Brooks v. D. Easter*, 3:20-cv-00569 (MPS), for various assertions, including that "[a]s of early December, there has been no facility-wide testing conducted since May …." (*See* Def. Mot. at 13-14 (*citing Martinez-Brooks v. D. Easter*, 3:20-cv-00569 (MPS), ECF No. 263 at 14)). Despite the defendant's assertions that FCI Danbury has failed to implement adequate safeguards for COVID-19, as part of the lawsuit he cites, *Martinez Brooks v. D. Easter*, the Government appended to its May 5, 2020 opposition motion a declaration of Diane Easter, the Warden of FCI Danbury, detailing FCI Danbury's multi-faceted response to COVID-19. *See Martinez-Brooks v. D. Easter*, 3:20-cv-00569 (MPS), ECF No. 24 Ex. A (detailing, among other things, FCI Danbury's implementation of BOP guidance relating to COVID-19 preventative and mitigation measures, including its testing efforts and protocols).[8] Indeed, as this Court noted in *Gray*, by August 2020, the number of COVID-19 infections among inmates and staff at FCI Danbury decreased significantly.

Yaroshenko's own BOP medical records also plainly contradict his argument about FCI Danbury's shortcomings in addressing the spread of COVID-19. Yaroshenko's BOP records note, among other things, that: as of December 2, 2020, "[i]nmate's entire housing unit COVID-19 tested," (*see* Ex. E at 1); the defendant appears to have been tested for COVID-19, described as "routine" testing, on at least three occasions, (*see id.* at 1, 10, 27); and, according to a note dated May 26, 2020, FCI Danbury "is doing mass testing for COVID-19," (*see id.* at 27). Moreover, medical records show not only that, as part of FCI Danbury's mass testing of inmates for COVID-19, Yaroshenko himself has received negative test results in or about December, September, and June 2020, respectively. (*See* Ex. E at 74, 81-82, 84-85). As of December 29, 2020, BOP data show that currently FCI Danbury has 29 active COVID-19 infections among inmates and one among staff, and that, to date, 172 inmates and 72 staff have recovered from COVID-19, and one

---

[8] The litigation in *Martinez-Brooks v. D. Easter* remains ongoing. On September 18, 2020, following a fairness hearing, the court approved a class settlement agreement. *See Martinez-Brooks v. D. Easter*, 3:20-cv-00569 (MPS), ECF Nos. 222-23. On October 19, 2020, on the parties' joint motion, the court entered an order of dismissal. *See id.* ECF No. 241. Thereafter, on December 17, 2020, plaintiffs moved to enforce the settlement agreement; the Government has not yet filed its response, due January 5, 2021. *See id.* ECF Nos. 296, 303.

inmate has died from COVID-19. (*Cf.* Def. Mot. at 2 (stating that "[a]s of the writing of this motion, there are at least ninety-five (95) confirmed cases of COVID-19 among the inmates at this facility.")). Several courts have recently denied motions for compassionate release for inmates who are housed at FCI Danbury. *See*, *e.g.*, *United States v. Petersen*, No. 3:16-CR-109 (SRU), 2020 WL 7129705, at *7 (D. Conn. Dec. 3, 2020); *United States v. Newton*, No. 3:18-CR-0022-8 (VLB), 2020 WL 6784267, at *6 (D. Conn. Nov. 18, 2020) ("Conditions at FCI Danbury appear well controlled."); *United States v. German*, No. 15-CR-3-02-PB, 2020 WL 5849530, at *3 (D.N.H. Oct. 1, 2020) ("The BOP has a mitigation plan in place that appears largely successful in controlling the spread of the virus at FCI Danbury, given that there are currently only two confirmed cases of active COVID-19 at the facility."); *United States v. Ellis*, No. 96-CR-100 (BMC), 2020 WL 5802312, at *2 (E.D.N.Y. Sept. 29, 2020) ("The record shows that FCI Danbury is strictly following all prevention protocols.") (appeal filed); *United States v. Kelley*, No. 2:18-CR-00200-6, 2020 WL 5665067, at *4 (S.D.W. Va. Sept. 22, 2020) ("Instead of alleging an inability of FCI Danbury to control the spread of COVID-19, Mr. Kelley has provided a detail that indicates that FCI Danbury is working hard to control the spread of COVID-19 within its walls."). Accordingly, the defendant fails to establish that FCI Danbury's efforts to contain and treat COVID-19 are insufficient so as to constitute "extraordinary and compelling reasons" supporting his release.

### B. The Motion Should Be Denied Based on the Section 3553(a) Factors

The Court should deny Yaroshenko's motion for the independent reason that compassionate release is not appropriate under 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A).

