UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States,<br>    Plaintiff<br>vs.<br>Konstantin Yaroshenko,<br>    Defendant. | 09-cr-00524<br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)** |

## Nature of the Offense

In its response in opposition to the instant motion, the prosecution emphasizes that Konstantin Yaroshenko committed a serious crime and that a sentence of ten years and seven months "would constitute a wholly unwarranted windfall in light of the nature of his criminal conduct." *See* Opposition at 12. Despite the Government's contentions, a brief summary of this case would indicate that Mr. Yaroshenko is only a first-time offender convicted of a non-violent inchoate offense.

In 2007-2009, the Drug Enforcement Administration conducted a sting operation to combat drug trafficking on the African continent. *See* Sentencing Memo, ECF No. 106 at 10. The investigation resulted in a string of cases against international drug traffickers in the Southern District of New York. Mr. Yaroshenko was not a target of this investigation at its inception. *Id.* He had never been arrested or charged with any crime prior to his indictment. *Id.* at 2. His initial contact with the DEA's confidential source had to do with the possible purchase of an abandoned Soviet-made turboprop Antonov aircraft stationed in Liberia. (Tr. 225)[1]. Hoping to get the ownership of that abandoned plane, Mr. Yaroshenko tried to impress his new acquaintance by exaggerating his abilities and status.

The reality was much different. Mr. Yaroshenko never had any problems with the law in any jurisdiction. The letters sent to the Court prior to sentencing describe Mr. Yaroshenko's

---

[1] Reference to trial transcripts.

- 1 -

stellar professional record in Russia, and his kind, gentle, and trusting personality[2]. His family has long been associated with a helicopter factory located in Rostov that operated during the Soviet years and continues to operate today. ECF No. 106 at 5. Almost every member of his family, including his father, mother, sister, and nephew, has worked there with pride. *Id.* In many ways, the plant defined who Mr. Yaroshenko is. *Id.* Mr. Yaroshenko worked there for ten years prior to coming to work in Africa. *Id.* Many plant workers submitted letters to the Court for the sentencing hearing describing the defendant's good character and his good reputation in the community.

Following the collapse of the Soviet Union, the helicopter factory fell on hard times, as did Mr. Yaroshenko. *Id.* There was an abundance of workers with aviation training but little to no work because the state-sponsored economy had collapsed. *Id.* at 6. Although there were many airplanes on the ground, few were flightworthy. *Id.* Russian aviation professionals trained to service Antonov airplanes struggled financially and searched for employment in developing countries, which still used these planes. *Id.* Eventually, the Rostov factory owners sold their one remaining serviceable airplane to a private company operating in Africa and provided its Russian employees to service the plane. *Id.* In 1999, that plane, An-32, was flown to Luandu, Angola. *Id.* That was Mr. Yaroshenko's first introduction to Africa. *Id.* Mr. Yaroshenko flew as a second-in-command pilot, the equivalent of a first officer on U.S. flights. *Id.* He was responsible for maintaining transportation logs and completed other tasks related to aircraft operation. *Id.* Later Mr. Yaroshenko was given the opportunity to work for an aviation company named "GR-Avia" in the city of Conakry, Guinea. *Id.* at 7. He oversaw the operations of a 48-passenger turboprop

---

[2] At the sentencing hearing, this Court determined that a sentence 52 months below the low end of the applicable guideline range was appropriate, acknowledging that "there is part of this defendant's character that is sufficiently positive that it has led many people, as shown by their letters to the Court, to respect him; in the case of his family, to love him; in the case of the government, various government officials of the government of Russia to want to present the Court with their positive view. And I take that as an important factor." ECF No. 159 at 40.

plane An-24 and managed the flight crew. *Id.* He rotated his schedule between working in Africa and spending time with his family in Russia. *Id.*

The Yaroshenkos have always been a very close family. *Id.* at 4. This is due, at least in part, to the relatively humble financial means at their disposal, as well as the close quarters in which they lived. *Id.* Living together in a small apartment in Rostov-on-Don were several extended family members. *Id.* This apartment[3] was allocated to the Yaroshenko family in 1968 when Mr. Yaroshenko was born. Mr. Yaroshenko was the sole provider for his wife, daughter, and an elderly mother. *Id.*