Yaroshenko was convicted of participating in a conspiracy that involved "a single criminal purpose—the distribution of huge quantities of cocaine throughout the globe." *Umeh*, 527 F. App'x at 62. Drawing on extensive experience providing transportation logistics for large-scale drug trafficking, he agreed to use his pilot skills in exchange for millions of dollars in order to further a criminal endeavor that contemplated a million-dollar bribe to foreign officials in Liberia, transportation of a multi-ton cocaine shipment, and abuse of the diplomatic-pouch process to import hundreds of kilograms into the United States.[9] Based on this conduct, the United States Probation Department recommended a sentence of 292 months' imprisonment. (*See* PSR at pg. 25). In imposing a below-Guidelines 240-month sentence, the Court accounted for countervailing arguments but reasoned:

> . . . [T]here just looms up like a mountain the enormity of the crime, and it cannot possibly be the case that the mandatory minimum would remotely send a message that is necessary to be sent for a crime of this colossal size. . . . There is Congress's wisdom in pointing the Court to the many factors that must be considered under the federal criminal code, and

---

[9] Despite the fact that Yaroshenko had, in his words, "zero problem" abusing diplomatic channels in this fashion, he now asserts that "[t]he Russian Embassy is now in ongoing contact with the U.S. State Department relative to the matter of Mr. Yaroshenko." (*See* Ex. B at 2). Any such contact has no bearing on Yaroshenko's request for compassionate release.

there is equal wisdom in saying that the Court should impose a sentence that is no greater than necessary to fulfill those factors. And I have, even before this lengthy proceeding today, spent a lot of time thinking about this sentence and the various factors that the Court must consider. And in the end, I'm going to impose a sentence that . . . the Court considers, quite frankly, quite lenient under the circumstances, and that is a sentence of 20 years.

(Sent. Tr. at 41).

In the approximately little over nine years since this Court sentenced the defendant to 20 years' imprisonment, the "colossal size" of his crime has not changed. (Sent. Tr. at 41). The seriousness of the defendant's crime makes clear his dangerousness to people all over the world. Yaroshenko "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (ECF No. 36, Tr. 22, 24). "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (ECF No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). The defendant's combination of eagerness to participate in the offense and his particular expertise in aviation made, and make, a potent combination of dangerousness. Further, as the Court recognized at sentencing, deterrence—specific, and, especially general—remain significant sentencing considerations in this case.

Yaroshenko's failure to accept responsibility and express remorse illustrate that he continues to pose a danger to the community and a risk of recidivism, and that at age 52 he is more than capable of returning to international drug trafficking if released. Throughout this case, including at sentencing and in a purported Rule 33 motion after his conviction was affirmed, Yaroshenko has asserted his innocence, mischaracterized his conduct, and made allegations of misconduct that this Court has found were, at best, unfounded. *E.g.*, *United States v. Yaroshenko*, No. 09 Cr. 524 (JSR), 2015 WL 3400805 (S.D.N.Y. May 21, 2015); *see also Umeh*, 646 F. App'x at 96.[10] Even now, the defendant argues that "[t]he recorded conversations in this case demonstrate that covert operatives aggressively encouraged [Yaroshenko] to participate in the offense." (Def. Mot. at 20-21). He is as wrong now as he was in prior applications. At sentencing, for example, in response to the defendant's "continued assertion of innocence," the Court noted

---

[10] Prior to trial, Yaroshenko alleged "extreme governmental misconduct," including, among other things, "torture, brutal and inhumane treatment of [Yaroshenko] during his detention at an unidentified location in Liberia by undisclosed individuals, one of whom was [a] DEA agent …" and "secret transfer" to the United States. (*See*, *e.g.*, Yaroshenko's Pretrial Motions, ECF No. 58 at 1-2). The Government refuted these claims with contemporaneous photographs of Yaroshenko showing no signs of abuse. (*See generally* Government's Opposition, ECF No. 63, at 16-27, Exs. A-C). At sentencing, the Court observed that the alleged beating was "so severe that it left no visible marks whatsoever" and left Yaroshenko in "such distress that no medical evidence was ever presented of the slightest kind to support his assertion." (Sent. Tr. at 15).

that "the evidence in this case was very strong, [and] much of it came from the defendant's own recorded statements." (Sent. Tr. at 38). In *United States v. Al Kassar*, the Court observed with respect to a 75-year-old defendant that there was a "reasonable possibility, quite plausible, that he would be sorely tempted, once he returned to Syria, to resume that trade and thus be a danger to the community, both to the United States and to the world." No. 07 Cr. 354 (JSR), Apr. 27, 2020 Tr. at 16-17 (S.D.N.Y. Apr. 27, 2020). Similar reasoning applies here with respect to the 52-year-old Yaroshenko. As detailed above and in the PSR, the defendant was an essential participant in an international drug-trafficking conspiracy, and the evidence showed that he agreed to help distribute *thousands* of kilograms of cocaine. The recordings established that although he was apprehended after his most recent drug transaction, it was not his first. His job was to pilot poison across the world, and he could easily resume that career if released at this juncture.