In 2009, Mr. Yaroshenko learned of an Antonov plane abandoned in Africa from a local airman James Scott and decided to buy it and set up his own company. (227). Unbeknownst to Mr. Yaroshenko, the airplane was the property of the DEA obtained in prior sting operations. (226). The aircraft was registered to a company owned by the DEA's confidential source Paddy McKay ("Paddy"). *Id.* James Scott was Paddy's friend and business partner. Mr. Scott gave Mr. Yaroshenko's phone number to Paddy, and in June 2009 Paddy contacted Mr. Yaroshenko as a potential purchaser of this airplane. *Id.* In early 2010, Paddy introduced the defendant to another confidential source Spyros Enotiades ("Nabil"). (228). Paddy and Nabil kept contacting Mr. Yaroshenko for many months and even came to Ukraine to meet him in person. *Id.* Eventually, Mr. Yaroshenko traveled to Liberia to inspect the airplane. (861). In Liberia, according to the DEA's plan, Nabil arranged two brief meetings between Mr. Yaroshenko and the future codefendant Chigbo Umeh to discuss the prospect of transporting "diplomatic mail" from South America to Liberia. (885); *see also* Gov't Tr. Exhibit "300T-34" at 11 and 24.

---

[3] In 2010 the family sold this apartment, which was their only family asset, in order to pay legal fees to trial counsel.

On May 11, 2010, Mr. Yaroshenko arrived in Liberia. (857). As he stepped on the ground, Nabil met him and introduced two men Alex and Joe as his "bodyguards," who were present with him 24 hours a day and kept him in sight at all times. (858-860). Unknown to Mr. Yaroshenko, the bodyguards were members of the Liberian National Security Agency. *Id.* Under this close surveillance, Mr. Yaroshenko was restricted in his ability to move about the city. (861). The "bodyguards" followed him everywhere and thwarted his attempts to purchase tickets to fly out of Liberia. (879).

On May 13, 2010, Nabil introduced Mr. Yaroshenko to Chigbo Umeh, the only convicted coconspirator, to discuss the prices for air transportation of special cargo from South America to Liberia. Gov't Tr. Exhibit "300-T-29R2" at 14. On May 15, 2010, Nabil arranged their second meeting. Gov't Tr. Exhibit "300T-34" at 11-12. These two meetings lasted approximately one hour each. Nabil served as an intermediary for most of the conversations, relaying answers to and from Umeh and Mr. Yaroshenko. (881). Mr. Yaroshenko's English was extremely poor. (443, 1382). On May 18, 2010, Mr. Yaroshenko looked at the airplane in Monrovia, which was supposed to be used in the transportation scheme as per the DEA's plan. (861). Mr. Yaroshenko told Nabil how bad the plane's condition was and that it was in need of at least $900,000 worth of repairs and several months of reconstruction work before it could fly. *Id.* The airplane also had to go through a lengthy re-registration process, pass various inspections, receive licenses from aviation authorities and the Antonov aircraft construction bureau. (1096).

On May 28, 2010, Liberian law enforcement agents apprehended Mr. Yaroshenko at the direction of the DEA. ECF No. 106 at 1. On May 30, 2010, Mr. Yaroshenko was transported out of Liberia to the United States by the DEA on a privately chartered airplane. (920). The U.S. jurisdiction was based on the fact that the DEA's confidential source Nabil mentioned that he intended to send his own share of "the cargo" to Ghana in diplomatic bags so that it could be