The defendant argues, based on his May 28, 2010 arrest and June 12, 2027 BOP-projected release date, that he has served approximately 62% of his sentence. (*See* Def. Mot. at 1). Whether one factors in "good time" credit prospectively, and marks the previously imposed 20-year term of imprisonment as ending in 2027, as opposed to 2030, the defendant has served approximately ten years and seven months in custody. As the Court made clear at sentencing, a ten-year sentence would be wholly inadequate to meet the purposes of sentencing, including specific and general deterrence. At the time of this writing, Yaroshenko has served approximately seven months more than that, and the same Section 3553(a) factors that justified his sentence weigh strongly against the defendant's requested release. Moreover, as Yaroshenko acknowledges (*see* Def. Mot. at 21-22), if his sentence were reduced to time served, he would be deported to Russia to resume his life there (instead of serving any term of supervised release), which would constitute a wholly unwarranted windfall in light of the nature of his criminal conduct.

The Court recently reached a similar conclusion in considering, and then reconsidering, Yaroshenko's co-defendant, Umeh's, motions for compassionate release. (*See* ECF Nos. 165, 171). This Court sentenced Umeh, who was recognized as a leader of the conspiracy, to 30 years' imprisonment, *i.e.*, a sentence 50% longer than Yaroshenko's and reflective of, among other things, Umeh's relatively larger role in the conspiracy and his previous narcotics conviction. In denying Umeh's initial motion for compassionate release and subsequent motion to reconsider, this Court noted that Umeh's conduct was "very serious" and that, even in the case of Umeh's 30-year sentence of imprisonment, "Umeh's full sentence is necessary to afford specific deterrence." (*See* Aug. 10, 2020 Order Denying Motion for Reconsideration, ECF No. 174 at 3-4). In addition to *Umeh*, this Court and countless others in this District have repeatedly declined to free dangerous inmates and those for whom the statutory purposes of sentencing still support the initial sentence. *See Al Kassar*, No. 07 Cr. 354 (JSR), Apr. 27, 2020 Tr. at 16-17 (S.D.N.Y. Apr. 27, 2020) ("So far as the Section 3553(a) factors, they almost all cut against him. There was more than an ample basis for the Court to impose a 30-year sentence simply as a matter of just punishment, let alone deterrence, and the like, and he has only served less than half of that."); *see also United States v. Slater*, No. 04 Cr. 48 (JSR), ECF No. 1251 at 6-7 (S.D.N.Y. June 30, 2020) ("[A] consideration of the relevant § 3553(a) factors weighs against such release. In particular, just punishment of Slater's underlying offense conduct—in which he led a conspiracy that took over an entire housing development and [run] it as an outpost for illegal drug distribution for almost ten years—would not be served by what would be essentially a 123-month reduction of his 336-month sentence."

Hon. Jed S. Rakoff  
December 29, 2020  
Page 13

(internal citation and quotation marks omitted)); *United States v. France*, No. 17 Cr. 724 (JSR), ECF No. 24 at 4 (S.D.N.Y. June 19, 2020) ("A further reduction in France's sentence, which was already below the applicable Guidelines range, would not reflect the seriousness of his crimes, provide just punishment, promote respect for the law, and afford specific and general deterrence."); *United States v. Pinto-Thomaz*, No. 18 Cr. 579 (JSR), ECF No. 189 at 2 (S.D.N.Y. Apr. 13, 2020) (denying release where "the sentence imposed by the Court was well below the Guidelines range and was, in the Court's view, the bare minimum necessary to satisfy the mandate of 18 U.S.C. § 3553(a)(1)"). The same logic applies to Yaroshenko's motion as it did to Umeh's and others', and the same result should follow.

### IV. Conclusion

The Court should deny the defendant's motion. The defendant has not identified an "extraordinary and compelling" reason that warrants his immediate release; moreover, even if he had, the Section 3553(a) factors continue to strongly support the 20-year sentence that was imposed.

Respectfully submitted,

AUDREY STRAUSS  
Acting United States Attorney for the  
Southern District of New York

By:    /s/  
Jacob H. Gutwillig  
Assistant United States Attorney  
(212) 637-2215

cc: Alexey Tarasov, Esq. (by ECF and Email)