transferred onto "a Delta flight." Over the course of the sting operation lasting from June 2009 to May 2010, the DEA's informants made three split-second passing references to "America," "Delta," and "New York," in separate communications. Gov't Tr. Exhibits "300T-16" at 33, "300-T-29R2" at 3, "300T-18" at 9. These words were tactically buried in the midst of lengthy monologues. The script was the product of the DEA's plan to establish SDNY jurisdiction. Yaroshenko had never set foot in America before his arrest. The 20-year sentence imposed in this case was based on the amount of the drugs that were to be transported.[4] In actuality, no drugs were present or transported anywhere. At bottom, Mr. Yaroshenko was not the driving force behind the offense. Instead, the more culpable codefendant Chigbo Umeh attempted to hire Mr. Yaroshenko to perform a limited function for his organization. Umeh acknowledged distributing narcotics around the world for most of his life. Unlike Mr. Yaroshenko, Umeh spent nearly ten years in B.O.P. custody prior to committing the instant offense. In all, while Mr. Yaroshenko's offense is significant, this was only his first conviction – a conviction for a conspiracy, whose object was never fulfilled. Further, the Court's denial of Umeh's release motion should not preclude due consideration of the merits of Mr. Yaroshenko's request.

## Risk to the Community

On page 11 of its opposition, the prosecution states that Mr. Yaroshenko is capable of returning to international drug trafficking if released. This is not the case. Aside from the sting operation that gave rise to the offense at issue, there is simply no evidence to support the Government's claim that Mr. Yaroshenko engaged in illicit drug trafficking activities before.[5] While confined, Mr. Yaroshenko has been a model inmate. The heavy toll that the lengthy period of incarceration has inflicted on Mr. Yaroshenko and his family, including the death of

---

[4] The amount to be transported from Africa to the United States was about 200 kilograms. (111).
[5] While the Government references an exhibit where Mr. Yaroshenko apparently says, "I have five years working around Guinea," there is no mention of any drugs and there is nothing inherently unlawful about working in Guinea.

his mother, is more than enough for the defendant to commit himself to a law-abiding future. Mr. Yaroshenko's wife wrote a letter to this Court expressing profound remorse and apologizing to the American people. Def. Exhibit "D." At the age of 52 and in poor health, Mr. Yaroshenko is in no condition to work as a pilot. He simply wishes to live a quiet life.

In addressing a defendant's potential danger to the community, courts have found that granting the release of a criminal defendant in certain circumstances better ensures public safety by decreasing the prison population. In a recent decision, a district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis." *See, e.g., United States v. Davis*, No. 20-cr-9, ECF No. 21 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary.").[6] Altogether, Mr. Yaroshenko does not pose a danger to the community.

## **Extraordinary and Compelling Reasons for Compassionate Release**

The opposition claims, on page 6, that Mr. Yaroshenko has not shown the existence of any extraordinary and compelling circumstances warranting relief. However, Mr. Yaroshenko did present medical records that reference hypertension, hyperlipidemia, and arthritis. The

---

[6] *See also United States v. Mclean*, No. 19-cr-380, ECF No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 16-cr-76, ECF No. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the COVID-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in a gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

updated medical records going up to December 2020 that the Government has filed with the Court confirm those conditions. Confronted with the increasingly dangerous spread of the virus in prisons across the country, many courts have recognized that COVID-19 is, for those at high risk, an extraordinary and compelling reason justifying compassionate release. As pointed out in the original submission, hypertension is the most widespread preexisting condition among those hospitalized for COVID-19, present in between 30% to 50% of the patients.[7] The Government's contention that the CDC has identified pulmonary hypertension and not essential hypertension as a COVID-19 risk factor is at odds with a recent CDC posting:

> **COVID-19 is a new disease. Currently there are limited data and information about the impact of many underlying medical conditions on the risk for severe illness from COVID-19. Based on what we know at this time, adults of any age with the following conditions might be at an increased risk for severe illness from the virus that causes COVID-19:**
>
> ….
> - **Hypertension or high blood pressure**
>
> ….
>
> **Centers for Disease Control, *Coronavirus Disease 2019: Groups at Higher Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 4, 2021).**

As for Mr. Yaroshenko's hyperlipidemia, higher values of total, LDL, and HDL cholesterol were associated with severe COVID-19.[8] Coupled with Mr. Yaroshenko's experiencing two major COVID-19 comorbidities of hypertension and hyperlipidemia, the defendant's immunosuppressing arthritis medication puts him at much greater risk than the average person if exposed to the virus. Importantly, Mr. Yaroshenko was proscribed Carvedilol to treat hypertension, with an initial dose of 3.1 mg. *See* Gov't Exhibit "E" at 16.

---

[7] WebMD, *Coronavirus and High Blood Pressure: What's the Link?*, available at https://www.webmd.com/lung/coronavirus-high-blood-pressure#1 (accessed on January 4, 2021).

[8] *See* Choi, G.J., Kim, H.M., & Kang, H. (2020). *The Potential Role of Dyslipidemia in COVID-19 Severity: an Umbrella Review of Systematic Reviews*. Journal of Lipid and Atherosclerosis, 9(3), 435-448, available at https://doi.org/10.12997/jla.2020.9.3.435 (accessed January 4, 2021).

Dosages subsequently increase to 6.2 mg, *id.*, and then to 12.5 mg. *Id.* at 7. Despite the four-fold increase in the amount of medication, his blood pressure remains high.[9] While he has so far tested negative for COVID, he experienced other infectious and parasitic diseases. *Id.* at 1.

Although FCI Danbury may have had only 28 ongoing COVID-19 cases according to B.O.P.'s statistics as of 12/31/2020,[10] there have been at least ninety-five (95) cases of the virus there when the defendant's motion was filed. This Court should not have to wait until the coronavirus actually infects Mr. Yaroshenko. By then, it may be too late for the defendant.

### The Measures Taken by the Bureau of Prisons Are Inadequate

FCI Danbury experienced problems in dealing with COVID-19. There are a number of court decisions from the Southern District of New York granting compassionate release from FCI Danbury due to COVID-19.[11] The opposition discusses the measures taken by the Bureau of Prisons and FCI Danbury to deal with the virus. However, despite the best efforts of the

---

[9] When measured on 11/03/2020, it was 138/93. *See* Gov't Exhibit "E" at 3. This is on the verge of stage 1 hypertension, whose manifestation includes systolic pressure of 140-159 and diastolic pressure of 90-99. According to Mayo Clinic, people with untreated high blood pressure are more at risk of complications from COVID-19 that those whose high blood pressure is under control and managed by medication. Mayo Clinic, *COVID-19 and high blood pressure: Am I at risk?* (July 20, 2020), available at https://newsnetwork.mayoclinic.org/discussion/covid-19-and-high-blood-pressure-am-i-at-risk/ (accessed January 4, 2021).

[10] *See* Fed. Bur. of Prisons, Open COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.

[11] *United States v. Davies* and *United States v. Brown*, No. 18-cr-390 (S.D.N.Y. June 26, 2020) (Davies and Brown were involved in a large-scale drug trafficking conspiracy between 2012 and 2018, selling heroin, mixed with fentanyl, as a street-level dealers. Davies, who served 49% of his 51-month-long sentence, argued that he is especially vulnerable to the most serious effects of COVID-19 because he is 60 years old and suffers from <u>high blood pressure</u> and obesity.); *United States v. Lucre*, No. 18-cr-420 (S.D.N.Y. June 15, 2020) (Lucre, who has persistent asthma, served about 40% of a 60-month term in FCI Danbury on a drug conviction.); *United States v. Joseph*, No. 18-cr-179 (S.D.N.Y. June 29, 2020) (This Court sentenced Joseph to 42 months; he served 29 months and was release because of compromised lung function.); *United States v. Phillips*, No. 94-cr-631 (S.D.N.Y. June 30, 2020) (The court modified the remainder of Phillips' twenty-eight-year term of imprisonment to home confinement. "Phillips [who was arrested in 1995] … <u>suffers from hypertension, a condition the Centers for Disease Control and Prevention has recently designated as one that may lead to 'an increased risk for severe illness from COVID-19.</u>'"); *United States v. Jones*, No. 15-cr-95 (S.D.N.Y. May. 24, 2020) (Jones served about 66% of his 78-month sentence for a racketeering conspiracy and was released because he suffered from sickle cell disease).

B.O.P., a second outbreak of COVID-19 did take place at FCI Danbury during the month of December 2020. FCI Danbury's inability to properly deal with the pandemic has become the subject of a federal lawsuit, *Martinez-Brooks v. D. Easter*, 20-cv-569 (D. Conn.), which is a class action that demands the release of all individuals in the medically vulnerable subclass. The following is summary of prison conditions at FCI Danbury taken from a sworn affidavit of class counsel in *Martinez-Brooks*, ECF No. 296, filed with the federal court in Connecticut on December 17, 2020 in connection with a Motion to Enforce a settlement agreement reached in that matter. Individuals imprisoned at Danbury received positive test results for COVID-19 on December 2, and two weeks later the B.O.P. website reflected 97 active cases among prisoners at the facility. *Id.* at 3. Before this most recent outbreak, reports from individuals at the men's facility reflected that temperature checks were not occurring consistently, and that symptom screening was not occurring at all. *Id.* at 3. On December 2, two men from the FCI tested positive for COVID-19. *Id.* One man was in C-unit and one was in J-unit. *Id.* at 4. The rest of C-unit and J-unit were tested the same day. *Id.* The man from C-unit had worked in the kitchen and shortly before had been housed in a different unit. *Id.* Other men in the units with the positive cases reported to medical that they had symptoms of COVID, including loss of taste/smell, coughing, and nausea. *Id.* These men were left on the unit and not immediately quarantined or tested. *Id.* One 70-year-old man experienced symptoms of the disease for days before he was tested. *Id.* He fainted while waiting for commissary on December 1, 2020 and was seen later that day by medical for complaints of a sore throat, cough, and difficulty breathing. *Id.* He was returned to his unit and wasn't tested until after another man in his unit tested positive. *Id.* He tested positive on December 6 and was moved to isolation. *Id.* As of December 17, 2020, there were over 50 positive cases in the men's facility among at least four different units. *Id.* On

December 22, 2020, the court in Connecticut ordered specific performance of the standards governing the B.O.P.'s home confinement process.[12] *Id.* at ECF No. 304.

The recent outbreak at FCI Danbury appears to correlate with the general COVID-19 situation in the geographical region where the facility sits. As of the date of the foregoing reply, Fairfield County, Connecticut has amassed 57,467 confirmed cases of the virus, with 1,740 deaths.[13] When this Motion was filed slightly less than two weeks ago, the county had 50,036 COVID-19 cases and 1,619 fatalities from the coronavirus. Fairfield County is Connecticut's COVID-19 epicenter in terms of the total case count and has the third highest seven-day average number of infections that now stands at 623.7, behind Hartford (639) and New Heaven (624.7).

## Conclusion

Mr. Yaroshenko is seeking compassionate release based on the fact that the COVID-19 spread in a prison setting makes him vulnerable to suffering undue complications were he to contract the coronavirus. The Court should conclude that a term of imprisonment of 10 years and seven months would be sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a). For all the reasons articulated in the defendants' original motion and this reply, Mr. Yaroshenko, respectfully requests this Court to order his release.

>Dated January 4, 2021.
>Respectfully submitted,
>/s/ Alexey V. Tarasov
>Alexey V. Tarasov,
>Attorney for Defendant
>5211 Reading Road
>Rosenberg, Texas 77471
>Tel.: 832-623-6250

---

[12] Previously, on December 11, the Connecticut court required the warden at FCI Danbury to release 17 of the inmates to home confinement. *Martinez-Brooks*, No. 20-cv-569, ECF No. 304 at 23. On May 12, 2020, the court granted a Temporary Restraining Order requiring the warden to release the medically vulnerable individuals. *See id.* at ECF No. 30.

[13] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (January 4, 2021), available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (accessed January 4, 2021).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States,<br>  Plaintiff<br>vs.<br>Mr. Yaroshenko,<br>  Defendant. | 09-cr-00524<br>**CERTIFICATE OF SERVICE** |

  I hereby certify that the attached pleading styled has been served via the ECF system on:

    Jacob Gutwillig, AUSA
    United States Attorney's Office, Southern District of New York
    1 Saint Andrew's Plaza, Room 844
    New York, NY 10007

    Dated January 4, 2021.
    Respectfully submitted,

    /s/ Alexey V. Tarasov
    Alexey V. Tarasov,
    Attorney for Defendant
    5211 Reading Road
    Rosenberg, Texas 77471
    Tel.: 832-623-6250
    Fax: 832-558-3540
    E-mail: alexey@tarasovlaw.com